109

1               IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3

UNITED STATES OF AMERICA,        )  Docket No. 17 CR 220-2
4                          )
                Plaintiff,  )
5                          )
        vs.              )
6                          )
CAMERON BATTISTE,            )  Chicago, Illinois
7                         )  February 12, 2019
                Defendant.  )  10:00 o'clock a.m.
8

                TRANSCRIPT OF PROCEEDINGS
9    BEFORE THE HONORABLE MATTHEW F. KENNELLY, AND A JURY
                   VOLUME 2-A
10

11  APPEARANCES:

12

For the Plaintiff:      UNITED STATES ATTORNEY'S OFFICE
13                     BY:  MR. ANKUR SRIVASTAVA
                         MR. SAURISH APPLEBY-BHATTACHARJEE
14                   219 S. Dearborn St., Suite 500
                   Chicago, Illinois  60604
15

16

For the Defendant:      LAW OFFICES OF JOSHUA B. ADAMS, PC
17                     BY:  MR. JOSHUA B. ADAMS
                   53 West Jackson Boulevard, Suite 1515
18                   Chicago, IL  60604
                   (312) 566-9173
19

20                   LAW OFFICE OF ALANA M. DeLEON
                   BY:  MS. ALANA MARIA DeLEON
21                   1016 West Jackson Boulevard
                   Chicago, IL  60607
22                   (312) 531-0888

23

Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                   Official Court Reporter
                   219 S. Dearborn Street, Suite 2102
25                   Chicago, Illinois  60604
                   (312) 435-5639

1   (The following proceedings were had in open court outside
2   the presence and hearing of the jury:)
3         THE COURT:  Okay.  We got one juror who had some
4   transportation problems.  They were supposedly going to arrive
5   at Union Station at 9:57.  So I assume they're on their way.
6   (Brief recess.)
7   (The following proceedings were had in open court outside
8   the presence and hearing of the jury:)
9         THE CLERK:  Case No. 17 CR 220, USA v. Battiste.
10        THE COURT:  Can I get the lawyers' names for the
11  record, please.
12        MR. SRIVASTAVA:  Good morning, your Honor.  Ankur
13  Srivastava and Saurish Appleby-Bhattacharjee for the United
14  States.
15        MR. ADAMS:  Good morning, your Honor.  Joshua Adams
16  and Alana DeLeon for Mr. Battiste, who is present at counsel's
17  table.
18        THE COURT:  So I reported to counsel that one of the
19  jurors had some transportation problems this morning.  He
20  isn't here yet.  So I think from what I recall, her car broke
21  down, had to take a train.  There was a delay, had to get a
22  ride to the train station, was supposedly going to get in
23  Union Station a little bit before 10:00 and hopefully going to
24  take a cab.  But, you know, that's 20 minutes ago, so I don't
25  know what the story is.  I just tried her phone and got

1    voicemail, so no luck there.

2          Is there anything we can do?  Anything we can do

3    while we are waiting?

4          MR. SRIVASTAVA:  Judge, yeah, while we are waiting,

5    there are a couple housekeeping matters we can address.  So

6    one of them was with respect to our --

7          THE COURT:  By the way, did your people get in?

8          MR. SRIVASTAVA:  Yes.  Everyone is here.  We are

9    ready to go.

10          MR. ADAMS:  He is on route from Milwaukee.  He should

11    be here by 11:00 or 12:00.

12          MR. SRIVASTAVA:  We have one witness who had

13    transportation issues.  The agent went to go pick her up, so

14    she should be here.

15          So, your Honor, with respect to our motions in

16    limine, what we had listed as motion in limine number 3 was a

17    motion to call witnesses out of order.  And I'm sorry, Judge.

18    This was docket --

19          THE COURT:  Oh, this was the thing about the agent?

20    Did I not rule on that?

21          MR. SRIVASTAVA:  No, there was a specific portion we

22    neglected to raise in court.  The motion generally was two

23    pronged.  It was, first of all, to have the witnesses testify

24    out of order so the government's DNA expert, then the

25    defendant, then the government's --

1        THE COURT:  Oh, that.  Okay.

2        MR. SRIVASTAVA:  -- and we proposed that because we

3   had logistical issues in terms of scheduling our witness for

4   this week's trial.  The defense objected to that, which we

5   understand, and they obviously don't have to take a position

6   on whether they are presenting a defense until we rest.  So

7   that motion was denied.

8        But the other prong of that motion, which we did not

9   address, was we generally understand that there is a motion to

10  exclude witnesses.  But what we had proposed was that the

11  experts be allowed to be in the courtroom to view the other

12  expert's testimony.

13       THE COURT:  Do you have an objection to that?

14       MR. ADAMS:  No objection.

15       THE COURT:  That's fine.

16       MR. SRIVASTAVA:  Okay.

17       THE COURT:  That's fine.  I'm sorry I didn't catch

18  that.  That's absolutely normal and standard.  That's granted.

19  Yeah.

20       MR. SRIVASTAVA:  And then secondly, your Honor, we

21  did file --

22       THE COURT:  You know, I'm just now seeing that here.

23  I just looked at the docket.  I had not seen it before.  So

24  let me just print it out and take a couple minutes to look at

25  it.  This is the motion to reconsider?

1          MR. SRIVASTAVA:  Yes.

2          MR. APPLEBY-BHATTACHARJEE:  And I have a printed copy

3    for the Court.

4          THE COURT:  Let me take a copy from you.  It's

5    easier.

6          MR. APPLEBY-BHATTACHARJEE:  Thank you, your Honor.

7          THE COURT:  Thanks.  Just have a seat, and I'll take

8    a few minutes to read it.  And then we can talk about it.

9      (Brief pause.)

10          THE COURT:  The juror is here.  So I'm just part way

11   through the motion to consider.  How quickly does it become a

12   live issue?

13          MR. APPLEBY-BHATTACHARJEE:  Just before the

14   government ends its case in chief.

15          THE COURT:  Fine.  We will deal with it --

16          MR. APPLEBY-BHATTACHARJEE:  If we can take it up over

17   the lunch hour.

18          THE COURT:  We can even deal with it at the -- if we

19   have a morning break, we'll deal with it at the morning break.

20          MR. APPLEBY-BHATTACHARJEE:  Thank you, your Honor.

21          MR. SRIVASTAVA:  Judge, maybe just one other

22   housekeeping matter with respect to the experts in case we get

23   to them before taking a break.  I didn't know if your Honor

24   had a courtroom policy --

25          THE COURT:  Thank you very much for asking.  People

1    usually don't ask.  I know what you are going to ask, but

2    finish the question anyway.

3        MR. SRIVASTAVA:  I had two questions, actually.  One

4    is, if we lay a proper foundation that referring to notes

5    would be helpful to the witness, if you have any problem with

6    the witness having their notes on the stand?

7        THE COURT:  Do you?

8        MR. ADAMS:  No objection.

9        THE COURT:  That's fine.

10       MR. SRIVASTAVA:  And the second one, Judge, is

11   whether your Honor has a preference as to whether we tender

12   the witness as an expert.

13       THE COURT:  That's what I thought you were going to

14   ask, and I appreciate you asking.  People don't usually do

15   that.  You may or may not know this.  One of the reasons we

16   took the word "expert" out of the pattern jury instructions is

17   so it doesn't sound like the Court is putting an imprimatur on

18   the person.

19       So when you get to the end of qualifying the expert,

20   what you should say is, "May I proceed?"  And I'll turn to you

21   at that point and ask you do you want to examine the witness

22   on her qualifications now, or do you want to hold it until

23   cross.  You will probably tell me the latter, and I'll just

24   say, "Go ahead."

25       MR. SRIVASTAVA:  Thank you, your Honor.

1    THE COURT:  Okay.  I really appreciate you asking.

2    MR. ADAMS:  One other issue relating to the expert.

3  There is a chart the government gave to us over the weekend,

4  and we're going to object to the inclusion of it.  We just

5  wanted to raise it with the --

6    THE COURT:  Is it something I can deal with now, or

7  do I need to hear testimony?

8    MR. ADAMS:  I think we should wait until --

9    THE COURT:  Okay.  Well, we'll wait.

10    MR. ADAMS:  I just wanted to front it with the Court.

11    THE COURT:  All right.  So are we good to go?

12    You can bring them out.

13    (The jury enters the courtroom.)

14    THE COURT:  All right.  Everybody can have a seat.

15  And we're ready to resume -- I can't remember your name --

16  Ms. Buitron's testimony.  I'm sorry if I mispronounced it.  Do

17  you understand you are still under oath?

18    THE WITNESS:  Yes, sir.

19    THE COURT:  Go ahead and have a seat.  Just, again,

20  you can pull the mic all the way towards you.

21    And I think we were ready for Mr. Adams at this

22  point.

23    MR. ADAMS:  It will be Ms. DeLeon.

24    THE COURT:  Sorry.  My mistake.

25    MR. ADAMS:  Sorry, your Honor.

1        THE COURT:  That's okay.  My mistake.

2                        - - -

3            BRIGITTE BALCER BUITRON, CROSS-EXAMINATION

4    BY MS. DeLEON:

5    Q.  Good morning.

6    A.  Good morning.

7    Q.  So when we wrapped up yesterday, we were talking about

8    your investigation into this case.  Did you at any point have

9    an occasion to review or learn anything about the lease

10   information for the apartment complex where you arrived to

11   arrest Iesha Stanciel?

12   A.  No.

13   Q.  Okay.  And when you testified yesterday, you had described

14   how Ms. Stanciel had walked out of a specific building; is

15   that right?

16   A.  Correct.

17   Q.  And you did not see Ms. Stanciel take the bag that she was

18   holding when she walked out of the apartment complex from

19   another person, correct?

20   A.  Correct.

21   Q.  And you did not see her hand it off to anybody at any

22   point, right?

23   A.  Correct.

24   Q.  You had described how when she got to the door to the

25   vehicle that she kept trying to open it.  Is it your

1   understanding that she was unable to because of your approach

2   or because she started moving away from the vehicle?

3   A.  Because the door was locked.

4   Q.  The door was locked?

5   A.  Yes.

6   Q.  And so how many times would you say she had attempted to

7   get -- to gain access inside the vehicle?

8   A.  Maybe four or five times.  She just pulled on the door

9   handle.

10  Q.  Okay.  And the door remained locked; is that right?

11  A.  Yes.

12  Q.  Okay.  You had described how Ms. Stanciel had a laundry

13  bag on her shoulder yesterday for us on direct testimony,

14  correct?

15  A.  Correct.

16  Q.  And that laundry bag you had occasion to look inside at a

17  later point?

18  A.  Yes, at a later point.

19  Q.  And who was it that picked the bag up from where

20  Ms. Stanciel had dropped it?

21  A.  My partner, Anthony Aguirre.

22  Q.  And were you present for when your partner picked that bag

23  up?

24  A.  Eventually, yes.

25  Q.  Okay.  And when he removed the items from within the bag,

Buitron - cross

1  were you present?

2  A.  No.

3  Q.  And so did you not -- you did not observe -- Agent

4  Aguirre, is it?

5  A.  Task force officer.

6  Q.  Task Force Officer Aguirre.

7       You did not observe Task Force Officer Aguirre take

8  the items actually, physically out of the bag; is that right?

9  A.  I did not.

10  Q.  Okay.  And so when was the first time that you saw the

11  items that were -- that came from the bag?

12  A.  Probably towards the very end of the whole incident.  I

13  can't exactly say when because I was still dealing with Iesha.

14  Q.  Sure.

15       So at what point did you see the items?

16  A.  I don't think I saw -- I had just seen the barrel of the

17  rifle when he first picked it up, but he didn't pull it out or

18  anything.  He just kind of glanced at it.  It was a barrel of

19  a rifle, and I don't think I saw the guns until later on,

20  until they were taken back to the office, I believe.

21  Q.  Okay.  So you did not see them at any point laid out --

22  A.  No.

23  Q.  -- then; is that correct?

24       Okay.  And do you know how -- if you know, do you

25  know how the items were in the bag?  Were the firearms wrapped

Buitron - cross

119

1   in anything?

2   A.  It appeared to be wrapped in a blanket.  I am not exactly

3   sure.  It appeared to be a blanket, and I just kind of glanced

4   at it.  I didn't get to inspect it or anything.

5   Q.  And at no time -- when you were dealing with Ms. Stanciel,

6   at no time did she say anything to the effect of the items

7   aren't mine or pointing to who they possibly belonged to; is

8   that right?

9   A.  She did not.

10  Q.  Okay.  And at no point did she say anything to the effect

11  of, he made me carry them, he made me do it, nothing?

12  A.  She did not.

13  Q.  Okay.  And you don't know -- Task Force Officer, you don't

14  know where that bag was packed, correct?

15  A.  I do not.

16  Q.  Or where -- when the items were placed into that bag?

17  A.  I do not.

18  Q.  Or placed into the sheet or -- I'm sorry.  I believe you

19  said it was a blanket.  You don't know when --

20  A.  I do not.

21  Q.  -- they were placed inside that blanket into the bag?

22  A.  Yes.

23  Q.  Okay.  You also testified yesterday that based on your

24  observations, you believed that certain motions Mr. Battiste

25  was making had a specific meaning, correct?

Buitron - cross

120

1  A.  Correct.

2  Q.  And that is your opinion, right?

3  A.  Yes.

4  Q.  That is not based on anything that you overheard

5  Mr. Battiste say, correct?

6  A.  Correct.

7  Q.  Or not based on any conversation that you had with

8  Mr. Battiste or any other party for that matter involved?

9  A.  Correct.

10  Q.  So when you had testified you believed that his gestures

11  were telling somebody to wait for him or wait a minute, that's

12  your opinion based on what you saw?

13  A.  Correct.

14  Q.  Okay.  And so you didn't know who he was gesturing to, if

15  anybody at all, at the time?

16  A.  Not initially.

17  Q.  Right.

18       And so you assumed that it was Ms. Stanciel because

19  she exited a shorter amount of time between Mr. Battiste

20  coming out and you first observing her, right?

21  A.  Correct.

22  Q.  So you were guessing that it must have been her?

23  A.  Correct.

24  Q.  But you have no idea if other persons were standing inside

25  that doorway?

Buitron - cross

121

1  A.  Correct.

2  Q.  Because they were out of your sight?

3  A.  Correct.

4  Q.  You also observed Mr. Battiste coming out of the building,

5  right, initially?  That's the first time you saw him?

6  A.  Correct.

7  Q.  And that was based on surveillance of the vehicle, right?

8  A.  Yes.

9  Q.  And that vehicle you learned was registered to whom?

10  A.  I am not exactly sure who it was registered to.

11  Q.  Okay.  Do you know -- so I guess when you had testified

12  yesterday, you were describing how you believed when he

13  stepped out of the apartment complex, he was looking around?

14  A.  Correct.

15  Q.  And you don't know who he was looking for?

16  A.  Correct.

17  Q.  Or what he was looking for?

18  A.  Correct.

19  Q.  If perhaps he had, for instance, called a ride share and

20  was looking for somebody's ride or his ride?

21           MR. APPLEBY-BHATTACHARJEE:  Objection.

22           THE COURT:  I'm sorry.  I didn't hear what you said.

23           MR. APPLEBY-BHATTACHARJEE:  Objection.

24           THE COURT:  Basis?

25           MR. APPLEBY-BHATTACHARJEE:  Speculation.

1    THE COURT:  You have made your point.  The objection
2  is sustained.
3    MS. DeLEON:  Thank you, Judge.
4  BY MS. DeLEON:
5  Q.  Lastly, we had talked about yesterday I believe at the
6  close of yesterday's testimony your concern for officer
7  safety.  Do you recall that?
8  A.  Yes.
9  Q.  Okay.  And we discussed officer safety and how -- and you
10  had stated that had you known that perhaps firearms would be
11  involved, you would have brought more agents; is that right?
12  A.  Correct.
13  Q.  Okay.  And so is it safe to say that when firearms are
14  involved, it changes your behavior as a task force officer?
15  A.  Yes.  It changes our tactics.
16  Q.  Okay.  So it changes your tactics, and it would change the
17  nature of your investigation were you to find firearms or
18  discover firearms in a place you didn't expect them?
19  A.  Correct.
20  Q.  Okay.  So when you're serving this arrest warrant on Iesha
21  Stanciel, then these firearms were found, that certainly
22  changed the nature of the encounter for you as a task force
23  officer, correct?
24  A.  Well, it was after the fact, once everything was settled
25  down, that we realized that there was guns in the bag.

Buitron - cross

123

1   Q.  Sure.

2        So -- but it's still an officer safety concern,

3   right, that firearms were found?

4   A.  Yes.

5   Q.  Okay.  And if it changed the nature of your encounter or

6   the way that you're perceiving this event for you and your --

7   the other officers and agents on the scene, it's your

8   understanding that you now have a firearms investigation;

9   isn't that correct?

10  A.  Yes.  After the fact, once everything was handled, now

11  there is that investigation.

12  Q.  Okay.  So you served the arrest warrant.  That arrest

13  warrant was executed, right?

14  A.  Correct.

15  Q.  Okay.  And Ms. Stanciel was placed in handcuffs?

16  A.  Correct.

17  Q.  And she was in custody.  She was secure, right?

18  A.  That whole process took about 25 minutes because there was

19  an issue with that, so it took some time.

20  Q.  Right.

21  A.  And then I actually had to deal with her because we ended

22  up having to call another caged vehicle to transport her

23  because after the arrest --

24  Q.  There was difficulty.

25  A.  Yes.

1  Q.  Right.  Understood.

2  A.  And I was a part of that.

3  Q.  Okay.  And but I guess my point is is that that -- serving

4  the arrest warrant was completed, and now firearms were

5  recovered.  So you're certainly, as a task force officer,

6  going to be now focusing, now that one point is finished, onto

7  the next, the fact that firearms are recovered?

8  A.  Correct.

9  Q.  Okay.  So in the course of your investigation related to

10  these firearms, did you ever have any occasion to or

11  discussion of even discovering where in the apartment complex

12  she came out of, where, in fact, she lived?

13  A.  I did not take part in the investigation when it pertained

14  towards the weapons.

15  Q.  Okay.

16        MS. DeLEON:  If you will just give me one second.

17        THE COURT:  Sure.

18     (Brief pause.)

19        MS. DeLEON:  Thank you for your time.

20        THE COURT:  Redirect?

21        MR. APPLEBY-BHATTACHARJEE:  Yes, your Honor.

22                              - - -

23        BRIGITTE BALCER BUITRON, REDIRECT EXAMINATION

24  BY MR. APPLEBY-BHATTACHARJEE:

25  Q.  Hello again, Officer Balcer.

1  A.  Good morning.

2  Q.  Were you the case agent for the investigation into

3  Ms. Stanciel?

4  A.  I was not.

5  Q.  On April 7, 2017, were you there to assist with the arrest

6  of Ms. Stanciel?

7  A.  Correct.

8  Q.  Is that the extent of your participation in this case?

9  A.  Correct.

10  Q.  You were asked on cross-examination about Ms. Stanciel

11  approaching a locked door of the car.  Do you recall that?

12  A.  Correct.

13  Q.  Do you know why the door was locked?

14  A.  I have no idea.

15  Q.  Do you know if the car was still engaged in reverse when

16  Stanciel approached it?

17  A.  Correct.  The vehicle was still moving as she was trying

18  to open the door.

19  Q.  And as the vehicle was still moving, she was unable to

20  enter the door?

21  A.  Correct.

22  Q.  Now, you were asked about your observations of the

23  defendant holding up a finger.  Do you recall that?

24  A.  Yes.

25  Q.  In the moments after you observed the defendant hold up

1  his finger facing the entryway, did you see anyone walk out of

2  the entryway in the immediate moments after?

3  A.  No.

4  Q.  After defendant pulled the car up near the entryway, how

5  many people walked out of the apartment building?

6  A.  One.

7  Q.  Who was that?

8  A.  Iesha Stanciel.

9  Q.  Do you recall observing the defendant running away?

10  A.  Correct.

11        MS. DeLEON:  Objection, your Honor.  That's outside

12  the scope.

13        THE COURT:  Overruled.  The answer can stand.

14  BY MR. APPLEBY-BHATTACHARJEE:

15  Q.  Was the bag containing the firearms opened at the time the

16  defendant ran away?

17  A.  No.

18  Q.  Had the firearms been found by law enforcement before

19  defendant ran away?

20  A.  No.

21        MR. APPLEBY-BHATTACHARJEE:  No further questions.

22        THE COURT:  Anything else based on redirect?

23        MS. DeLEON:  No, your Honor.

24        THE COURT:  The witness is excused.  You can call the

25  next witness.

1          MR. SRIVASTAVA:  Your Honor, at this time, the

2    government calls Task Force Officer Anthony Aguirre.

3      (Witness sworn.)

4          THE COURT:  Go ahead.

5                        - - -

6          ANTHONY AGUIRRE, DIRECT EXAMINATION

7    BY MR. SRIVASTAVA:

8    Q.  Good morning, sir.  Can you please state and spell your

9    name for the record.

10   A.  Anthony Aguirre; A-n-t-h-o-n-y, Aguirre, A-g-u-i-r-r-e.

11   Q.  Can you tell us where you work, sir?

12   A.  I'm assigned to FBI as a task force officer.

13   Q.  And when you say you're assigned to FBI as a task force

14   officer, do you also work somewhere else?

15   A.  Yes.  Work for Cook County Sheriff's Police.

16   Q.  And you are currently detailed or working for the FBI?

17   A.  Yes.

18   Q.  Okay.  How long have you been a law enforcement officer?

19   A.  For a little over 23 years.

20   Q.  How long have you been a task force officer with the FBI?

21   A.  A little over three years.

22   Q.  Are you assigned to a particular unit within the FBI?

23   A.  Yes.

24   Q.  What unit is that?

25   A.  It's a South Area 1 violent crimes, South Area.

Aguirre - direct

128

1   Q.  Can you just briefly tell us what your responsibilities

2   are.

3   A.  RICO cases, kidnappings, bank robberies.

4   Q.  Sir, are you familiar with an individual by the name of

5   Iesha Stanciel?

6   A.  Yes.

7   Q.  Did you assist with executing a warrant for Iesha

8   Stanciel's arrest on the afternoon of April 7th, 2017?

9   A.  The attempt?

10  Q.  I'm sorry?

11  A.  Yes.

12  Q.  And in order to execute that warrant, did you go to an

13  apartment complex located at 10 South 481 Ivy Lane in

14  Willowbrook?

15  A.  Yes.

16  Q.  Who did you go there with?

17  A.  With Brigitte Buitron.  And eventually Michael Ericks

18  showed up.

19  Q.  And when you went to that location, were you there to

20  arrest anyone other than Ms. Stanciel?

21  A.  No.

22  Q.  When you arrived there, were you aware that the defendant,

23  Cameron Battiste, was at that location?

24  A.  No.

25  Q.  Did you know who Cameron Battiste was?

1    A.  No.

2    Q.  So what did you do when you arrived at the apartment

3    complex?

4    A.  We were given information of a vehicle and -- a vehicle

5    description and a plate number, and we were searching for

6    that.  Once we located that vehicle, we set up on surveillance

7    to watch that vehicle.

8    Q.  When you say you set up on surveillance, can you describe

9    what you mean by that?

10   A.  In a position where we can continue to watch the vehicle.

11   Q.  And can you describe where you were positioned in relation

12   to the front door of the apartment building?

13   A.  We initially were south of there, south of the front

14   doors.  The front door faces westbound.  And we were

15   initially -- correction -- we were initially west, and then we

16   relocated to a closer position, which was just south of there

17   for like -- just south of the doors.

18   Q.  And maybe this is an easier way to ask this.  If someone

19   were to walk out of the apartment building, would they turn

20   right or left to go towards your car?

21   A.  They would turn left.

22   Q.  And about how far down from the front door of the

23   apartment building were you?

24   A.  Ten feet.  It was two car spaces, approximately two car

25   spaces.

1    Q.  And were you on foot or in a vehicle?

2    A.  We were in a vehicle.

3    Q.  What kind of vehicle?  Marked or unmarked?

4    A.  Unmarked.

5    Q.  And were you and your partner in plain clothes?

6    A.  Yes.

7    Q.  Okay.  And you indicated you were conducting surveillance

8    on a particular vehicle; is that correct?

9    A.  Yes.

10   Q.  Were you looking also at anything else?

11   A.  At the doors.

12   Q.  The doors to the apartment building?

13   A.  Yes.

14   Q.  Okay.  And as you were looking at the door to the

15   apartment building and conducting surveillance on the vehicle,

16   did anything catch your attention?

17   A.  Yes.  Eventually Cameron exited the residence or the

18   building.

19   Q.  And when you say Cameron exited the building, at the time

20   you first saw this individual, did you know who he was?

21   A.  No.

22   Q.  Okay.  The person who exited the building, is that someone

23   you see here in court today?

24   A.  Yes.

25          MR. ADAMS:  Judge, we will stipulate the witness

1    identification.

2         THE COURT:  It's stipulated that he would identify

3    Mr. Battiste.

4         You can proceed.

5    BY MR. SRIVASTAVA:

6    Q.  Can you just tell -- describe for the ladies and gentlemen

7    of the jury what the defendant did when he exited the

8    building.

9    A.  He walked into the parking lot, and he began to look

10   around.  And as soon as he looked in our direction, I turned

11   to face Brigitte so we would no longer make eye contact.  So

12   after he started to look around, I don't know what he was

13   doing.

14   Q.  So you indicated that the defendant made -- looked at you

15   and your partner and your vehicle?

16   A.  Yes.  He was -- he began to look left and right in the

17   parking lot.  And as soon as he looked at us, I looked to my

18   left, so I would -- so he would no longer think that we're

19   paying attention to him.

20   Q.  Okay.  So did you see what the defendant did after he

21   looked at you and your partner?

22   A.  He eventually went to the vehicle that we were watching.

23   Q.  Did you see him walk towards the front door of the

24   apartment, or was your attention directed elsewhere?

25   A.  My attention was directed elsewhere.

1  Q.  After you saw the defendant go into the vehicle that you

2  had been conducting surveillance on, what, if anything, did

3  you see him do?

4  A.  He got into the driver's seat, and he reversed the vehicle

5  close to the doors above the yellow lines.  So it was not an

6  initial parking spot.  It's the closest position you can take

7  to the front door.

8  Q.  And once the defendant positioned that vehicle close to

9  the front door, what did you see?

10  A.  We seen a female who we thought would be Iesha Stanciel

11  standing by the front glass doors.  The doors to the building,

12  it's glass, so we threw our vests so we could be clearly

13  marked.

14  Q.  Okay.  And after you threw on your vest, what did you do?

15  A.  As soon as we seen Iesha exit the door, got a better look

16  to positively identify Iesha, we exited our vehicles.

17  Q.  Okay.  And just so I'm clear, before you went to that

18  apartment complex, did you receive any information on who you

19  were trying to arrest?

20  A.  Yes.  Iesha?

21  Q.  Yes.

22  A.  Yes.

23  Q.  Was part of that information a photograph of Ms. Stanciel?

24  A.  Yes.  We went to another location earlier in the day

25  looking to effect an arrest of Iesha.

1    Q.   Okay.  But I guess my question, sir, is, when you saw

2    Ms. Stanciel walk out of the apartment building, did you know

3    who that was?

4    A.   Yes.

5    Q.   And that was based on a photograph you had seen?

6    A.   Yes.

7    Q.   Okay.  So when you saw Ms. Stanciel walk out of the

8    apartment building, was she carrying anything?

9    A.   She was carrying a bag.

10   Q.   What kind of bag?

11   A.   At the time, it was just an over-the-shoulder big bag.

12   Q.   And where did she go?

13   A.   She went to the front passenger's side of that black

14   vehicle.

15   Q.   As she walked to the front passenger's side of the

16   vehicle -- and just to be clear, that's the vehicle that the

17   defendant had backed into near the front door?

18   A.   Yes.

19   Q.   Okay.  What did your partner, TFO Brigitte Balcer, do?

20   A.   She went around to the passenger's side and was yelling

21   commands to her.  I don't know exactly the words that she used

22   because my focus was on getting Battiste to put the vehicle

23   into park.

24   Q.   Okay.  So did you approach the defendant in the driver's

25   seat?

1  A.  Yes.

2  Q.  What, if anything, did you say or do?

3  A.  I was yelling commands, "Let me see your hands," and to

4  put the car in park.

5  Q.  Did you see -- did the defendant immediately comply?

6  A.  No.

7  Q.  Can you describe what happened next?

8  A.  I heard Iesha tapping on the window, saying, "Open the

9  door."  And the car was still in gear.  And as soon as he

10  pressed the unlock button, that's when I opened the door.

11  Q.  So you saw the defendant press the unlock button to the

12  vehicle?

13  A.  Yes.

14  Q.  And then you opened which door?

15  A.  I opened the driver's side door.

16  Q.  After you opened the driver's side door, that's near the

17  defendant?

18  A.  Yes.

19  Q.  What happened after that?

20  A.  I'm still yelling commands for him to put the car into

21  park because -- I mean, it's still in park.  I didn't want him

22  to injure Brigitte or Mike who was also now coming up to the

23  front of the car.

24  Q.  And as you were giving these commands, what, if anything,

25  did the defendant do?

1    A.  He eventually put it into park.  Once he put it into park,

2    I requested that he turn the vehicle off.  And as soon as he

3    turned the vehicle off -- or as soon as he put it into park,

4    he ran.

5    Q.  Did you chase him?

6    A.  Yes.

7    Q.  Did anyone else help you to chase him?

8    A.  Yes.

9    Q.  Who was that?

10   A.  Michael Ericks.

11   Q.  Did you eventually catch up to the defendant?

12   A.  Yes.

13   Q.  At that point did you place him in handcuffs?

14   A.  Yes.

15   Q.  After placing the defendant in handcuffs, did you go back

16   to assist your fellow task force officer who had been dealing

17   with Ms. Stanciel?

18   A.  Yes.

19   Q.  What, if anything, did you see or do when you went back to

20   that area?

21   A.  Stanciel continued to resist.  By then -- by the time I

22   came back, Brian Wentz, who was also an agent, he was also

23   assisting Brigitte.  So after I was able to confirm that they

24   were okay, I was going back and forth between Cameron, Mike at

25   the time had him, and Stanciel.

1    Q.  And as you and your fellow agents gained control of the

2    scene, at some point did you go to retrieve the bag that

3    Ms. Stanciel had been carrying out to the car?

4    A.  Yes.

5    Q.  Okay.  And can you describe what happened when you

6    approached the bag?

7    A.  Well, before that, I heard somebody.  I heard somebody

8    yell, "Don't get involved."  So I looked to my right.  I seen

9    the bag standing there.  I didn't want the bag to get moved,

10   so I went to go -- it's Iesha's property at that time.  So she

11   was placed into custody, and she was going to be arrested.  I

12   went to go retrieve that bag.

13   Q.  And when you went to go retrieve it, had the bag been

14   opened or was it still closed?

15   A.  It was still closed.

16   Q.  Okay.  And if we can publish, your Honor, Government's

17   Exhibit 10.

18          THE COURT:  Off the computer?

19          MR. SRIVASTAVA:  Off the computer, please.

20          THE COURT:  There you go.

21   BY MR. SRIVASTAVA:

22   Q.  Task Force Officer Aguirre, does that photograph depict

23   what the laundry bag looked like while it was still closed?

24   A.  Yes.

25   Q.  Okay.  And can you describe what those objects are that

1  are protruding from the top of the laundry bag towards the

2  right side of the screen?

3  A.  There is a blanket, like bedsheets, and then a plastic bag

4  protruding out of it.

5  Q.  So there is an object in a sheet and a black plastic bag

6  around that?

7  A.  Yes.

8  Q.  And all that is inside that laundry bag?

9  A.  Yes.

10  Q.  What part of this bag did you touch when you first tried

11  to pick it up?

12  A.  One hand I grabbed the black handle.  The other hand I

13  grabbed the bedsheet.

14  Q.  And what did you feel when you grabbed the bedsheet?

15  A.  When I grabbed the bedsheet, I felt the muzzle of the

16  rifle.

17  Q.  Were these -- after you felt what you said was a muzzle,

18  what did you believe, based on your training and experience,

19  was inside that bag?

20  A.  I knew it was a rifle at that time.

21  Q.  How did you know it was a rifle?

22  A.  I've been in law enforcement for 20-something years.  I've

23  seen multiple and I've held rifles.

24  Q.  Was the laundry bag ultimately opened and items removed?

25  A.  Yes.

Aguirre - direct

138

1    Q.  Okay.  Were there items of clothing inside that laundry
2    bag?
3    A.  Yes.
4    Q.  Okay.  And primarily what type of clothing?
5    A.  Men's clothing, but I didn't look to see what else was in
6    there.
7    Q.  Do you remember seeing a lot of children's clip-on ties
8    and things like that?
9            MR. ADAMS:  Objection, leading.
10           THE COURT:  Sustained.
11   BY MR. SRIVASTAVA:
12   Q.  Task Force Officer Aguirre, is your memory exhausted as to
13   what was inside the bag?
14   A.  I know what's in the bag now.  I didn't know at the time.
15   Sorry.
16   Q.  Okay.  So as you sit here today testifying, do you now
17   recall what was inside the laundry bag, including clothing?
18   A.  Yes.
19   Q.  Okay.  What type of clothing was inside the laundry bag?
20   A.  Collared shirts, like men -- a men's pink collared shirt,
21   smaller man's dress shirts, and clip-on ties and a hat.
22           MR. SRIVASTAVA:  If I may have just a moment, your
23   Honor.
24           THE COURT:  Sure.
25     (Brief pause.)

1      MR. SRIVASTAVA:  And, your Honor, what I'd like to do

2   is approach the witness with what was previously entered as

3   Government's Exhibit 14.

4   BY MR. SRIVASTAVA:

5   Q.  Task Force Officer Aguirre, I'm going to hand you a pair

6   of rubber gloves.  I will ask you to put those on.

7   A.  Can I stand?

8      MR. SRIVASTAVA:  Judge, the witness is inquiring if

9   he can stand.

10     THE COURT:  That's fine.  Yeah.  And you can just set

11  that over there somewhere.  Just put it up on this thing here

12  so it's out of the way.

13  BY MR. SRIVASTAVA:

14  Q.  And, sir, if you can try to show the ladies and gentlemen

15  of the jury what's inside the open plastic bag.

16  A.  The laundry bag.

17  Q.  What is that?

18  A.  This was the shoulder laundry bag.

19  Q.  And when did you first observe that?

20  A.  When Iesha walked out of the building.

21  Q.  Is that the same bag that contained the rifle that you

22  described being inside the sheet and black plastic bag?

23  A.  Yes.

24  Q.  Okay.  Now, are you familiar with what's inside this box?

25  A.  Yes.

1  Q.  What's inside this box?

2  A.  Men's clothing, men's ties.

3  Q.  Okay.  Generally speaking, is this the items of clothing

4  that were inside the bag?

5  A.  Yes.

6  Q.  Okay.  What I'd like you to do now is take those out one

7  by one and show the ladies and gentlemen of the jury what kind

8  of clothing was inside the laundry bag.

9          And as you're taking the items out, sir, if you could

10  just describe them.

11  A.  A pink collared dress shirt, size 17 and a half; white

12  collared shirt, size 20; pink tie.  And then these are smaller

13  shirts; size 16 collared shirt collared shirt, smaller

14  collared shirt, an XL shirt.

15  Q.  Is that a children's XL or men's XL?

16  A.  I couldn't tell you.

17  Q.  Would you be able to fit into that shirt, sir?

18  A.  I would, but I'm not a big guy.

19  Q.  Approximately how big are you?

20  A.  Approximately five-eight.

21          MR. ADAMS:  Objection, your Honor.

22          THE COURT:  Overruled.

23  BY MR. SRIVASTAVA:

24  Q.  If you can continue to show the ladies and gentlemen of

25  the jury the other items of clothing.

1  A.  Collared shirt.

2  Q.  About how big are those collard shirts?

3  A.  These are large shirts size 15, size 14/15.  Polo collared

4  shirt, size 14.  Eddie Bauer shirt, collared shirt, collared

5  shirt.

6  Q.  And that Eddie Bauer shirt, since you didn't give a size

7  to it, is that about the same size as the size 14 shirt --

8  A.  Yes.

9  Q.  -- that you just put down?

10  A.  Yes.

11       Hankies.  Another collared shirt, 15 and a half.  34,

12  35.  Small shirt, dress shirt.

13  Q.  About how big is the dress shirt?

14  A.  Medium fitted, Casual Corner, so female's.  Size 8, size

15  14.  And then a ton of ties.  Do you want me to pull these all

16  out?

17  Q.  If you can just describe for the ladies and gentlemen of

18  the jury, are those all large men ties, or are there also some

19  smaller ties?

20  A.  These are large men ties, and then these are smaller kids'

21  ties.  They're clip-ons.

22  Q.  For the record, you're holding up right now --

23  A.  These are clip-ons.

24  Q.  -- four clip-on ties?

25  A.  Yeah.  Do you want me to get them all out?  I mean,

1  there's --

2  Q.  About how many are in the box?

3  A.  I'd say a little bit more than 10, 10 to 15.

4  Q.  Okay.  You can begin to put those items of clothing back

5  in the box.  But just to be clear, are these items of clothing

6  all items of clothing that were recovered from the laundry

7  bag?

8  A.  Yes.

9  Q.  Having now gone through this clothing again, is it still

10  your testimony that it was men's clothing that was inside the

11  bag?

12  A.  Men's, boys', and it appears that's a female, so...

13  Q.  So a combination of different types of clothing?

14  A.  Yes.

15  Q.  Okay.  You can put these items of clothing back.

16         And if you could hand me the laundry bag that was

17  also part of Government's Exhibit 14.

18  A.  Do you want me to put it in the envelope?

19  Q.  Yeah, you can put it in the envelope.

20         So in addition to the clothing and the assault rifle

21  that you described feeling a portion of, what else was inside

22  that laundry bag?

23  A.  A 9-millimeter gun.

24         MR. SRIVASTAVA:  May I have just a moment, your

25  Honor?

1          THE COURT:  Sure.

2      (Brief pause.)

3   BY MR. SRIVASTAVA:

4   Q.  Sir, you described yourself as five-foot eight and how

5   large in terms of weight?

6   A.  170.

7   Q.  Okay.

8          MR. ADAMS:  Objection, relevance, Judge.

9          THE COURT:  Overruled.  I had previously overruled

10  the objection to that, and it just got garbled when he

11  answered it.  So...

12  BY MR. SRIVASTAVA:

13  Q.  Have you had an opportunity to interact with the defendant

14  going back to April 7, 2017, and also see him in court today?

15  A.  Yes.

16  Q.  How would you say his size compares to yours in terms --

17          THE COURT:  Why don't you just ask is he bigger or

18  smaller?

19  BY MR. SRIVASTAVA:

20  Q.  Is he bigger or smaller?

21  A.  He is bigger.

22          MR. SRIVASTAVA:  No further questions, your Honor.

23          THE COURT:  Mr. Adams.

24                      - - -

25              ANTHONY AGUIRRE, CROSS-EXAMINATION

1  BY MR. ADAMS:

2  Q.  Good morning.

3  A.  Good morning.

4  Q.  I'd like to talk to you first about a report you wrote

5  related to this -- to Ms. Stanciel's arrest.  And then we're

6  going to go over some other stuff about April 7th.  Is that

7  okay with you?

8  A.  Yes.

9  Q.  All right.  Now, you have been in law enforcement for over

10 20 years, correct?

11 A.  Yes.

12 Q.  And you're trained in writing reports?

13 A.  Yes.  I didn't --

14 Q.  How many reports have you written in your over two decades

15 of experience?  Hundreds?

16 A.  Over hundreds, yeah.

17 Q.  And the purpose of writing these reports is to memorialize

18 certain events, correct?

19 A.  Yes.

20 Q.  And you decide what to put in the reports?

21 A.  Yes.

22 Q.  And you decide what to leave out?

23 A.  Yes.

24 Q.  And you put in the important facts, the important things

25 you want to remember in these reports, right?

1  A.  Yes.

2  Q.  Part of that is in case you testify at a trial, you want

3  to remember what happened, correct?

4  A.  Yes.

5  Q.  Now, did you write a report in this case?

6  A.  I did not.

7  Q.  Did you write a report with Agent Ericks and Agent Balcer?

8  A.  Yes.

9  Q.  So you did?

10  A.  So I didn't type it, but I was on there to proofread it.

11  Q.  So you have read that report?

12  A.  Yes.

13  Q.  Did you notice anything incorrect or any errors in that

14  report?

15  A.  Not that I can recall.

16  Q.  Had you noticed anything incorrect or wrong, would you

17  have notified Agent Ericks?

18  A.  Yes.

19  Q.  Would you have written your own report?

20  A.  No.

21         MR. ADAMS:  Your Honor, may I approach?

22         THE COURT:  Sure.

23         THE WITNESS:  Sorry.  Just not following along here.

24  BY MR. ADAMS:

25  Q.  Agent, I just handed you what I marked for identification

1   as Battiste Exhibit A.  Do you recognize what that is?

2   A.  This is the report that Ericks wrote.

3   Q.  Have you read that report before?

4   A.  I have.

5   Q.  How many times have you read that report?

6   A.  Twice.

7   Q.  Twice.

8           And when is the most recent time you read that

9   report?

10  A.  A couple days ago.

11  Q.  And when you read it then, did you notice any errors or

12  omissions in that report?

13  A.  I did not.

14  Q.  Agent, I've also handed you a green highlighter.  Do you

15  have that in your hand?

16  A.  I do.

17  Q.  All right.  Now, I want to go back to what you told this

18  jury a few minutes ago.  You mentioned that when you went to

19  arrest Ms. Stanciel, you said that you saw her tapping on the

20  car window, correct?

21  A.  Yes.

22  Q.  And you also said that you heard her say, "open the door"?

23  A.  Yes.

24  Q.  Do you remember telling that to the jury?

25          I want you to take the green highlighter and please

1    highlight in your report where it says that.

2                    MR. SRIVASTAVA:  Objection.

3                    THE COURT:  Overruled.

4                    THE WITNESS:  I don't see it in the report.

5    BY MR. ADAMS:

6    Q.  All right.  You also told this jury earlier that you heard

7    someone say, "Don't get involved."  Do you remember saying

8    that?

9    A.  Yes.

10   Q.  And you told the jury that you heard that after Iesha was

11   arrested; is that correct?

12   A.  Yes.

13   Q.  Who said that?

14   A.  The only thing I can give you right now is a description

15   of her.  It was a female, black, in her mid 40s.

16   Q.  A female, black, in mid 40s.  And was she in the parking

17   lot?

18   A.  Yes.  She was between cars.

19   Q.  Did you interview her?

20   A.  I did.

21   Q.  You did?  Did you write a report about that?

22   A.  I did not.

23   Q.  Agent, I'd like for you to take that green highlighter

24   again and highlight in that report where it says that you

25   heard this woman say, "Don't get involved."

1    A.  It doesn't say that here.

2              MR. ADAMS:  Your Honor, may I approach again?

3              THE COURT:  That's fine.

4    BY MR. ADAMS:

5    Q.  Agent, you also told this jury that when you took this

6    bag, you were able to feel a muzzle.  Do you remember saying

7    that?

8    A.  Yes.

9    Q.  Is that because the sheet wrapped around this firearm was

10   wrapped very tightly, correct?

11   A.  It wasn't wrapped really tight, but just by the way I

12   grabbed it.

13   Q.  So tight enough you could make out the size and shape of a

14   muzzle, correct?

15   A.  I felt it.  Once I grabbed it, I felt it.  I knew it was a

16   muzzle.

17   Q.  And there was a bedsheet wrapped around that, correct?

18   A.  Yes.

19   Q.  So after you retrieved these firearms and you opened up

20   this bag with clothes in it, did you go into the apartment

21   complex?

22   A.  No.

23   Q.  Did you go into Ms. Stanciel's apartment unit?

24   A.  No.

25   Q.  Do you know which apartment unit Ms. Stanciel lived in?

1  A.  No.

2  Q.  Do you know how many people were in that unit?

3  A.  No.

4  Q.  How many people were in the apartment complex at the time

5  on April 7th when you arrested Ms. Stanciel?

6  A.  People?  I don't know how many people.  I just know how

7  many units there are.

8  Q.  How many units are there?

9  A.  32.

10  Q.  32 units?

11  A.  Yes.

12  Q.  And out of those 32, do you know which one Ms. Stanciel's

13  is?

14  A.  I do not.

15  Q.  Now, you told this jury earlier that this woman -- you

16  interviewed this woman, and you did not write a report.  How

17  many people did you interview on April 7th?

18  A.  She was the only one that I spoke to.

19  Q.  Did you get her name?

20  A.  At the time I did.

21  Q.  You don't have it anymore?

22  A.  I do not.

23  Q.  Now, Agent, when you approached Ms. Stanciel, you saw her

24  drop this bag, correct?

25  A.  I didn't see it drop.  I seen her walk out with the bag.

1  I didn't see it when it dropped.

2  Q.  And you didn't hear her say, "These aren't mine," correct?

3  A.  No, at that time, I did not.

4  Q.  She didn't say anything else about the firearms, did she?

5  A.  No.

6  Q.  In fact, she didn't say anything, did she?

7  A.  Not to me.

8         MR. ADAMS:  One moment, your Honor.

9         THE COURT:  Sure.

10    (Brief pause.)

11  BY MR. ADAMS:

12  Q.  Agent, you just took out a variety of different clothes

13  from that bag.  Do you remember doing that?

14  A.  Yes.

15  Q.  And they're all different sizes.  Do you remember that?

16  A.  Yes.

17  Q.  Size 14, 15, 16, 20, correct?

18  A.  Yes.

19  Q.  And there was also children's clothes?

20  A.  Yes.

21  Q.  And children's ties?

22  A.  Yes.

23  Q.  Who put the clothes in the bag?

24  A.  What do you mean who put the clothes -- I don't know --

25  Q.  How did the clothes get in that bag?

Aguirre - redirect

1    A.  I don't know.

2    Q.  Whose clothes were they?

3    A.  I don't know.

4    Q.  Did you test those clothes for DNA or fingerprints?

5    A.  No.

6    Q.  What happened to the bedsheet that was -- the firearm was

7    wrapped in?

8    A.  I don't know.

9              MR. ADAMS:  Nothing further, your Honor.

10             THE COURT:  Redirect.

11                            - - -

12             ANTHONY AGUIRRE, REDIRECT EXAMINATION

13   BY MR. SRIVASTAVA:

14   Q.  Task Force Officer Aguirre, when you arrived at the

15   apartment complex in Willowbrook, you were asked if you

16   searched Ms. Stanciel's apartment.  Do you recall that

17   question?

18   A.  Yes.

19   Q.  Did you have a warrant allowing you to do so?

20   A.  No.

21   Q.  Can you tell us if the purpose of law enforcement sworn

22   reports are to include every single detail or the details that

23   you believe are important at the time?

24   A.  The details we believe are important at the time.

25   Q.  The details that were not included, did you believe those

1  were relevant at the time?

2  A.  No.

3  Q.  Did you write that report?

4  A.  No.

5  Q.  The things that you testified to happening on direct

6  examination, whether or not they were in the report, did those

7  things actually happen?

8  A.  Yes.

9  Q.  Did your report include the fact that the defendant ran

10 away from you and ran out of the car when you were telling him

11 to shut the engine off?

12 A.  No.

13 Q.  Okay.  Is your memory exhausted as to whether that detail

14 is in the report?

15             MR. ADAMS:  Objection, your Honor.

16             THE COURT:  Sustained.

17 BY MR. SRIVASTAVA:

18 Q.  Did the defendant run?

19 A.  Yes.

20 Q.  And after you caught him and he was placed in handcuffs,

21 did he run again?

22 A.  Did I run again?  Yes, I ran back to check on Iesha.

23 Q.  After you ran back to check on Iesha, do you know whether

24 or not the defendant ran from law enforcement a second time?

25             THE COURT:  The question is whether you observed

1    that.

2              THE WITNESS:  I didn't observe it.

3              THE COURT:  Okay.

4    BY MR. SRIVASTAVA:

5    Q.  At the time the defendant ran from you, had the firearms

6    been recovered from the laundry bag yet?

7    A.  No.

8              MR. SRIVASTAVA:  No further questions, your Honor.

9              THE COURT:  Anything based on the redirect,

10   Mr. Adams?

11             MR. ADAMS:  Very briefly, your Honor.

12                            - - -

13             ANTHONY AGUIRRE, RECROSS-EXAMINATION

14   BY MR. ADAMS:

15   Q.  Agent, did you ask Ms. Stanciel to go into her apartment?

16   A.  No.

17             MR. ADAMS:  Nothing further, Judge.

18             THE COURT:  Anything based on that, Mr. Srivastava?

19             MR. SRIVASTAVA:  Yes, your Honor.

20                            - - -

21          ANTHONY AGUIRRE, FURTHER REDIRECT EXAMINATION

22   BY MR. SRIVASTAVA:

23   Q.  Do you know if other agents on scene attempted to talk to

24   her?

25   A.  I don't know that.  I was not dealing with that.

1          MR. SRIVASTAVA:  No further questions, your Honor.

2          THE COURT:  The witness is excused.  We are going to

3    do -- even though we started late, we still need to do a

4    break.  There is one thing I need to address with the lawyers.

5    We are going to go until about 12:30.  We'll break for lunch

6    at that point.  We will take a 10-minute break.

7      (The jury leaves the courtroom.)

8          THE COURT:  You can sit down.  So I've looked at the

9    motion to reconsider, and completely aside from what's being

10   asked in there, I guess I have a concern about what I think

11   you're intending -- one of the things that I think you're

12   intending to introduce.  So the person from BOP who is going

13   to authenticate the emails, when is that person -- is that

14   next, or is it coming up?  Or --

15         MR. SRIVASTAVA:  No, Judge.  That person is available

16   at the MCC, but I think we can work on a stipulation just to

17   the foundation for those records.

18         THE COURT:  So have you had a chance to look at the

19   motion to reconsider yet?

20         MR. ADAMS:  I have, your Honor, this morning.

21         THE COURT:  Okay.  So let's talk -- let me tell you

22   the thing I have a concern about.  So on page 4 -- I guess

23   it's attached as an exhibit, too.  One of the email exchanges

24   has an email, if you read in chronological order at the

25   bottom, from Ms. Stanciel, May 1st, 2017, 3:51:22 p.m.:  "Why

1   didn't I get no mail or pictures today?  It's just the
2   beginning.  Don't fall apart.  God got you."
3           Then there is a response from Mr. Battiste at
4   5:21 p.m., same date.  Then there is a response to that from
5   Ms. Stanciel at 9:00 o'clock that same date.  No further
6   response, at least that I'm seeing, from Mr. Battiste after
7   that.
8           And there is a line in the last -- in other words,
9   the unresponded email from Ms. Stanciel that it sounds like
10  the government is intending to introduce to -- apparently to
11  help show that the firearm was Mr. Battiste's firearm.  This
12  is the "leave me with your shit" line.  Am I reading that
13  right?
14          MR. APPLEBY-BHATTACHARJEE:  That's correct.
15          THE COURT:  How is that not hearsay?
16          MR. APPLEBY-BHATTACHARJEE:  Well, your Honor,
17  Ms. Stanciel's state of mind at the time of her plea colloquy
18  has been put before the jury.
19          THE COURT:  Oh, I don't agree at all.  Her state of
20  mind of her plea colloquy has not been put at issue at all.
21  Her statements at the plea colloquy were put in issue.
22          MR. APPLEBY-BHATTACHARJEE:  And the statements to the
23  effect that the plea colloquy is silent as to whether she
24  stated that she was directed.
25          THE COURT:  So I'm just going to tell you something.

1  When we had the sidebar yesterday about the plea colloquy,

2  there was an objection made to whether the plea colloquy would

3  go in.  I overruled that objection because -- I think I

4  miscited.  I think I said 804(b)(5).  It's really 804(b)(3).

5  I said that was admissible.  That went in, and then there were

6  further questions about, it didn't say this, it didn't say

7  that.  There was no objection made to those questions, and I

8  don't think that you can use that as a basis to get this in,

9  besides which I don't think this impeaches.

10           A hearsay declarant can be impeached.  That's what

11  Rule 806 says.  I don't think this impeaches that.  "Leave me

12  with your shit."  It's more vague than the stuff we were

13  talking about before.  So you would be -- you would be -- you

14  would be courting having to do all this over again if I let

15  that in.  And I'm not going to let that in.

16           I understand that certain of the emails are, you

17  know, probably admissible -- I want to hear from Mr. Adams on

18  it -- to show residence at the house and whatnot, and that's

19  clearly been put in issue.  But trying to draw an inference

20  out of this statement from --

21           So the full exchange is Mr. Battiste emailed back at

22  5:21, says:  "Iesha, don't do that shit, bro."  Then there's

23  an abbreviation, s-m-m-f-h.  "You know how fucked up it is for

24  me to be out here right now.  You talking about MF picture and

25  shit.  What about our car?  What about where the fuck ima

1    sleep?"  I-m-a sleep.  "Yo ass tripping, smmfh."

2          Then Ms. Stanciel's response is:  "Let me know how

3    things work at the courthouse.  If it come to it, go stay with

4    Tasha.  You got to the 21st to get the car.  Maybe something

5    will come up, IDK.  What do you want me to do?  I'm in jail

6    facing more charges.  You in the world, DA world, with access

7    to whatever yo ass tripping, to leave me with your shit.

8    Remember, I can remember them words bright as day.  I wish I

9    would, dot, dot, dot."

10          I mean, to allow you to argue -- to put that in and

11   argue that "leave me with your shit" means that's what he was

12   talking about, the gun, that doesn't even come close to piling

13   inferences upon inferences.  That's piling speculation on

14   speculation.  So you don't get to put that in.

15          And I've read the motion to reconsider.  I'm not

16   persuaded.  It's denied.  Okay?  So --

17          MR. APPLEBY-BHATTACHARJEE:  I think there are two

18   issues that come out of that then, your Honor.  There are

19   other emails that the government is tendering in that chain of

20   proof.

21          THE COURT:  Are there issues on the other emails,

22   Mr. Adams?  I mean, you can solve this problem by redacting

23   out the 9:00 o'clock email at the top of that one page.  Are

24   there issues on the other emails?

25          MR. APPLEBY-BHATTACHARJEE:  Would it be other than

1  the first statement, your Honor?  Would the government be

2  permitted to say:  "Let me know how things work out at the

3  courthouse," and then redact the rest?

4          THE COURT:  Oh, I don't have a problem with that.

5  Yeah, right.  You can -- if you need the "let me know how

6  things work out at the courthouse," because that involves the

7  eviction matter?  Is that why?

8          MR. APPLEBY-BHATTACHARJEE:  That's correct.

9          THE COURT:  Okay.

10          MR. APPLEBY-BHATTACHARJEE:  And the next day, there's

11  a notice of appearance filed by the defendant at the

12  courthouse.

13          THE COURT:  That, I wouldn't require you to redact

14  unless Mr. Adams is about to persuade me that it shouldn't

15  come in.

16          MR. ADAMS:  I would just for the record object,

17  Judge, that it's hearsay from Ms. Stanciel's statements.

18          THE COURT:  A question of "let me know how things

19  work out" is not hearsay.  It's asking him to do something.

20  That's not hearsay.  It's not offered for its truth.  It's

21  just offered to show that it's said.

22          So are there -- on the other emails, I guess they're

23  all attached here.  The Bates stamp numbers are -- the last

24  four digits on each are 1150, 470 and 0115.  Are there issues

25  on any of the other ones?

1          MR. ADAMS:  Let me check really quickly.

2          THE COURT:  Yeah.

3          MR. ADAMS:  I would object to the 5/1/2017 at

4    11:36 a.m.

5          THE COURT:  Okay.  Let me read that.  So it's not the

6    Mr. Battiste email, but the Stanciel email?  11:36 is from

7    Mr. Battiste to Ms. Stanciel.

8          MR. ADAMS:  Yes.

9          THE COURT:  You're objecting to that one?

10          MR. ADAMS:  Yes.

11          THE COURT:  Okay.  On what ground?

12          MR. ADAMS:  On relevance grounds, your Honor.

13          THE COURT:  Okay.  So let me just look at it in

14    context.

15          Okay.  So the exchange here, there is an email from

16    Mr. Battiste on April 30th at 9:51 p.m.  "I miss you more, and

17    you know that.  Nobody came to buy nothing.  That's the Feds.

18    I'm not even fucking with that shit no more because they

19    pissing me off.  What exactly am I trying to do at the

20    courthouse?"

21          So what is the significance of the "nobody came to

22    buy nothing.  That's the Feds.  I'm not even fucking with that

23    shit no more because they pissing me off"?

24          MR. APPLEBY-BHATTACHARJEE:  At this point, really,

25    we're looking at what exactly am I trying to do at the

1    courthouse.  It lays foundation for his subsequent actions.

2         THE COURT:  So you're going to have to redact out the

3    first two sentences.  The rest of it I think is relevant.

4    "What am I trying to do at the courthouse?"  Ms. Stanciel

5    tells him, go, tell them you have been served with a seven-day

6    notice, ask to file a motion for stay, tells him what to do.

7    And he basically responds to that.  And, I mean, there is an

8    argument that all his response shows is that he is a God-awful

9    boyfriend -- but pardon my language -- but I think it's

10   relevant to show a connection with the house or with the

11   apartment.

12        So all you need to redact on this one, this is 470,

13   is the first two sentences of the email at the bottom.  The

14   sentence that begins "I miss you," and the sentence that

15   begins "Nobody came to buy nothing."  So you'd start it with

16   "What exactly am I trying to do?"

17        And the email 115, so that's the -- that's the one we

18   were just talking about.  It's the one we were talking about

19   before.  So I already told you about -- I told you what you

20   need to redact on 115.  And on 1150, that's really the first

21   email that kind of sets up the whole thing about going to the

22   apartment.  So I think that's all relevant too.  And it's not

23   hearsay because she's telling him to do something.

24        MR. APPLEBY-BHATTACHARJEE:  Just so I'm clear, your

25   Honor, and we'll have the redacted exhibit prepared, 1150

1    comes in as is.

2            THE COURT:  In its entirety, correct.

3            MR. APPLEBY-BHATTACHARJEE:  470 comes in with the

4    redactions to the bottom email from Iesha Stanciel talking

5    about "SMH" --

6            THE COURT:  Right.

7            MR. APPLEBY-BHATTACHARJEE:  -- "I said I miss you,"

8    and the first two lines of Mr. Battiste's response above that.

9    And with those redactions -- with those redactions made, the

10   rest of the email comes in.

11           THE COURT:  Correct.

12           MR. APPLEBY-BHATTACHARJEE:  And the entirety of the

13   email on 115 except for the statement at the top email from

14   Ms. Stanciel starting "if it come to it" and ending with "I

15   wish I would, dot, dot, dot."

16           THE COURT:  Right.  So on the top email on 115, the

17   only thing that comes in is "let me know how things work at

18   the courthouse."

19           MR. APPLEBY-BHATTACHARJEE:  So we will make those

20   redactions, your Honor.  If that's the Court's rulings on the

21   admissibility of the underlying documents, I suppose I'd like

22   to speak with Mr. Adams as to whether we can stipulate as to

23   the authenticity of the emails.

24           THE COURT:  Okay.  That's fine.  Go ahead and do

25   that.

1          MR. APPLEBY-BHATTACHARJEE:  And if we can also

2   stipulate that that is the defendant's email address,

3   CameronBattiste@, and what's redacted is @icloud.com.  We do

4   have jail calls that we could tender to establish what the

5   defendant was saying to Ms. Stanciel.  So if we can just -- if

6   we can all beat all that, we can streamline this presentation

7   quite a bit.

8          THE COURT:  As I understand it, s-m-m-f-h means

9   shaking my MF head.  You probably already knew that.

10         MR. SRIVASTAVA:  Judge --

11         THE COURT:  You are all younger than me.

12         MR. SRIVASTAVA:  While we are on break, this could

13  wait until later, but a couple other things we could raise.

14  Along the same lines, if we are able to work out a

15  stipulation, which I think we will, we would then seek

16  permission to recall Special Agent Ericks for the limited

17  purpose of putting those emails in.

18         THE COURT:  Not a problem.

19         MR. SRIVASTAVA:  Limit cross accordingly.  And I

20  think we are agreeable to that, but we would like the Court's

21  permission.

22         THE COURT:  That's fine.

23         MR. SRIVASTAVA:  And then the second issue we wanted

24  to raise, your Honor, was in light of some of the issues

25  raised in the motion for reconsideration, if we would be

1    permitted to introduce a portion of Iesha Stanciel's plea

2    declaration, and I can walk the Court through exactly which

3    portion --

4            THE COURT:  Why don't you talk about it.

5            MR. SRIVASTAVA:  Okay.

6            THE COURT:  I mean, it's been discussed.  It may be

7    that there is no objection to it.  So talk about what you want

8    to introduce.  If you can't work it out, then we will talk

9    about it.

10           MR. SRIVASTAVA:  Okay.  Thank you, your Honor.

11           MR. ADAMS:  Thank you.

12     (Short break.)

13           MR. SRIVASTAVA:  Judge, just to be clear -- I'm

14    sorry, your Honor.

15           THE COURT:  Go ahead.

16           MR. SRIVASTAVA:  To answer your question more

17    precisely, with respect to the issue of whether we need a

18    custodian from the BOP, we have that issue worked out.  We do

19    not have the plea declaration issue worked out yet.  They're

20    talking about it.

21           THE COURT:  That's the one I was asking you about.

22           MS. DeLEON:  Thank you, Judge.

23     (The jury enters the courtroom.)

24           THE COURT:  Everybody can have a seat.  You can call

25    the next witness.

1    MR. SRIVASTAVA:  Your Honor, at this time, the

2  government would like to call Special Agent Brian Wentz.

3    (Witness sworn.)

4    THE COURT:  Have a seat.  Make sure the mic is in

5  front of you.

6    You can go ahead.

7                              - - -

8              BRIAN WENTZ, DIRECT EXAMINATION

9  BY MR. SRIVASTAVA:

10  Q.  Good morning.

11  A.  Good morning.

12  Q.  Can you please state and spell your name for the record.

13  A.  It's Brian Wentz; B-r-i-a-n, W-e-n-t-z.

14  Q.  Can you tell us what you do for a living, sir?

15  A.  I am a special agent with the FBI.

16  Q.  Can you tell us about your educational background?

17  A.  Educational?

18  Q.  Sure.

19  A.  I have a background in accountancy.  I have a CPA license

20  out of Texas.  And I'm a CFE, also a certified fraud examiner.

21  I've got my MBA in accounting, and I'm also on the evidence

22  response team at work.  I specialize -- I used to specialize

23  in bank robberies.  Worked on the violent crimes squad for

24  14 years, and currently I'm on a PC, public corruption squad

25  in the South Area.

1  Q.  And you indicated that you worked violent crimes for
2  14 years with the FBI?
3  A.  Yes.
4  Q.  So back in April of 2017, were you assigned to a
5  particular unit at that time?
6  A.  I was on the South Area 1 squad, violent crime squad.
7  Again, I was working bank robberies, but I assisted the squad
8  with other needs as necessary.
9  Q.  And on the afternoon of April 7th, 2017, were you
10  assisting some other agents on your squad?
11  A.  Yes.  Yes, I was.
12  Q.  What was the nature of that assistance you were providing?
13  A.  There was an arrest warrant that Special Agent Mike Ericks
14  had, and he needed a squad assist on that date.
15  Q.  And in order to execute that arrest warrant, do you know
16  if your partners went to a particular location?
17  A.  Yes.
18  Q.  Where did they go that afternoon?
19  A.  In the afternoon -- it wasn't the first location we had
20  been to, but in the afternoon they had went to a location in
21  Willowbrook off of Route 83, an apartment complex.
22  Q.  And do you know what it was that drew the agents to that
23  particular location, if you know?
24  A.  I do not.
25  Q.  And do you know who the arrest warrant was for?

1   A.  It was for Iesha Stanciel, I believe is her name.

2   Q.  And can you tell us how you became involved in assisting

3   that afternoon?

4   A.  That afternoon -- I had been out that morning.  That

5   afternoon I was at the office, and I got a notification via

6   email from Agent Ericks that he needed assistance.  They had

7   her located, and at that point, I left the office to go

8   assist.

9   Q.  And what happened as you were traveling to the location

10  where you heard that your partners needed assistance?

11  A.  I knew there were three people on the scene.  I called

12  Anthony Aguirre, one of our task force officers, and asked

13  exactly where they were located as I was pulling into the

14  apartment complex.  He was trying to describe where they were

15  as I was trying to figure out where I was located in relation

16  to them.

17  Q.  Can you describe just generally what that apartment

18  complex looks like?

19  A.  I'm not familiar with the whole entire area.  There may be

20  multiple complexes together, but it was a very, very large

21  apartment complex.  I probably drove past a dozen buildings

22  before I got to the back of the complex where they were

23  located.

24  Q.  And what happened as you were in contact with Task Force

25  Officer Aguirre?

1    A.   I could hear radio transmission that said something to the

2    effect of I see her coming out as he was talking to me on the

3    phone, and I told him I would call him back because I needed

4    to stop and get my protective vest on.  And so I called him

5    back, and he didn't answer at that point.

6    Q.   So at this point in time, you're going to assist your

7    partners.  And you have heard him say something to the effect

8    of "She's coming outside"?

9    A.   I heard that in the background over the radio.

10   Q.   Okay.  And let me just back up for a moment.  As you're

11   going to assist your partners, are you looking for anyone at

12   that point other than Iesha Stanciel?

13   A.   No.

14   Q.   Do you know who Cameron Battiste is at that time?

15   A.   At that point, no.

16   Q.   Okay.  So after you threw on your protective vest, what,

17   if anything, happened?

18   A.   Again, I called Anthony Aguirre, the task force officer,

19   to get the exact location of where they were in relation to

20   where I was sitting at this point.  And I noticed -- I watched

21   him run by at that point chasing somebody.

22   Q.   You saw Task Force Officer Aguirre running by?

23   A.   Yeah.  He didn't answer his phone, obviously.  And I saw

24   him running by.

25   Q.   What did you do when you saw him running after somebody?

1  A.  I jumped out of my car, and I observed a fight on the

2  ground at that point occurring between two other individuals.

3  Q.  And who were the two individuals involved in the fight

4  that was occurring on the ground?

5  A.  That was my Task Force Officer Brigitte Balcer, or

6  Buitron, and Iesha Stanciel.

7  Q.  So what did you do when you saw that?

8  A.  At that point I started running in that direction, and I

9  noticed that Agent Ericks was also chasing the male at that

10 point with Aguirre.  And so I joined in the arrest attempt on

11 the ground with TFO Buitron.

12 Q.  How did you assist in that arrest attempt?

13 A.  We both secured her and handcuffed her at that point.

14 Q.  After Ms. Stanciel was placed in handcuffs, what, if

15 anything, did you do?

16 A.  I went -- she had her -- sorry.  TFO Buitron had her

17 secured, so I walked over to where Agent Ericks was and asked

18 if I could assist him in any manner.

19 Q.  And did he ask for your assistance?

20 A.  Yes.

21 Q.  What did he ask you to do?

22 A.  To watch over Mr. Battiste at that point.

23 Q.  And as you refer here today to Mr. Battiste, is that

24 someone you see here in court?

25 A.  Yes, I do.

1        MR. ADAMS:  Judge, we will stipulate the in-court

2   identification.

3        THE COURT:  All right.  It's stipulated he would

4   identify Mr. Battiste.

5   BY MR. SRIVASTAVA:

6   Q.  So when Special Agent Ericks asked you to assist with the

7   defendant, what specifically was Special Agent Ericks asking

8   you to do?

9   A.  Basically, just stay with him until we could figure out

10  who he was and why he was there.

11  Q.  And can you describe whether or not the defendant was in

12  handcuffs at that point?

13  A.  At that point, he was.

14  Q.  So what specific steps -- excuse me -- did you take to

15  assist the rest of your squad at that point?

16  A.  We walked over to the parking lot and set him down,

17  Mr. Battiste, sat him down.  And I just began sitting with him

18  at that point.

19  Q.  And were you trying to do anything at that point?

20  A.  I was trying to figure out who he was and generally just

21  assist Mr. Ericks in any way I could at that point.

22  Q.  As you were trying to identify who the defendant was, did

23  you tell him that he was going to be charged with any crimes?

24  A.  No.

25  Q.  Did you tell him that he was under arrest?

1  A.  No.

2  Q.  And in relation to the apartment building, where was he

3  situated?

4  A.  It was kind of kitty-corner.  So we were kind of on a curb

5  stop that was in front of the adjacent building, so it was

6  like a diagonal towards the building where I think that he had

7  exited from earlier.

8          MR. SRIVASTAVA:  Your Honor, at this time I'd ask

9  permission to publish from the laptop what was previously

10 admitted into evidence as Government's Exhibit 9.

11         THE COURT:  That's fine.

12 BY MR. SRIVASTAVA:

13 Q.  Special Agent Wentz, does this photograph assist you in

14 describing where you and the defendant were located at this

15 point?

16 A.  Yes, it does.

17 Q.  And can you use your words and, if you would like, the

18 graphics on the screen to mark where you were.

19 A.  Can I draw on the screen?

20 Q.  You can.  If you press --

21         THE COURT:  That's fine.  Just try it and see what

22 happens.  It's good right now.

23         THE WITNESS:  Okay.

24         THE COURT:  Yeah.

25 BY MR. SRIVASTAVA:

Wentz - direct

1   Q.  Okay.  I see you've drawn a blue circle on the screen.

2   A.  Yes.

3   Q.  What does that blue circle mark?

4   A.  That curb stop is where Mr. Battiste was sitting, and I

5   was standing with him.

6   Q.  And as the defendant was sitting on that curb, were other

7   people around in the area?

8   A.  Law enforcement-wise, no, but the residents of the

9   building were starting to -- they had been outside.  They were

10  watching.  People were gathering at that point.

11  Q.  And as people were gathering, can you describe your

12  interactions with the defendant?

13  A.  So, again, I was asking who he was.  He had his wallet.  I

14  was looking at his ID.  His ID had a different hair style than

15  what he had currently, so I was questioning if that was really

16  him.  But he wasn't really answering at that point.

17          In the meantime, he was -- I was standing in front of

18  him, so if he was sitting at the curb stop where I drew the

19  circle, he is sitting on the curb stop, I am standing in front

20  of him in the parking lot.  And he is trying to look around me

21  at that point, communicating non-verbally with somebody.  And

22  I was asking him what he was doing.

23  Q.  When you asked the defendant what he was doing, did he say

24  anything?

25  A.  Yes.

Wentz - direct

1  Q.  What did he say?

2  A.  He said that he wanted somebody to come get his debit card

3  because -- I don't recall the specifics, but maybe that he

4  owed them money.  He wanted to get them money before he was

5  taken off.

6  Q.  And who was in possession of his wallet and debit card at

7  that point?

8  A.  I was holding it.

9  Q.  Was he asking you to do anything with his debit card?

10  A.  Not me specific.  He wanted somebody to come down and get

11  it.

12  Q.  When you saw him looking around you, did you look back and

13  try to determine who he was looking at?

14  A.  Yes.

15  Q.  And what did you see?

16  A.  At this point -- may I draw on the picture again?

17  Q.  You may.

18  A.  There were multiple individuals on that balcony up there

19  that I saw as well as others.  But that was the direction he

20  was looking and gesturing to.

21  Q.  And can you describe what you saw up on the balcony?

22  A.  I recall there were at least two black males up there.

23  Q.  Okay.  And how was the defendant -- you indicated he was

24  trying to communicate with him non-verbally.  What did you see

25  the defendant doing?

1    A.  He was gesturing with his head with a motion.  May I?

2    Q.  If you can demonstrate what you --

3    A.  Demonstrate?

4    Q.  -- mean by that, that might be helpful.

5    A.  So if that's the balcony up there and this is the front of

6    the building, he was doing this, like gesturing for somebody

7    to come down is what I was assuming.

8         MR. ADAMS:  Objection.

9         THE COURT:  What he was assuming is stricken.  The

10   jury is directed to disregard it.  What you were doing, when

11   you say gesturing, you mean with his head.

12        THE WITNESS:  With his head.

13        THE COURT:  Okay.  That's fine.  Thanks.

14        Go ahead.

15   BY MR. SRIVASTAVA:

16   Q.  And you indicated that he was gesturing with his head.

17   When he began that motion, where was he pointing his head?

18   A.  When he began, he was pointing it at the persons on the

19   balcony.

20   Q.  And when he completed that motion with his head, where was

21   his head pointing downwards towards?

22   A.  To the -- can I draw on here?

23   Q.  You can.

24   A.  To the front, I guess these -- I'm not familiar with the

25   building.

 1          MR. ADAMS:  Objection, your Honor, as to

 2   characterizations as to where he is pointing.

 3          THE COURT:  Well, why don't you rephrase the

 4   question.

 5          MR. SRIVASTAVA:  Sure.

 6   BY MR. SRIVASTAVA:

 7   Q.  What direction was he gesturing with his head?

 8   A.  In the direction of the doors of the building.

 9   Q.  So would that be down and to the left?

10   A.  Yes.

11          THE COURT:  The doors which is the middle of the

12   three circles there?  Is that what you are talking about?

13          THE WITNESS:  Yes.  Correct.

14          THE COURT:  Okay.

15   BY MR. SRIVASTAVA:

16   Q.  And, again, because this is confusing with the three blue

17   circles, which circle indicates where the defendant is sitting

18   on the curb?

19   A.  May I draw a number?  1?

20   Q.  And then if you could draw a 2 where the men were on the

21   balcony.

22   A.  I'm not good at this drawing.

23          3.

24   Q.  And 3, the blue 3 indicates where you believe the

25   defendant was gesturing towards?

Wentz - direct

1   A.  He was gesturing at the door, in that area, yes.

2   Q.  At that point in time when you saw the defendant gesturing

3   in that manner, were you aware of a laundry bag or anything

4   else that was near the front door?

5   A.  No.

6   Q.  When you saw the defendant gesturing like that, what, if

7   anything, did you do?

8   A.  I kept getting in his way, asking him to cut it out.

9   Q.  What did the defendant do?

10  A.  He kept looking around me, gesturing towards them, same

11  manner.

12  Q.  About how many times did he do that?

13  A.  At least ten.

14  Q.  Did any of those people -- did you see any of those people

15  from the balcony ever come down?

16  A.  I did not.

17  Q.  And had anyone indicated to you at that point over the

18  radio that firearms had been recovered or anything like that?

19  A.  No.

20  Q.  So can you tell us what happened after the defendant

21  gestured up at the balcony and you did not see anyone come

22  down?  What was the next thing that happened?

23  A.  Next thing in the time line of events was I believe he was

24  complaining about his back hurting.

25  Q.  And when he told you that his back was hurting, what did

1   you do?

2   A.  I asked him to just remain there, and we would get things

3   figured out.  But he continued to complain about his back

4   hurting and asked if he could stand up, stretch his back.

5   Q.  When he asked to stretch his back, what, if anything, did

6   you say or do?

7   A.  I allowed him to stand up and stretch his back.

8   Q.  When the defendant stood up, what happened?

9   A.  He took off running.

10  Q.  After the defendant took off running, what did you do?

11  A.  I caught up to him within a couple steps.  He was

12  handcuffed.  And I don't recall if he had shoes on at that

13  point or not.  But I was able to catch up and grab the cuffs

14  with my right hand, and I wrapped my left hand around him

15  trying to stop him at that point.  And he is much bigger than

16  me, and he was dragging me at that point.  The only thing I

17  could do is I swept his legs with my left leg, and we went

18  down like a tree trunk, just slammed right down.

19          MR. SRIVASTAVA:  No further questions, your Honor.

20          THE COURT:  Mr. Adams.

21                           - - -

22              BRIAN WENTZ, CROSS-EXAMINATION

23  BY MR. ADAMS:

24  Q.  Good morning, Agent.

25  A.  Good morning.

1    Q.  So it's your story today that Mr. Battiste was gesturing

2    towards some people on a balcony?

3    A.  That's what I observed, yes.

4    Q.  And you told this jury just now that it was two

5    African-American males?

6    A.  At least two.

7    Q.  How old were they?

8    A.  I couldn't see from that distance.  They would probably be

9    in their 20s, I guess.

10   Q.  How tall were they?

11   A.  I have no idea.

12   Q.  When did you go up to that apartment to interview them?

13   A.  I did not.

14   Q.  When did you look in the apartment, I guess, address

15   registry to find out which apartment it was?

16   A.  I did not.

17   Q.  When did you ask Mr. Battiste who were those people?

18   A.  I did not.

19   Q.  Agent Wentz, when you were preparing for this trial, did

20   you meet with the government, these two government

21   prosecutors?

22   A.  Yes.

23   Q.  How many times?

24   A.  Once.

25   Q.  And that was around February 5th, correct?

Wentz - cross

1  A.  Correct.

2  Q.  And that's in this building?

3  A.  Yes.

4  Q.  On the fifth floor?

5  A.  Yes.

6  Q.  And that was the first time you really met with these

7  agents -- with these government prosecutors, correct?

8  A.  On this case, yes.

9  Q.  Did you write any other reports in this case?

10  A.  I believe so, yes.

11  Q.  How many reports did you write in this case?

12  A.  I believe just one on this instance.

13  Q.  I'm sorry.  Could you repeat the last part?

14  A.  Just one in this instance.

15  Q.  And was that report from February 5th?

16  A.  I did not author a report on February 5th.

17  Q.  What was the date of the report you authored?

18  A.  I don't have the report in front of me.  I couldn't tell

19  you.

20  Q.  Well, on February 5th, you met with the agents -- with the

21  prosecutors, correct?

22  A.  Yes.

23  Q.  And this is the first time you told them about these

24  individuals on this balcony, correct?

25  A.  Correct.

1    Q.  And that was about a week before trial?

2    A.  Correct.

3    Q.  And you told this jury that you were assuming that

4    Mr. Battiste is gesturing towards a door?

5            THE COURT:  I struck the assumption, so the jury

6    is --

7            No, don't answer that.

8            The jury is not considering that.  I struck when he

9    testified about his assumption.  There may be some other

10   things, but you'd want to rephrase that.

11   BY MR. ADAMS:

12   Q.  Did Mr. Battiste know the people that he was gesturing to

13   on the balcony?

14           MR. SRIVASTAVA:  Objection.

15           THE COURT:  Rephrase the question.

16   BY MR. ADAMS:

17   Q.  Did you ask Mr. Battiste if he knew the people he was

18   gesturing to?

19   A.  No.  He told me he was --

20           THE COURT:  Hang on.  No.  Just answer the question

21   that's asked.  Don't volunteer.

22           THE WITNESS:  Sorry.  Rephrase.

23           THE COURT:  The remainder of the answer is stricken.

24           THE WITNESS:  Can you repeat the question?

25           THE COURT:  He already answered it no.  That's the

1    answer.  Ask another question.

2            MR. ADAMS:  Judge, one moment.

3       (Brief pause.)

4    BY MR. ADAMS:

5    Q.  You said that Mr. Battiste was communicating non-verbally.

6    Is that what you said?

7    A.  Yes.

8    Q.  How many times before April 7th did you interact with

9    Mr. Battiste?

10   A.  Zero.

11   Q.  How many times during April 7th did you have a chance to

12   discuss -- strike that, your Honor.

13           How many times during your encounter with

14   Mr. Battiste did you talk to him?

15   A.  Multiple.

16   Q.  Multiple times.

17           And he had said he needed his debit card, correct?

18   A.  Correct.

19   Q.  And you told this jury that you saw his ID?

20   A.  Yes.

21   Q.  And his ID had a name on it?

22   A.  Correct.

23   Q.  And did it have an address on it?

24   A.  It was a state ID.  It has to have had an address on it,

25   correct.

1   Q.  And did you check to see if that address was the same

2   address as this Willowbrook apartment?

3   A.  I did not.

4   Q.  Was it the same address?

5   A.  I don't recall.

6   Q.  Do you still have that ID?

7   A.  I do not.

8   Q.  Where is that ID now?

9   A.  I have no clue.

10  Q.  Did you check to see if Mr. Battiste had a valid driver's

11  license?

12  A.  No.

13  Q.  Whose car -- who was registered to that car, the blue

14  Dodge?

15  A.  I don't know.

16  Q.  Was it Ms. Stanciel?

17  A.  I don't know.

18  Q.  Did you or your brother or sister agents search that car?

19  A.  No.  I did not.

20          MR. ADAMS:  Judge, one moment, please.

21          THE COURT:  Sure.

22      (Brief pause.)

23  BY MR. ADAMS:

24  Q.  Agent Wentz, thank you.

25          How close were you to Special Agent Ericks at the

1    time you were standing next to Mr. Battiste?

2            MR. SRIVASTAVA:  Objection.

3            THE COURT:  What's the basis for the objection?

4            MR. SRIVASTAVA:  Just as the foundation.  It's not

5    clear as to which.

6            THE COURT:  Rephrase it.

7    BY MR. ADAMS:

8    Q.  After Mr. Battiste was handcuffed and sitting on the

9    curb --

10           THE COURT:  There you go.

11   BY MR. ADAMS:

12   Q.  -- how close were you to Special Agent Ericks?

13   A.  Within 20 feet, maybe.  Not close.

14   Q.  Could you hear him talking?

15   A.  I could tell he was on the telephone.  I couldn't hear

16   what he was saying.

17   Q.  Could you see Ms. Stanciel?

18   A.  In the distance, yes.

19   Q.  Could you hear her?

20   A.  I could hear the fighting, yes.

21   Q.  Could you hear anyone speaking?

22   A.  No.

23   Q.  Now, how many people were milling around the parking lot

24   at this time?

25   A.  Not many.  I would say three, four, five, something like

 1  that, in the parking lot.
 2  Q.  Did you interview any of those people?
 3  A.  I did not.
 4  Q.  Did you ask them if you could interview them?
 5  A.  No.
 6  Q.  Did you ask Mr. Battiste which apartment unit on the
 7  balcony he was gesturing to?
 8  A.  No.
 9  Q.  Did you review any reports in this case written by your --
10  by other agents?
11  A.  I did not.
12  Q.  You did not.
13          MR. ADAMS:  One moment.
14     (Brief pause.)
15          MR. ADAMS:  Judge, nothing further.  Thank you.
16          THE COURT:  Redirect.
17                         - - -
18          BRIAN WENTZ, REDIRECT EXAMINATION
19  BY MR. SRIVASTAVA:
20  Q.  Special Agent Wentz, were you the case agent for this
21  case?
22  A.  No, I was not.
23  Q.  You were asked a question on cross-examination about the
24  fact that you first told the attorneys on the case about this
25  gesturing movement on February 5th, 2019.  Do you recall that?

Wentz - redirect

184

1   A.  Yes.

2   Q.  Had you ever met with either of the government attorneys

3   about this case prior to that day?

4   A.  No.

5   Q.  You indicated when you first arrived on scene, you saw

6   Task Force Officer Aguirre chasing after the defendant.  Do

7   you recall that?

8   A.  Yes.

9   Q.  To your knowledge, at the time that that first chase was

10  taking place, had the firearms been recovered yet?

11  A.  I had no knowledge of that, no.

12  Q.  You indicated that you then assisted watching the

13  defendant on the curb; is that correct?

14  A.  Subsequently, yes.

15  Q.  Subsequent to when he ran away and was caught?

16  A.  Yes.

17  Q.  And you indicated that when he was sitting on the curb, he

18  asked to stand up and stretch his back?

19  A.  Yes.

20  Q.  And you also testified that he then ran again?

21  A.  Yes.

22  Q.  At the time he ran that second time in handcuffs, to your

23  knowledge, had the firearms been recovered yet?

24  A.  No, they had not.

25          MR. SRIVASTAVA:  No further questions, your Honor.

1        THE COURT:  Anything based on that, Mr. Adams?

2        MR. ADAMS:  Briefly, your Honor.

3                         - - -

4              BRIAN WENTZ, RECROSS-EXAMINATION

5   BY MR. ADAMS:

6   Q.  This arrest occurred April 2017, correct?

7   A.  Correct.

8   Q.  And the first time anyone from the government's

9   prosecutors contacted you was February 2019, correct?

10  A.  Correct.

11       MR. ADAMS:  Nothing further, Judge.

12       THE COURT:  All right.  Anything else?

13       MR. SRIVASTAVA:  No, your Honor.

14       THE COURT:  You can step down.

15       Please call the next witness.

16       MR. SRIVASTAVA:  Your Honor, the government would

17  call Daniel Lien to the stand next.

18    (Witness sworn.)

19       THE COURT:  Have a seat.  Make sure the mic is right

20  in front of you.

21       All right.

22                         - - -

23            DANIEL LIEN, DIRECT EXAMINATION

24  BY MR. SRIVASTAVA:

25  Q.  Good morning, sir.  Can you please introduce yourself to

1    the ladies and gentlemen of the jury and spell your name for
2    the record.
3    A.  My name is Daniel Lien.  My last name is spelled L-i-e-n.
4    Q.  How are you employed, sir?
5           THE COURT:  Let me just make a slight adjustment
6    here.
7           Go ahead.
8    BY MR. SRIVASTAVA:
9    Q.  How are you employed, sir?
10   A.  I am a physical scientist, forensic examiner in the latent
11   print operations unit at the FBI laboratory.
12   Q.  How long have you been a latent print examiner?
13   A.  A little over 15 years.
14   Q.  Can you tell us what your job responsibilities are as a
15   latent print examiner?
16   A.  As a forensic examiner, I examine items of evidence to
17   determine if there are any latent prints present on those
18   items.  I'll process that evidence with chemicals, examine
19   them with forensic light sources and powders to develop any
20   prints that might be present on those items.
21          If I develop items, I will -- or excuse me.  If I
22   develop latent prints, I will compare those prints developed
23   to known individuals or search them against the latent print
24   database.  I will provide a report of my findings and will
25   testify to those findings in court when requested to do so.

1  Q.  Did you examine any physical evidence in this case?

2  A.  Yes, I did.

3  Q.  Did you form any opinions about the evidence that you

4  examined?

5  A.  Yes, I did.

6  Q.  Now, sir, would it assist you to have a copy of your notes

7  with you as you testify?

8  A.  Yes, it would.

9          MR. SRIVASTAVA:  Your Honor, I'd like to approach the

10  witness and give him what's been marked as Government's

11  Exhibits 18-A and 18-B just for identification.

12          THE COURT:  That's fine.

13          THE WITNESS:  Thank you.

14  BY MR. SRIVASTAVA:

15  Q.  Sir, before we get to the conclusions you drew in this

16  case, I'd like to talk to you a little bit about your

17  qualifications.  Okay?

18  A.  Yes.

19  Q.  Can you tell us about your educational background.

20  A.  I have a bachelor's of science from the South Dakota

21  School of Mines in Rapid City, South Dakota.  It's a geology

22  with an emphasis in paleontology.

23  Q.  So did you have a career prior to becoming a forensic

24  scientist with the FBI?

25  A.  Yes, I did.

1    Q.   Just generally speaking, what was that?

2    A.   I was a -- while I was going to school, I performed

3    paleontology work for the South Dakota School of Mines, and I

4    conducted digs and researches in the South Dakota Badlands.

5    Q.   As a forensic scientist conducting latent print

6    examinations, can you tell us if you received any formal

7    training?

8    A.   Yes, I have.

9    Q.   What formal training have you received?

10   A.   I completed an approximately two-year training program at

11   the FBI laboratory in the area of friction ridge analysis,

12   comparison and development.  That training consisted of

13   classroom lectures, laboratory exercises, oral boards, moot

14   courts.  I conducted case examinations under the supervision

15   of a mentor.  During my training, I examined hundreds of items

16   of evidence and performed over 150,000 comparisons.

17   Throughout the training program, we were tested at various

18   stages to be able to demonstrate mastery of the subject

19   material.

20          At the end of the training, we had a comprehensive

21   examination that consisted of questions in the latent field

22   area as well as comparison exercises.

23   Q.   You mentioned in the course of your training being tested.

24   Did you pass all of the tests that you were given?

25   A.   Yes, I have.

1  Q.  You also mentioned -- I think you said you performed over

2  150,000 examinations.  Was that in the course of the two-year

3  training program or in your 15 years as an examiner?

4  A.  That was just during the training program.

5  Q.  Have you continued to perform examinations since the

6  conclusion of your training program?

7  A.  Yes, I have.

8  Q.  Since you completed your training program with the FBI,

9  have you enrolled in any additional training courses

10 subsequent to that?

11 A.  During the time that I have been with the latent print

12 unit, we participate in what's called continuing education.

13 It generally takes place on an annual basis, but sometimes it

14 can be more or less, but we try and stay abreast of all the

15 current developments in the science as well as stay abreast of

16 any new techniques and things that we might be able to utilize

17 for our examinations.

18 Q.  Mr. Lien, have you previously testified in court on the

19 topic of fingerprint analysis?

20 A.  Yes, I have.

21 Q.  Approximately how many times?

22 A.  About a half dozen times.

23 Q.  When was the most recent time?

24 A.  Last February.

25        MR. SRIVASTAVA:  Your Honor, I would ask at this

1    point for permission to proceed.

2              THE COURT:  Do you want to question him on his

3    qualifications now?

4              MR. ADAMS:  No, subject to cross.

5              THE COURT:  You can proceed.

6    BY MR. SRIVASTAVA:

7    Q.  Okay.  So now I would like to shift gears and talk with

8    you about fingerprints.  Okay?

9    A.  Okay.

10   Q.  To begin with, can you just tell us what a latent

11   fingerprint is.

12   A.  On the palms of the hands, there are raised portions of

13   ridges known as friction ridges.  These ridges have little

14   openings that run along them called pores which will exude

15   perspiration.  Then as an individual goes through their day if

16   they come in contact with their face or any other material,

17   that could adhere to those ridges.  And then when an object is

18   touched, that material can be left on that object.  That's

19   known as a latent print.  Latent prints are often fragmentary

20   and require chemical processes, forensic light sources, or

21   powders to be visualized.

22   Q.  How is that different, sir, from a known fingerprint?

23   A.  A known fingerprint is the intentional reproduction of the

24   friction ridge.  The friction ridge is present on the end

25   joints of the finger.  And that's generally accomplished by

1    applying a thin layer of black printer's ink and then rolling

2    that from nail to nail on a contrasting background such as a

3    standard fingerprint card.

4    Q.  Can you tell us about the basic factors that come into

5    play when you're using fingerprints as a means of

6    identification?

7    A.   Fingerprints are a reliable means of identification

8    because of two main factors, and that's prints are persistence

9    and uniqueness.  Fingerprints are persistent in that they form

10   during fetal development and remain constant throughout an

11   individual's life, barring any damage, permanent scarring, or

12   disease that may cause the regenerative layer to effect a

13   change until death and decomposition.

14        Fingerprints are unique in that they're formed during

15   fetal development, and they're influenced by not only genetic

16   but by environmental factors and physical forces that take

17   place during the womb, so that the friction ridge arrangements

18   are unique even on -- from identical twins, from areas on the

19   same finger, small areas, or even from one hand to the next.

20   Q.  So in order to conduct a fingerprint comparison, can you

21   tell us what the basic process is?

22   A.  We have a methodology that we refer to as ACE, and ACE is

23   an acronym.  It stands for analysis, comparison, and

24   evaluation.  The first thing I'm going to do is examine the

25   latent print, determine if the print is suitable to be used

1  for a comparison.  I'm looking at what we refer to as three

2  levels of detail.  The first thing I'm going to do is take

3  note of the overall pattern type or the ridge flow of the

4  print.  Fingerprints come in three basic categories:  Arches,

5  where the ridges enter one side, make a slight rise, wave, and

6  exit out the opposite side.  Fingerprints also can be loose

7  where the ridges come in one side, make a recurve, and enter

8  out the same side that they entered on.  Or they can be a

9  circular type pattern, which we refer to as a whirl.

10         The next thing I'm going to do is look at the

11  overall -- the ridge characteristics.  So ridges aren't

12  constant.  Some ridges will end.  We would call that an ending

13  ridge.  Some ridges will divide or bifurcate, which we call a

14  bifurcation.  And then sometimes you'll see little ridge

15  segments which appear as a period at the end of a sentence

16  which are hard dots.

17         The third level of the detail I'm looking at is the

18  actual ridges on the ridges themselves, the widths, any type

19  of shapes along the ridge edges, as well as pores, their size,

20  shapes, and spacings.

21         After I do an analysis on the latent print, I'm going

22  to do that same analysis on my known print.  Excuse me.  After

23  I finish my analysis, I'll move on to the comparison phase.

24  Q.  What is the comparison phase?

25  A.  During the comparison, I will perform a side-by-side

1   comparison to the ridge ending events that are present in the

2   latent print compared to the known print.  And it's not -- I'm

3   not just looking at the minutia themselves, but it's the

4   minutia, its orientation, its location in the fingerprint, as

5   well as the relationships that those -- the spatial

6   relationships they have with other minutia that's present in

7   those prints.

8   Q.  So you described -- I'm sorry.  Was there more to your

9   answer, sir?

10  A.  No.  Go ahead.

11  Q.  You described how you compared known prints to latent

12  prints.  Can you tell us how you examined evidence for the

13  presence of latent prints?

14  A.  Well, after I'm done with the comparison, that's when we

15  do an evaluation.  The evaluation is where we determine if the

16  print originated from the same source, if it is excluded from

17  that source, or if there was not enough information to reach a

18  conclusive decision.  That's during the evaluation of the --

19  the evaluation phase of the ACE methodology.

20  Q.  Okay.  And having told us about the ACE methodology, can

21  you tell us about how you examined evidence for the presence

22  of latent prints?

23  A.  Yes.  So evidence that we received, we generally break

24  down into two categories.  Either it's a porous item such as

25  this piece of paper where the print is actually absorbed into

1  the item or a non-porous item such as this picture where if I

2  touch the top of this, there is a chance that I'm going to

3  leave a print on the surface of this item.

4            We'll start with the non-porous items.  The first

5  thing I'm going to do is conduct a visual examination.  I use

6  a white light looking at it obliquely to see if I can see any

7  prints without applying any type of chemicals or anything.

8  It's just the evidence as is.  And it's important to note,

9  too, that in between each of these steps, if we do detect a

10  latent print, that's documented.  It's generally photographed

11  before we move on to the next step.

12  Q.  So you told us about the visual test that you will

13  perform.  Were you describing a process for a porous or

14  non-porous?

15  A.  Non-porous.

16  Q.  Okay.  And is the process generally the same, or does it

17  differ quite a bit for porous and non-porous?

18  A.  It's the same.  It starts out the same, but then they

19  diverge.

20  Q.  So if you could, maybe start by telling us the common

21  steps to both.  So you indicated there's a visual examination.

22  Is that for porous and non-porous objects?

23  A.  Yes, for both.

24  Q.  What's --

25  A.  That would be for both.

1   Q.  What's the next examination that you perform?

2   A.  The next examination would be a forensic light source

3   examination.  Basically what I'm doing is I'm looking at the

4   items of evidence with forensic light sources, ultraviolet

5   lights, 450 nanometer blue light, or a forensic laser.  And

6   I'm looking to see if there's any what we call inherent

7   fluorescence.  That is any type of fluorescence that's present

8   without us putting a forensic dye stain or something like that

9   on the item.

10  Q.  What other tests do you perform?

11  A.  So after those two, that's where non-porous and porous

12  items diverge.  After -- sticking with the non-porous, after

13  my forensic light source examination, I'm going to conduct

14  what's called super glue fuming.  And basically I take the

15  items of evidence and put it into one of our glue chambers.

16  It's a microprocessor-controlled piece of equipment with a

17  premeasured amount of glue for volume.  We bring it up to

18  approximately 70 percent humidity.  And then once it

19  reaches -- the hot plate reaches the temperature, we will put

20  the glue on there so it volatilizes.  Those fumes will adhere

21  to the residue that might be present on the items.

22          After that exam, after I'm done gluing, then I will

23  do a visual exam again, and I will take it into our forensic

24  light source room and look at it under a device that we call

25  the RUVIS, it's generally detected after a super glue fuming

1    process.  It allows me to visualize prints that might not be

2    visible because of multi colored backgrounds or textured

3    surfaces, that type of thing.

4            And then after the super glue, I'm going to use a

5    chemical dye stain that I will put on that item, and that dye

6    stain is designed to fluoresce under ultraviolet, under the

7    blue light, and under the laser, the forensic laser.  And so I

8    will conduct an examination with that to see if there's any

9    prints present on that item.

10   Q.  So I think you have now described five tests for us.  The

11   visual examination, the forensic light source examination, the

12   RUVIS examination, super glue fuming, and the chemical R.A.M.

13   examination?

14   A.  Yes.

15   Q.  Does that cover all of the examinations you conducted in

16   this case?

17   A.  Yes, it does.

18   Q.  Okay.  Can you tell us what specific objects you tested

19   for the presence of fingerprints in this case?

20   A.  I processed a rifle, a pistol, two magazines, a plastic

21   bag, and six cartridges.

22   Q.  And did you perform the same tests on each of those items?

23   A.  Yes, I did.

24   Q.  And were those the five tests you told us about?

25   A.  Yes, they were.

1  Q.  Okay.  Are you aware, sir, of whether any of these items

2  were tested in any other portions of the FBI laboratory?

3  A.  I had received them after they had gone through our DNA

4  unit's examination.

5  Q.  I am going to now hand you Government Exhibit 1-A, which

6  is -- you can tell us if it's one of the objects that you

7  tested.  Okay?

8          And if you would, sir, I'm going to ask you to put on

9  the rubber gloves.  And if you could open up Government

10  Exhibit 1-A, sir, and tell us if you recognize that item.

11  A.  Yes, I do.

12  Q.  How do you recognize it?

13  A.  It's the lab number that I examined, the evidence number

14  that we received, and then the item number, the laboratory

15  number, and my initials appear on the firearm.

16  Q.  Okay.  And is that an assault rifle, Government

17  Exhibit 1-A?

18  A.  It is a assault style rifle, yes.

19  Q.  Okay.  Did you perform each of the five tests you

20  described on this piece of evidence?

21  A.  Yes, I did.

22  Q.  What were the results of that examination?

23  A.  I did not develop any latent prints on this item.

24  Q.  Here's what I want to ask you, sir:  Are there any

25  characteristics of Government Exhibit 1-A that make it

1    difficult to retrieve latent fingerprints?

2    A.  Generally, we do have a difficult time recovering prints

3    from firearms in general.

4    Q.  Why is that?

5    A.  Just the way that the items are manufactured, the

6    coatings, the gluing, and the material that is -- they're

7    constructed out of tend to resist fingerprints.  It's

8    something that the manufacturer uses to retard rusting.  Also,

9    the portions where you would generally hold the weapon tend to

10   be texturized to improve the grip and control, and so it's

11   really difficult to develop prints off of that.

12   Q.  Sir, being careful not to point that at anybody, I'm just

13   going to ask you if you can show the ladies and gentlemen of

14   the jury what you mean by the particular surfaces that are

15   difficult to retrieve a print from.

16          THE COURT:  Just so the jury knows, the firearm has

17   been completely -- both of them have been completely disabled.

18   So they are not operable.

19          THE WITNESS:  The textured guard, the pistol grip,

20   but the entire weapon has been glued.  And so we generally

21   have a difficult time developing prints off of it.  Plus, it's

22   a non-porous item, so prints that would be on this item would

23   be sitting on the surface, which makes them susceptible to

24   being wiped off.  So how the evidence -- the item was stored

25   or handled, if it was cleaned, you know, things like that

1  would be -- would wipe off any prints that might be present on

2  it.

3  BY MR. SRIVASTAVA:

4  Q.  Sir, I'm going to approach you with Government's

5  Exhibit 2-A and trade.  If I can ask you to take a look at

6  Government's Exhibit 2-A and tell us if you recognize it.

7  A.  Yes, I do.  My initials appear on the firearm, and it also

8  bears the laboratory number and the evidence number.

9  Q.  What is Government's Exhibit 2-A?

10  A.  It's a handgun.

11  Q.  What tests did you perform on that handgun?

12  A.  The visual examination, the forensic light examination,

13  the super glue fuming examination, and then the R.A.M.

14  process.

15  Q.  Can you tell us what the results of those examinations

16  were?

17  A.  I did not develop any latent prints on this item.

18  Q.  And can you tell us what, if any, characteristics of that

19  firearm make it difficult to retrieve prints?

20  A.  It's the same as the rifle, the textured grip, just the

21  way the weapon is manufactured to basically resist

22  fingerprints.  It's to keep them from rusting or things like

23  that.  And then the operation of how the weapon would be

24  utilized.  It would make it very difficult to develop prints

25  on a weapon like this.

1  Q.  Sir, I'm going to ask you to put that one back in the box
2  before I take it back from you.
3        I'm now handing you what's previously been entered
4  into evidence as Government's Exhibit 15, which consists of
5  six cartridges and a magazine.  Can you tell us if you
6  recognize those items?
7  A.  Yes, I do.
8  Q.  How do you recognize Government's Exhibit 15?
9  A.  My initials appear on the magazine.  And I cannot see my
10 initials on the cartridges, but the evidence number appears on
11 the packaging.  And then my initials appear across the seal of
12 the packaging.
13 Q.  Did you test those cartridges and that magazine for the
14 presence of fingerprints?
15 A.  Yes, I did.
16 Q.  How did you do so?
17 A.  Using the same techniques, the visual light source -- the
18 visual examination; the forensic light source; the super glue
19 fuming; and the chemical dye stain, the R.A.M. process.
20 Q.  What were the results of that examination?
21 A.  I did not develop any latent prints on this item -- these
22 items.
23 Q.  Is there anything about the magazine that's in
24 Government's Exhibit 15 that makes it difficult to recover
25 prints?

1  A.  Again, just like the firearm, just the way that they're

2  manufactured.  And then the motion of inserting the magazine

3  into the pistol.  If there's a print on the surface, there

4  would be a chance that that would be wiped off.

5          And then the same way with the cartridges.  They're a

6  smaller surface area, so the chance of leaving a usable print

7  on them is going to be small.  But the action of uploading a

8  magazine with them, that would have a chance of wiping off any

9  prints that might be present on this.

10 Q.  And finally, sir, I'm going to show you a bag that

11 contains Government's Exhibit 16.  Can you take a look at this

12 and let us know if you recognize it?

13 A.  Yes.  My initials appear on the top of the magazine, and

14 it bears the evidence number that was assigned to this

15 particular piece of evidence.

16 Q.  And is that the magazine that went with the assault rifle?

17 A.  Yes.

18 Q.  Okay.  Did you perform any tests on it?

19 A.  Yes, I did.

20 Q.  What tests?

21 A.  I performed the visual examination; the forensic light

22 source examinations; the super glue fuming process; and the

23 chemical by stain process, R.A.M.

24 Q.  And, again, did you retrieve any prints after conducting

25 all of those tests?

1  A.  No, I did not.

2  Q.  Did you prepare a report to document all these findings,

3  sir?

4  A.  Yes, sir, I did.

5  Q.  Now, sir, how many times would you say you've tested a

6  firearm for the presence of fingerprints?

7  A.  I've tested -- I've examined thousands of weapons, rifles,

8  pistols, various forms of firearms, including magazines,

9  cartridges, and roughly about 10 percent of the time, I'll

10  develop a print off of those.

11  Q.  And is that roughly the same for firearms, cartridges and

12  magazines?

13  A.  Generally, the research shows that there's a little higher

14  probability of getting a print off of a magazine.  I think the

15  highest that I've seen was about 12 percent.  But it's lower

16  for the cartridges.

17  Q.  Now, did the circumstances in which these items are

18  packaged or carried affect the likelihood of retrieving

19  fingerprints?

20  A.  Yes, it is possible.

21  Q.  Okay.  So, if, for example, you learned that one of these

22  items had been packaged inside a sheet, would that impact the

23  likelihood of recovering fingerprints?

24  A.  It would have a -- there would be a chance that if there

25  was a print present on that item, that during the packaging or

1  wrapping in the sheet or the transportation of that item, if

2  it's allowed to slide back and forth per se.  If there was a

3  print on it, it could have the potential of wiping it off.

4  Q.  Does it surprise you that you were not able to recover

5  fingerprints from any of these items you examined?

6  A.  Again, it's very rare that we get prints off of firearms,

7  so the fact that I did not develop any prints on these items

8  did not surprise me.

9  Q.  So is it possible that the defendant touched these

10  firearms, cartridges, and magazines and you would still not

11  recover any fingerprints?

12  A.  Yes, it is.

13  Q.  And just to be clear then, is it possible for someone to

14  touch an item and not leave a fingerprint?

15  A.  Yes, it is.

16          MR. SRIVASTAVA:  No further questions, your Honor.

17          THE COURT:  Mr. Adams.  We are going to start.  We

18  will go for about five minutes.

19                      - - -

20          DANIEL LIEN, CROSS-EXAMINATION

21  BY MR. ADAMS:

22  Q.  Good afternoon.

23  A.  Good afternoon.

24  Q.  So you just told this jury that about 10 percent of the

25  time you develop a fingerprint on a firearm, correct?

1  A.  Yes.

2  Q.  But you test thousands of weapons in your career, did you

3  say?

4  A.  Um-hmm, yes.

5  Q.  How many weapons a month does the FBI test?

6  A.  I don't have any idea.  A lot.

7  Q.  How many do you test a month?

8  A.  Our cases aren't -- yeah, I couldn't tell you exactly how

9  many a month.

10  Q.  Is there an average?

11  A.  No.  I probably will receive a case every two, three weeks

12  that might be related to a firearms.  In some cases you'll get

13  a single weapon; some cases you'll get hundreds of weapons.

14  It just varies.

15  Q.  And you're in the latent print unit?

16  A.  That's correct.

17  Q.  How many other individuals in the latent print unit that

18  test firearms -- or that test for fingerprints?  I'm sorry.

19  A.  I believe right now we have about 30 plus examiners in our

20  unit.

21  Q.  So testing for fingerprints, it goes without saying, is a

22  commonly accepted practice for the FBI?

23  A.  Yes, it is.

24  Q.  So you expect to find fingerprints on items that you test?

25          MR. SRIVASTAVA:  Objection.

1        THE COURT:  Overruled.

2        You can answer.

3        THE WITNESS:  Well, when I process an item of

4   evidence, I really have no idea what I'm going to find, so I

5   try -- I don't go in with any preconceived, I'm going to get a

6   print off of this item, or I'm not going to get a print off of

7   this item.  We are just given a case.  The evidence that we

8   have is what we have, and then we conduct our processes on

9   that.  If we develop prints, then we proceed to the

10  comparison.  If we don't, we'll issue our reports.

11  BY MR. ADAMS:

12  Q.  And if there's no print on an item, that's not indicative

13  that someone -- scratch that.

14        The fact that you can't find a print on something

15  like a firearm, that doesn't tell you whether the person

16  touched it or not, correct?

17  A.  That is correct.

18  Q.  The fact that there is no fingerprint on a firearm isn't

19  indicative as to whether someone wiped off a fingerprint,

20  correct?

21  A.  That is correct.

22  Q.  So merely finding no fingerprint on a firearm isn't

23  indicative of possession of a firearm, correct?

24  A.  The only knowledge that I have is from the result of my

25  examination, so I don't -- I don't know what happened to that

1  weapon before it was received in the laboratory.  I can only

2  testify to what I determine during my examination.

3  Q.  Is there a way to tell whether a fingerprint was present

4  on a firearm and then was wiped off?

5  A.  Sometimes you'll see where a print was there, and I can't

6  say whether that was actually a fingerprint or if somebody was

7  wearing gloves like these and had something on the glove that

8  touched the item.  But sometimes you can see that the item was

9  handled and no usable print was left on it.

10  Q.  And that didn't happen here, did it?

11  A.  No.

12        MR. ADAMS:  Your Honor, could we take a break now?

13        THE COURT:  Let me see you at sidebar for a second.

14    (The following proceedings were had at sidebar outside the

15  hearing of the jury:)

16        THE COURT:  I was really kind of hoping to try to

17  finish this guy.  How much more you got?

18        MR. ADAMS:  There is one other issue, probably 10 or

19  15 minutes.

20        THE COURT:  Seriously?  Okay.  If you're telling me

21  10 or 15 minutes, we'll stop.

22    (The following proceedings were had in open court in the

23  presence and hearing of the jury:)

24        THE COURT:  Okay.  We're going to break for lunch,

25  and we'll resume at 1:30.  Don't discuss the case with each

1   other or with anyone else.

2      (The jury leaves the courtroom.)

3          THE COURT:  Because you are being cross-examined, you

4   can't discuss your testimony.  You understand?

5          Okay.  See you at 1:30.

6      (The trial was adjourned at 12:30 p.m. until 1:30 p.m. of

7   this same day and date.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3
     UNITED STATES OF AMERICA,          )   Docket No. 17 CR 220-2
 4                                       )
                          Plaintiff,     )
 5                                       )
                 vs.                     )
 6                                       )
     CAMERON BATTISTE,                    )   Chicago, Illinois
 7                                       )   February 12, 2019
                          Defendant.     )   1:30 o'clock p.m.
 8
                      TRANSCRIPT OF PROCEEDINGS
 9     BEFORE THE HONORABLE MATTHEW F. KENNELLY, AND A JURY
                          VOLUME 2-B
10

11   APPEARANCES:

12
     For the Plaintiff:        UNITED STATES ATTORNEY'S OFFICE
13                             BY:  MR. ANKUR SRIVASTAVA
                                    MR. SAURISH APPLEBY-BHATTACHARJEE
14                             219 S. Dearborn St., Suite 500
                               Chicago, Illinois  60604
15

16
     For the Defendant:        LAW OFFICES OF JOSHUA B. ADAMS, PC
17                             BY:  MR. JOSHUA B. ADAMS
                               53 West Jackson Boulevard, Suite 1515
18                             Chicago, IL  60604
                               (312) 566-9173
19

20                             LAW OFFICE OF ALANA M. DeLEON
                               BY:  MS. ALANA MARIA DeLEON
21                             1016 West Jackson Boulevard
                               Chicago, IL  60607
22                             (312) 531-0888

23
     Court Reporter:           MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                             Official Court Reporter
                               219 S. Dearborn Street, Suite 2102
25                             Chicago, Illinois  60604
                               (312) 435-5639
```

1    (The following proceedings were had in open court outside
2    the presence and hearing of the jury:)
3          THE COURT:  The record should reflect that
4    Mr. Battiste isn't here.  I think we are just talking about
5    scheduling.
6          MR. ADAMS:  Judge, downstairs in the cafeteria during
7    lunch, I was in line with Ms. DeLeon, and we were getting some
8    pretzels or something.  And one juror said, "Oh, those are
9    good" to me and Ms. DeLeon.  We ignored her.  I just want to
10   put it on the record, your Honor.  I don't think it's
11   anything.
12         THE COURT:  Is the suggestion that the juror telling
13   you that something is good suggests she is trying to poison
14   you?
15         MR. ADAMS:  I think so, probably.
16         THE COURT:  There is a 50/50 chance.
17         MR. ADAMS:  It is.
18         THE COURT:  It's the cafeteria.
19         MR. APPLEBY-BHATTACHARJEE:  We certainly appreciate
20   Mr. Adams' candor.
21         THE COURT:  Thanks for putting it on the record.
22         MR. SRIVASTAVA:  Judge, given how we left it, do you
23   want him to just be on the stand?
24         THE COURT:  He should, yeah.  Just make a record of
25   it.

1    (Short break.)

2    (The following proceedings were had in open court in the

3    presence and hearing of the jury:)

4         THE COURT:  All right.  Everybody can have a seat.

5         Mr. Adams, do you have any more questions for

6    Mr. Lien?

7         MR. ADAMS:  No further questions, your Honor.

8         THE COURT:  Anything on redirect?

9         MR. SRIVASTAVA:  No, your Honor.

10        THE COURT:  Thank you.  You're excused.

11        THE WITNESS:  Thank you.

12        THE COURT:  You can call the next witness.

13        MR. SRIVASTAVA:  Your Honor, at this time the

14   government calls Jasmine Mattox to the stand.

15        THE COURT:  Come right up here.

16     (Witness sworn.)

17        THE COURT:  All right.  You can go ahead.

18                            - - -

19           JASMINE MATTOX, DIRECT EXAMINATION

20   BY MR. SRIVASTAVA:

21   Q.  Good afternoon, ma'am.

22   A.  Good afternoon, sir.

23   Q.  Can you please tell the ladies and gentlemen of the jury

24   your name and also spell it for the record.

25   A.  My name is Jasmine Mattox; J-a-s-m-i-n-e, M-a-t-t-o-x;

Mattox - direct

211

1    Jasmine Mattox.

2    Q.  How old are you, ma'am?

3    A.  I am 25 years old.

4    Q.  Can you tell us without giving us an address just

5    generally where you live?

6    A.  Burr Oak in Berkeley.  Berkeley, Illinois.

7    Q.  And do you know a person named Iesha Stanciel?

8    A.  Yes.

9    Q.  How do you know Iesha Stanciel?

10   A.  She's my aunt.

11   Q.  And have you known her your whole life?

12   A.  Yes, sir.

13   Q.  Can you describe your relationship with Ms. Stanciel?

14   A.  We are very close.  She is my aunt on my dad's side, so I

15   don't see her very often, unless I, like, go over there

16   sometimes.  But we have a good relationship.

17   Q.  And as you have gotten to know Ms. Stanciel over the

18   years, do you know if she was dating anybody?

19   A.  Yes.

20   Q.  What's the name of the person that she was dating?

21   A.  His name Trub.  That's his nickname.  That's what I called

22   him.

23   Q.  Trub, like T-r-u-b?

24   A.  Yes.

25   Q.  And can you tell us if you've met Trub in person before?

1  A.  Yes, sir.

2  Q.  About how many times?

3  A.  I could say at least about six, seven, eight times.

4  Q.  And over the past how many years do you know of Iesha

5  Stanciel dating Trub?

6  A.  A couple of years, about ten years at the most, I believe.

7  I'm not sure, but that's kind of an accurate answer for me as

8  I know of.

9  Q.  Okay.  Do you know if Ms. Stanciel and Trub have any

10  children together?

11  A.  Yes.

12  Q.  Do you know how many?

13  A.  Two, I believe.

14  Q.  And do you know Trub's actual name?

15  A.  I know he has a son.  I believe his son is named after

16  him.  I believe his name is Christopher.  His last name, I'm

17  not sure.

18  Q.  Now, I would like you to look around the courtroom and

19  tell us if you see Trub here in court.

20  A.  Yes.  He is over there with the white button-up next to

21  the guy with the red tie on my left side.

22         THE COURT:  All right.  Indicating Mr. Battiste.

23  BY MR. SRIVASTAVA:

24  Q.  Can you tell us before today when was the last time you

25  saw Trub?

Mattox - direct

213

1    A.   The last time I seen Trub was at a party at my grandma

2    house.  I believe it was like two, about two years ago.

3    Q.   And do you remember about what time of the year it was?

4    A.   It was in the summertime because it was real hot.

5    Q.   So around the summer of 2017.  Is that fair?

6    A.   Correct.

7    Q.   Okay.  And when you saw Trub on that occasion, was

8    Ms. Stanciel with him?

9    A.   Yes.

10   Q.   Can you describe their interactions?

11   A.   A very good interaction.  Laughing, joking, very close

12   matter.

13   Q.   Did you get the impression the last time you saw Trub that

14   he was dating or in a relationship with Ms. Stanciel?

15   A.   Yes, sir.

16   Q.   Now, I want to fast-forward ahead to the winter of 2017.

17   I'm sorry.  The winter of 2016, rather.

18          So let me go back.  Did you help Ms. Stanciel get an

19   apartment?

20   A.   Yes, sir.

21   Q.   Okay.  And do you remember around what time of year that

22   was?

23   A.   It was in December of 2017, December or November.  It was

24   around the wintertime because it was snowing real bad out.  I

25   remember.

Mattox - direct

214

1  Q.  Okay.  So you remember it was snowing and it was November

2  or December of 2017 when you helped Ms. Stanciel get an

3  apartment?

4  A.  Yes.

5  Q.  Okay.  And I think my last question was confusing.  I'm

6  going to go back and ask you again.  That party where you saw

7  Trub and Ms. Stanciel together, you said that was in the

8  summer?

9  A.  Yes.

10 Q.  Was that in the summer before you helped Ms. Stanciel get

11 an apartment or the summer after?

12 A.  Way before then.

13 Q.  Okay.  So if you helped Ms. Stanciel get an apartment in

14 November or December of 2016, the party would have been that

15 summer of 2016?

16 A.  Yes.

17 Q.  Okay.  Can you tell us why you helped Ms. Stanciel obtain

18 an apartment?

19 A.  I helped her obtain an apartment because she told me she

20 was homeless.  She didn't have nowhere to go.  She was living

21 in and out of her car, which I did witness that.  She did have

22 a whole bunch of clothes inside her car.  I got the apartment

23 for her so she can have somewhere to stay because she did told

24 me she didn't have nowhere to go.  So that's the reason why I

25 got the apartment for her.  It was being nice as a niece to

Mattox - direct

215

1  get an apartment for her in my name.

2  Q.  And how was the apartment selected?

3  A.  She selected it.  I didn't know anything about the area or

4  anything like that.  I'm not from over there at all.

5  Q.  So you offered to help Ms. Stanciel get an apartment, and

6  then she chose one.  What did you do next?

7  A.  After she chose one, we went to see the apartment, and she

8  liked the apartment.  And we went to get the agreement, and we

9  signed the lease.  I signed the lease for her.  And after I

10  signed the lease for her, I handed her over the keys so she

11  had the right to the apartment.  And after that, I never been

12  back to the apartment before, and that was the last time I had

13  seen Iesha after that.

14  Q.  Okay.  So I want to just go back and go over what you just

15  told us a little bit more slowly.  Okay?

16          So you indicated that you signed a lease to help

17  Ms. Stanciel get an apartment?

18  A.  Yes, sir.

19  Q.  When you signed that lease, did you have any intention of

20  living there?

21  A.  No, sir.

22  Q.  Who did you understand would be living there?

23  A.  Iesha Stanciel.

24  Q.  And if you know, do you know whether anyone else was going

25  to live with her?

Mattox - direct

216

1   A.  No, not that I know of, sir.

2   Q.  Did you fill out any paperwork in addition to the lease

3   itself?

4   A.  Yes, I did.  I did -- I filled out the paperwork.

5   Q.  Okay.  So I'm going to show you what's been marked as

6   Government's Exhibit 21 for purposes of identification.  Okay?

7   I'm going to ask you to take a look at this and let us know if

8   you recognize that document.

9   A.  Yes, I recognize the document.

10  Q.  And what is that?

11  A.  It's a parking permit application.

12  Q.  And is this a parking permit application you filled out

13  when you signed the lease paperwork?

14  A.  Yes, sir.

15  Q.  Is there a date on that form?

16  A.  Yes.

17  Q.  What's the date?

18  A.  December 15th, 2016.

19  Q.  Is there a signature on that form?

20  A.  Yes, sir.

21  Q.  And whose signature is on that form?

22  A.  My signature, sir.

23  Q.  And does this appear to be a true and accurate copy of the

24  parking permit application you filled out?

25  A.  Yes, sir.

Mattox - direct

217

1  Q.  I'm also going to show you what's been marked as

2  Government's Exhibit 22.  Can you tell us if you recognize

3  that document?

4  A.  Yes, I recognize this document, sir.

5  Q.  What is it?

6  A.  The intercom phone entry system.

7  Q.  We are going to talk about that more in a moment.  But do

8  you see where it says "resident name"?

9  A.  Yes.

10  Q.  What name is listed there?

11  A.  Jasmine Mattox.

12  Q.  And does this appear to be a true and accurate copy of the

13  intercom phone entry system form that you filled out?

14  A.  Yes.

15          MR. SRIVASTAVA:  Your Honor, at this time I move to

16  admit Government's Exhibits 21 and 22 into evidence.

17          MR. ADAMS:  No objection.

18          THE COURT:  They are admitted.

19    (Above-mentioned exhibits were received in evidence.)

20          MR. SRIVASTAVA:  May I publish?

21          THE COURT:  That's fine.

22  BY MR. SRIVASTAVA:

23  Q.  So, Ms. Mattox, I'm first showing you what you just looked

24  at, which was Government's Exhibit 21.  And do you see where

25  it says there "parking permit application" at the top?

Mattox - direct

1   A.  Yes.

2   Q.  And I'm just going to read the first line aloud and ask

3   you to follow along.  "In order to park a vehicle in the

4   parking lot of Hinsdale Lake Terrace Apartments, a parking

5   permit sticker must be displayed at all times on the bottom,

6   passenger's side of the front windshield of the vehicle."

7           Did I read that correctly?

8   A.  Yes.

9   Q.  And so what did you understand this form to be for?

10  A.  The parking permit application was stating in order to

11  park at the residence, you have to have a parking sticker.

12  Q.  Okay.  And do you see your signature there dated

13  December 15, 2016?

14  A.  Yes.

15  Q.  And now do you see under that it says name, Jasmine

16  Mattox; building and unit number, 14-114?

17          Do you see that?

18  A.  Yes.

19  Q.  And right below that, do you see where it says "car

20  information"?

21  A.  Yes.

22  Q.  Can you read aloud for the ladies and gentlemen of the

23  jury what the make of the car is for which you're applying for

24  a permit?

25  A.  2013 Dodge Durango.

1   Q.  What color is listed?

2   A.  Black.

3   Q.  Is that your car?

4   A.  No.

5   Q.  Back in December of 2016, whose car was that?

6   A.  Iesha Stanciel's.

7   Q.  Do you see a license plate number there?

8   A.  Yes.

9   Q.  What's the license plate number that's listed?

10  A.  305T709.

11  Q.  And as best as you know, is that the license plate number

12  for Iesha Stanciel's Dodge Durango?

13  A.  Yes, sir.

14  Q.  Who provided this information?

15  A.  Iesha Stanciel.

16  Q.  And why is it that you got a permit for a car that

17  belonged to Iesha Stanciel?

18  A.  Because Iesha Stanciel was staying at the residence, and

19  it was her vehicle.  So in order for her to park her car at

20  the residence, she needed a vehicle sticker for her car.

21  Q.  Did you own a car back in December of 2016?

22  A.  No, sir.

23  Q.  And I'm going to now show you Government Exhibit 22.  Do

24  you see where it says "intercom phone entry system" at the

25  top?

Mattox - direct

1    A.  Yes, sir.

2    Q.  And then right below that do you see where it says in the

3    first paragraph:  "When a person comes to visit you, they will

4    press your apartment number on the intercom system.  The

5    system will ring your phone.  Once you have decided to let

6    that person in, press 9 on your phone, and the door will

7    open."

8         Did I read that correctly?

9    A.  Yes.

10   Q.  So what did you understand this form to be?

11   A.  In order for someone to come inside your building, they

12   have to press the intercom number to get inside.

13   Q.  And the intercom would then call a particular phone

14   number?

15   A.  Yes.

16   Q.  Do you see below that where it says resident name?

17   A.  Yes.

18   Q.  And is that your name listed?

19   A.  Yes, sir.

20   Q.  Under that, do you see where it says "phone number for

21   intercom"?

22   A.  Yes.

23   Q.  And there is a phone number listed?

24   A.  Yes.

25   Q.  Is that your phone number?

Mattox - direct

221

1  A.  No, sir.

2  Q.  Was that your phone number in December of 2016?

3  A.  No, sir.

4  Q.  Whose phone number was that in December of 2016?

5  A.  Iesha Stanciel.

6  Q.  How do you know that?

7  A.  Because that's the number that I would reach her out of in

8  the past.  That's her number.

9  Q.  And, again, why is it that her number was listed on this

10  form instead of yours or anyone else's?

11  A.  Because she lived at the building.  I don't.  So they

12  can't get in contact with me because I don't live there.  They

13  have to call her phone in order to get let in because she's

14  the one who is staying there.

15  Q.  And to the best of your knowledge, did Iesha Stanciel move

16  into that apartment?

17  A.  Yes.

18  Q.  Do you know who else lived with her at that apartment?

19  A.  No.

20  Q.  Did you ever go to see her at that apartment?

21  A.  No.

22  Q.  After you went with Iesha Stanciel and signed the lease,

23  did you ever go back to that apartment?

24  A.  No.

25  Q.  And that apartment, was that the apartment in Willowbrook,

Mattox - direct

222

1  Illinois?

2  A.  Yes.

3  Q.  And, ma'am, was it the apartment located at 10 South 481

4  Ivy Lane in Willowbrook?

5  A.  Yes.

6         MR. SRIVASTAVA:  May I have just a moment, your

7  Honor?

8         THE COURT:  Sure.

9     (Brief pause.)

10  BY MR. SRIVASTAVA:

11  Q.  Now, ma'am, after you signed the lease for the apartment,

12  did you learn what the management company was that managed

13  that apartment complex?

14  A.  You said did I learn?  What do you mean by that?

15  Q.  Did you at some point learn that there was a management

16  company that managed the apartment complex?

17  A.  No.

18  Q.  Okay.  Let me ask you this:  Later on in 2017, did you

19  learn that there were eviction proceedings against the

20  occupants of the apartment building for which you had signed a

21  lease?

22  A.  Yes, I did learn that, sir.

23  Q.  How did you learn that?

24  A.  I went down to DuPage for a case, and I gave them my

25  Social Security number.  And they said I had two cases.  And I

Mattox - cross

223

1    asked them why did I have two cases here.  They said for

2    eviction in DuPage.  And right off the back of my head, I knew

3    that it was for that apartment.  And they gave me the address

4    and told me to find it through the apartment.  And that's how

5    I found out.

6    Q.  So let me back up.  When you helped Ms. Stanciel get this

7    apartment by signing the lease, what was your understanding as

8    to who would be paying the rent?

9    A.  Iesha Stanciel would be paying the rent.

10   Q.  And did you --

11   A.  And with the help of her mother also.

12   Q.  Okay.  And based on what you learned when you went to the

13   DuPage County courthouse, do you know if that happened?

14   A.  No, apparently it didn't.

15   Q.  Ma'am, what else do you recall about the eviction

16   proceedings themselves?

17   A.  The eviction proceedings, there was a balance of $3,000

18   that I owed.  Apparently she didn't even pay none of the rent

19   that I know of.  So all the months that she was living there,

20   the rent didn't get paid from knowledge of what they told me

21   down at DuPage.

22              MR. SRIVASTAVA:  No further questions, your Honor.

23              THE COURT:  Mr. Adams.

24                             - - -

25              JASMINE MATTOX, CROSS-EXAMINATION

1   BY MR. ADAMS:

2   Q.  Good afternoon, Ms. Mattox.

3   A.  Good afternoon.

4   Q.  You had talked earlier about a party in the summer of

5   2016.  Do you remember talking about that?

6   A.  Yes.

7   Q.  Where was that -- where was that party?

8   A.  At my grandmother's house on Cranberry Lane.

9   Q.  What town is that in?

10  A.  It was in the summertime.

11  Q.  What town is Cranberry Lane in?

12  A.  Aurora.

13  Q.  Aurora.

14          And you mentioned someone named Trub?

15  A.  Yes.

16  Q.  That's Mr. Battiste.

17          Where was he living at the time?

18  A.  That, I don't know.

19  Q.  Where was Mr. Battiste living at the time that you got

20  this apartment for your aunt?

21  A.  Apparently I don't know.  I don't remember him getting an

22  apartment with us at all.  He wasn't there, and I have no

23  knowledge of him even living there until after the fact when

24  my auntie said that he was there.  Other than that, I didn't

25  have no knowledge at all.

Mattox - cross

1    Q.  Now, I want to talk to you about this eviction case you

2    just mentioned to the jury.  That was against you and your

3    mother, correct?

4    A.  No, not my mother.

5    Q.  You and Ms. Stanciel?

6    A.  Yes.

7    Q.  Sorry.  I apologize.

8             And that was for back rent due on the apartment in

9    Willowbrook, correct?

10   A.  Correct.

11   Q.  Because nobody has been paying the rent?

12   A.  Correct.

13             MR. ADAMS:  Judge, may I have one moment?

14             THE COURT:  Sure.

15             MR. ADAMS:  Nothing further, your Honor.

16             THE COURT:  Any redirect?

17             MR. SRIVASTAVA:  No, your Honor.

18             THE COURT:  You are excused.

19             THE WITNESS:  Thank you.

20             THE COURT:  You can call the next witness.

21             MR. APPLEBY-BHATTACHARJEE:  Yes.  The government

22   calls Tiffany Smith, your Honor.

23     (Witness sworn.)

24             MR. APPLEBY-BHATTACHARJEE:  May I proceed, your

25   Honor?

1          THE COURT:  That's fine.  Do you have that set up how

2    you need to?

3          MR. APPLEBY-BHATTACHARJEE:  It is plugged in.

4          THE COURT:  Okay.  All right.

5                              - - -

6          TIFFANY L. SMITH, DIRECT EXAMINATION

7    BY MR. APPLEBY-BHATTACHARJEE:

8    Q.  Good afternoon, ma'am.

9    A.  Good afternoon.

10   Q.  Would you please state and spell your name for the record.

11   A.  My name is Tiffany Smith, spelled T-i-f-f-a-n-y, last

12   name, S-m-i-t-h.

13   Q.  Ms. Smith, are you currently employed?

14   A.  I am.  I'm a forensic examiner in the DNA casework unit of

15   the FBI laboratory.

16   Q.  How long have you been employed as a forensic examiner

17   with the FBI's DNA casework unit?

18   A.  Since August of 2010, so for almost nine years.

19   Q.  Would you briefly describe for the members of the jury

20   your job responsibilities.

21   A.  Sure.  As a forensic examiner, it is my job to manage a

22   case.  So when a case comes into the DNA casework unit that

23   requires DNA testing, I will review the incoming paperwork and

24   determine what types of tests are required.  I will then

25   direct a team of biologists to perform that testing in the

1   laboratory.  Once that testing is complete, I will review the

2   data, make any comparisons as necessary, write a report, and

3   then testify, if needed.

4   Q.  Did you conduct comparisons of DNA samples in this case

5   with respect to Defendant Cameron Battiste?

6   A.  I did, yes.

7   Q.  Before we talk about your procedures and findings here,

8   let's provide the members of the jury some more information

9   about your educational background and qualifications.  Would

10  you briefly describe your educational background as it relates

11  to your current job?

12  A.  I have a bachelor's of science degree from West Virginia

13  University in forensic and investigative sciences.  I also

14  have a master's degree in biology, also from West Virginia

15  University.

16  Q.  While you were in school getting those degrees, did you

17  have any kind of internship position with a forensic

18  laboratory?

19  A.  I did.  While in my undergraduate, I worked at a forensic

20  laboratory, it was the Connecticut State Forensic Laboratory,

21  as an intern for three months.  And then while in graduate

22  school, I worked as a teaching assistant for three years where

23  I taught forensic DNA or biology lab work as well as basic DNA

24  courses.

25  Q.  Would you briefly describe the professional training you

Smith - direct

228

1    have received in forensic DNA analysis?

2    A.   Sure.  Once I graduated in 2010 from West Virginia

3    University, I was hired directly by the FBI laboratory.  I was

4    hired into the nuclear DNA unit at that time.  We are now the

5    DNA casework unit.  In that unit I went through a year and a

6    half training program where I worked alongside qualified

7    forensic examiners performing the same duties I currently

8    perform under direct supervision.  I also worked on items of

9    evidence in the laboratory.  They were mock items of evidence

10   so that I could understand the lab processes that were done on

11   items.  I took a series of oral Board Examinations and moot

12   court exercises, and then I took a competency test at the end

13   of that training, which I passed and was deemed qualified at

14   that time.

15   Q.   Do you have continuing education requirements as part of

16   your current job function?

17   A.   I do.  Yearly, I'm required to take continuing education

18   courses through either going to conferences or reading

19   articles or attending meetings, and this is done every single

20   year as part of our quality system.

21   Q.   And do you also have continuing certification or

22   qualification requirements?

23   A.   Every year I'm required to take two proficiency tests, and

24   a proficiency test is a test provided by an outside company

25   where the results are known.  And the purpose of this test is

1    to perform the tests that we do at the FBI laboratory under

2    our own protocols and determine what those results are.  We

3    then send our results out to that proficiency test provider.

4    They grade essentially our tests and deem that we are still

5    producing reliable results.  And I'm required to do that every

6    year, twice a year.

7    Q.  And are you current with your continuing education

8    requirements?

9    A.  I am, yes.

10   Q.  Are you current with your continuing certifications?

11   A.  The proficiency test, yes.

12   Q.  Have you recently attended any conferences or symposia or

13   forensic DNA analysis?

14   A.  I did.  In 2018, I attended the International Human

15   Identification Symposium in Phoenix, Arizona.

16   Q.  Do you provide training on forensic DNA analysis to

17   investigators in the field?

18   A.  I do.  Not as much anymore.  Now we have other individuals

19   that provide that training.  I do have my own trainees that

20   follow me.  And I observe their work, and I help assist them

21   to become qualified themselves.  I also do provide training to

22   our evidence response team and senior team leaders

23   occasionally to explain to them how DNA should be properly

24   collected and packaged so that it is shipped to the laboratory

25   and maintains its integrity once it gets to the lab.

Smith - direct

230

1    Q.  Does the FBI laboratory where you work have its own

2    accreditation requirements?

3    A.  We do.  We are accredited.  In addition, the DNA casework

4    unit follows the quality assurance standards for forensic DNA

5    testing laboratories.

6    Q.  Based on your training and experience, are the methods for

7    forensic DNA analysis used at the FBI laboratory consistent

8    with generally accepted methods in the forensic scientific

9    community?

10   A.  Yes, they are.

11   Q.  Over the course of your tenure with the FBI, can you

12   approximate how many items of evidence for which you've

13   conducted the forensic DNA analysis?

14   A.  It's well into the thousands.

15   Q.  Have you previously testified about your opinions on DNA

16   examinations in court?

17   A.  Yes, I have.

18   Q.  Approximately how many times?

19   A.  I believe this would be about 42 times in those 8 years.

20         MR. APPLEBY-BHATTACHARJEE:  Your Honor, may I

21   proceed?

22         THE COURT:  Do you want to question her on her

23   qualifications?

24         MS. DeLEON:  On cross, your Honor.

25         THE COURT:  Okay.  You can proceed.

Smith - direct

231

1    BY MR. APPLEBY-BHATTACHARJEE:

2    Q.  Let's start with first principles.  What's DNA?

3    A.  DNA stands for deoxyribonucleic acid, and it's our

4    hereditary material.  We receive half of our DNA from our

5    mother and half of our DNA from our father.  And it controls

6    not only what we look like physically but also all the

7    different chemical processes going on within the body.

8    Q.  Why is DNA significant for forensic analysis?

9    A.  DNA is found within ourselves, which are the building

10   blocks of our body.  So we have DNA in our skin cells, blood

11   cells.  Males have it in their sperm cells.  And because of

12   that, when people come in contact with items, they potentially

13   will leave that DNA behind on those items, which we can then

14   process forensically to determine if DNA can be recovered.

15   And then we can use that for comparison purposes against known

16   individuals where we have their DNA profile collected directly

17   from them.

18   Q.  Does one particular person have the same DNA throughout

19   his or her body?

20   A.  No.  DNA is unique to an individual with the exception of

21   identical twins.  Identical twins do have identical DNA.  Over

22   99 percent of our DNA is the same, and that's what makes us

23   human.  It's why we have arms, legs, nose, mouth.  However,

24   that 1 percent of DNA that varies is why we look different

25   from one another.  We focus for forensic DNA testing on a very

 1   small portion of that 1 percent.  We focus on regions that

 2   differ in their length between individuals, and these are

 3   called short tandem repeats.  And that's what we forensically

 4   test in the FBI laboratory.

 5   Q.  And so other than identical twins, using the methodology

 6   that you described, are you able to generate unique DNA

 7   profiles for individuals?

 8   A.  We are able to obtain DNA profiles from evidence, whether

 9   that be from one individual or multiple individuals.  And then

10   we are then able to compare it to other individuals.

11   Q.  So let's talk about that DNA forensic process.  Can DNA be

12   forensically recovered from an inanimate object?

13   A.  It can, yes.

14   Q.  Could you provide some examples of objects from which you

15   could recover DNA for forensic testing purposes?

16   A.  You can recover DNA from almost anything.  It just depends

17   on whether an individual has come in contact with that item.

18   And if they have come in contact with that item, for how long.

19   Or DNA can be deposited in other means, such as sneezing on an

20   item.  You can leave behind saliva that contains DNA.

21           Anything that I touch, such as this microphone, if I

22   touch this microphone, then I could potentially be leaving

23   skin cells behind that contain DNA, if an individual is

24   injured and are bleeding, they could leave blood behind at a

25   scene, which could be processed forensically as well.

Smith - direct

233

1  Q.  So one of the ways you described DNA could be left behind

2  is by touching something.  I'd like to focus on that.  What

3  factors impact whether DNA is left behind when somebody

4  touches an object?

5  A.  There are a lot of factors.  The first is going to be what

6  is the object.  A smooth object is going to be more difficult

7  for DNA to stay on than a textured surface where skin cells

8  might get trapped on the item.  The length of time an

9  individual comes in contact with an item could have an effect.

10 So if I touch something very briefly, I may only leave a few

11 skin cells behind.  If I touch something for a long period of

12 time, I might leave more skin cells behind.

13        How that touch occurs, if it's a brief, just a touch,

14 versus a rubbing, that could affect.  Also, individuals differ

15 in the amounts of DNA they leave behind.  Some people leave a

16 lot of DNA behind when they touch an item.  Other people leave

17 little DNA behind.  So there's a lot of factors that could

18 potentially result in getting different results from items.

19 Q.  Could whether an item has been cleaned impact whether DNA

20 that may otherwise have been left behind can be recovered?

21 A.  Yes, that is one possibility.

22 Q.  How about the age of an item?

23 A.  Yes.  That is another possibility.  If DNA is on an item

24 for a long period of time, in pristine conditions, it can last

25 for years.  However, if the item is subjected to extreme heat,

1    moisture, humidity, sunlight, it could break down the DNA and

2    you may not obtain DNA any longer.  And, also, again, if an

3    item is cleaned, it could be wiped away or removed.

4    Q.  Are you familiar with the term "degraded" when it's used

5    to describe DNA?

6    A.  Yes.  Degraded is the breakdown of DNA over time or

7    through some type of environmental condition or chemical.  So

8    it is when DNA that is on an item is no longer recovered

9    because it has been broken down or broken into many pieces.

10   Q.  Does a DNA profile change as the underlying DNA gets

11   degraded?

12   A.  No, the profile doesn't change.  You'll still get the same

13   profile if you get a profile.  Degradation, all that occurs is

14   you're actually just breaking down the DNA so that you are no

15   longer able to detect it.  So, for instance, if a person's DNA

16   profile is a 1014, you may only see the 10.  You might miss

17   that 14 because it's broken down.  But it won't turn to a 915.

18   Q.  And in certain circumstances, can wiping an object impact

19   whether DNA can be recovered from it?

20   A.  It's possible if you wipe an object it could, again,

21   remove some of the DNA that's left behind potentially.

22   Q.  If an object is handled by multiple people, can that

23   impact whether DNA can be recovered from an item?

24   A.  Yes.  So when more than one individual comes in contact

25   with an item, we typically will get a mixture of DNA from that

Smith - direct

235

1    item.  That's when either skin cells or some other cell is

2    left behind by different people.  We see a mixture of DNA from

3    that item.  Sometimes if you have one person that contributed

4    the majority of the DNA on that item, you may not see the

5    other people.  So it really depends on the specifics of the

6    case.  All cases are slightly different.

7    Q.  Now, we've talked about recovering DNA from objects in the

8    abstract.  In certain circumstances, can DNA be recovered from

9    firearms?

10   A.  Yes, it can.

11   Q.  And in certain circumstances, is the DNA recovered from a

12   firearm suitable for comparison to other samples of known DNA?

13   A.  Yes, it can be.

14   Q.  And does that sometimes include degraded DNA that might be

15   recovered from a firearm?

16   A.  Yes, that is possible.

17   Q.  Compared against other objects, is it generally easier or

18   harder to recover DNA from a firearm?

19   A.  Again, it depends.  All firearms are different.  Sometimes

20   we don't get any DNA from that firearm.  Sometimes we get full

21   profiles.  Traditionally, if an item has a body fluid, such as

22   blood, semen, or saliva, we get more DNA from that item

23   because body fluids contain a lot of DNA.  Whereas skin cells

24   may or may not be left behind when a person comes in contact

25   with that item.

1  Q.  Let's talk about the process of recovering DNA from a

2  firearm.  What's the first step?

3  A.  The first step is a DNA collection.  That's where we take

4  a moistened swab that is moistened with sterile water.  And we

5  swab all the textured portions of that firearm.  This is to

6  try to pick up any skin cells that might have been trapped in

7  those textured areas.  This, again, is called a DNA

8  collection.  Then we add chemicals and heat to that

9  collection.  This will allow us to break open those cells that

10 contain DNA, releasing the DNA into that tube or the solution.

11        We will then quantify the amount of DNA we are able

12 to obtain.  This is when we estimate how much DNA we are able

13 to obtain from a sample.  We then amplify the locations of

14 interest.  So, again, over 99 percent of our DNA is the same.

15 We don't want to look at those regions.  So we go through an

16 application process where we only amplify the locations of the

17 DNA that vary, and even only a small subset of those

18 locations.

19        Lastly, we run the DNA through a separation technique

20 that separates the DNA pieces out by their size, and this will

21 generate a DNA profile, which I can then use for comparison

22 purposes.

23 Q.  So for the jury's benefit, I just want to break this into

24 the steps and the process.  So you start with the swab.  Is

25 that fair?

Smith - direct

237

1  A.  Yes.  We start with the firearm specifically, and then we

2  will swab that firearm.  And then we continue the process with

3  the swab.

4  Q.  And then the next step in the process is called

5  extraction; is that right?

6  A.  That is correct.

7  Q.  And following that is quantification?

8  A.  Yes, that's correct.

9  Q.  And then amplification?

10  A.  Yes.

11  Q.  And lastly separation?

12  A.  That's correct.

13  Q.  Is the underlying DNA altered during this process of

14  extraction, quantification, amplification, and separation?

15  A.  The DNA itself is not altered.  We just make millions of

16  copies of the locations of interest.

17  Q.  And at the end of this four-step process of extraction,

18  quantification, amplification, and separation, are you able to

19  generate a DNA profile?

20  A.  Yes.  If there is DNA to begin with on the item, yes.

21  Q.  And what, if anything, does developing such a DNA profile

22  allow you to do as a forensic examiner?

23  A.  As a forensic examiner, I will first interpret that DNA

24  profile from that item.  So I will determine is male DNA

25  present?  Is female DNA present?  Is it potentially a mixture

1   of both male and female DNA?  I will then determine was one

2   person on that item, or are there multiple people on that

3   item?  If there are multiple people, how many people am I

4   seeing?  I do this first.  I do this interpretation

5   independently, and then I will do any comparisons to known

6   individuals if I have samples from them.

7            And, typically, this is through a cheek swab or a

8   blood sample that we obtained directly from a person where we

9   then will process that evidence -- or excuse me -- that known

10  individual.  And we will generate a DNA profile, and I will

11  compare them side by side.

12  Q.  And so we'll come back to that comparison step, but as we

13  are talking about generating the DNA profile from DNA

14  recovered from a firearm, based on your training and

15  experience, are there instances in which more than one

16  person's DNA can be recovered from firearms?

17  A.  Yes.  It's very common to see more than one individual on

18  a firearm.

19  Q.  As part of your analysis of DNA extracted from a firearm,

20  you talked about looking to see if there were multiple

21  contributors.  Is that fair?

22  A.  Yes, that is correct.

23  Q.  Now, where there are multiple contributors to DNA

24  recovered from a firearm, is it possible to estimate the

25  relative amounts of DNA belonging to each contributor?

Smith - direct

239

1   A.  It is.  Once we generate a DNA profile and after I make

2   that interpretation, I will use a software package called

3   STRmix where I will enter the profile into that package.  Once

4   it is into that software package, it will estimate how much

5   DNA is from each contributor.  It is an estimate, though.  It

6   is not an exact number.

7   Q.  And is use of the STRmix program to generate such

8   contributor proportion estimates, is that something that's a

9   generally accepted practice in the DNA forensic sciences?

10  A.  Yes, it is.

11  Q.  Now, before we get to the topic of comparisons, I just

12  want to stop right here and talk about what your job is and

13  what your job isn't.  Your job function is determining whether

14  DNA is on an object.  Is that fair?

15  A.  Yes, that is correct.

16  Q.  Are you able to tell when DNA got on an object?

17  A.  I am not, no.

18  Q.  Are you able to tell how DNA got on an object?

19  A.  No, I am not.

20  Q.  Is that even part of your job description?

21  A.  It is not, no.

22  Q.  Are you familiar with the term "secondary transfer"?

23  A.  I am, yes.

24  Q.  So would you please provide a brief explanation of what

25  secondary transfer is.

1   A.   Secondary transfer is when DNA gets on an object through

2   indirect contact.  So, for instance, if I touch this

3   microphone stand and then I walk away and somebody else comes

4   in and also touches that microphone stand, they may never have

5   come in contact with me, but they may have picked up some of

6   my skin cells onto their own hands because they touched an

7   object I have also touched.  So direct contact is when I touch

8   an item and I leave my DNA behind; secondary is when someone

9   else comes in and picks up my DNA from that item.

10  Q.   Are there, based on your training and your experience, any

11  generally understood limitations on when DNA can be

12  secondarily transferred?

13  A.   There are.  There's a lot of research on secondary

14  transfer.  Traditionally, secondary transfer is much easier

15  with liquid, body fluid; such as, blood, saliva, semen.  And

16  if you think about it, if you have ketchup and you put ketchup

17  on a plate and it's wet ketchup, it's very easy to dip your

18  french fry into that ketchup and transfer the ketchup onto

19  that french fry because it's in a liquid state.

20          When it's dried, it's much more difficult to transfer

21  onto your french fry.  And it's kind of the same with blood,

22  semen, saliva.  If the item is dried, it's more difficult to

23  transfer between items.  If it's liquid, it's much easier to

24  transfer.  Also, the type of item that it is is also going to

25  have an impact.  If it's an absorbant item, like a shirt or a

1  pair of pants, the DNA will actually absorb into that item.

2  And it's more difficult to transfer than if it is a smooth

3  object.

4  Q. So let's talk about the process of creating a DNA profile

5  from a known person. You talked about cheek swabs. Is that

6  where this fits into the narrative?

7  A. Yes.

8  Q. So walk us through that. How do you go from taking a

9  cheek swab to generating a DNA profile of a person?

10  A. It's the exact same steps of the process. We take a

11  cutting or a collection from that cheek swab. We then add

12  chemicals and heat. We quantify the amount of DNA. We then

13  amplify that DNA. And then we are able to run it through a

14  separation process where we obtain a DNA profile that can then

15  be used to compare it to the evidence.

16  Q. And one point of clarification. Is a cheek swab also

17  commonly known as a buccal swab in the forensic DNA community?

18  A. Yes. They are interchangeable.

19  Q. So at the end of this four-step process, are you able to

20  generate a DNA profile for the person who gave the buccal

21  swab?

22  A. Yes.

23  Q. And can that DNA profile then be compared against DNA, for

24  example, that's recovered from a firearm?

25  A. Yes, it can.

1   Q.  What, if any, conclusions are you able to draw from those

2   comparisons?

3   A.  There are three conclusions.  The first is a match.  When

4   the DNA from a known individual is found on the DNA from a

5   evidence item, we say that that individual matches the DNA and

6   could have been the contributor to that item.

7           If the DNA profile from the evidence is different

8   than the DNA from the known individual, we say that that is an

9   exclusion and the person could not have left their DNA on that

10  item.

11          And the third is an inconclusive result, and that is

12  when the quality or the quantity of the DNA is lower.  And,

13  therefore, we cannot make a determination one way or the other

14  if a person's DNA is present on an item.

15  Q.  So with respect to these comparison conclusions, I want to

16  focus on matches.  Is there a -- is there a common metric used

17  to assess the quality of a match?

18  A.  When we have a match, we calculate a statistic to show how

19  strong is that match.  We do -- at the FBI laboratory we use

20  likelihood ratios.  And the bigger the number, the stronger

21  the sample -- the match is.

22  Q.  And so are there ranges of likelihood ratios that the FBI

23  employs when doing these kinds of DNA match conclusions?

24  A.  Yes, there are.

25  Q.  And are you able to explain for the jury what those

Smith - direct

243

1 general ranges are of likelihood ratios?

2 A.  I would if I could refer to my report just because we have

3 recently changed our likelihood ranges.

4         MR. APPLEBY-BHATTACHARJEE:  So if I may, your Honor,

5 may I approach the witness?

6         THE COURT:  That's fine.  Sure.

7         THE WITNESS:  Yes, this is a copy of my materials,

8 and I can provide the ranges.  So the ranges we have at the

9 FBI lab at the time this report was generated was 100 to 999

10 was limited support that a person was a contributor to a

11 sample.  1,000 to 9,999 was moderate support.  10,000 to

12 999,999 was strong support.  1 million to less than 1 trillion

13 was extremely strong support.  And then anything greater than

14 1 trillion was support for identification.

15         And just to back up a little bit, what a likelihood

16 ratio is, is it's comparing two different probabilities.  The

17 first is what is the probability of the DNA evidence given

18 that it originated from a certain person of interest.  And we

19 compare that to the probability of the evidence given that it

20 originated from a random, unrelated unknown individual.

21         So we compare these two probabilities.  The bigger

22 the number gets, the more support that a certain person of

23 interest is the contributor to the DNA.  The smaller the

24 number, if it's less than 1, means there is more support that

25 an unknown unrelated individual left the DNA.  And then if it

Smith - direct

244

1   equals 1, then we cannot tell one way or the other.  They are

2   equally likely.

3   BY MR. APPLEBY-BHATTACHARJEE:

4   Q.  So I'd like you to maybe use a likelihood ratio in a

5   sentence.  Let's say a particular person of interest

6   likelihood ratio is 1 trillion.  What does that mean?

7   A.  If the likelihood ratio is 1 trillion, what that means is

8   the DNA typing results are 1 trillion times more likely if

9   they originated from a person of interest than if they

10  originated from a random, unrelated unknown individual.  And

11  that would also equal support for identification, according to

12  our numbers that we use at the FBI lab.

13  Q.  Based on your training and experience, are the likelihood

14  ratio ranges that you've described generally accepted in the

15  forensic scientific community?

16  A.  They are.  Different laboratories might use different

17  ranges.  However, the idea of a likelihood ratio and -- the

18  ranges are similar between laboratories.

19          MR. APPLEBY-BHATTACHARJEE:  Your Honor, at this time

20  may I read stipulation number 3 into the record?

21          THE COURT:  Sure.  Do you need the ELMO?

22          MR. APPLEBY-BHATTACHARJEE:  Yes.  If we can switch

23  over to the ELMO.

24          THE COURT:  You may be able to do that there.  There

25  you go.

1          MR. APPLEBY-BHATTACHARJEE:  So reading the party's

2    stipulation number 3.  In 2017, FBI special agents transferred

3    a Smith & Wesson, M&P15 Sport II CA assault rifle, bearing

4    serial number TE38718, Government's Exhibit 1-A; a Smith &

5    Wesson model SDV9E, 9-millimeter pistol, bearing serial number

6    FYJ7552, Government's Exhibit 2-A; a buccal sample from

7    Cameron Battiste, Government's Exhibit 3-A; and a buccal

8    sample from Iesha Stanciel, Government's Exhibit 4-A, to the

9    FBI laboratory in Quantico, Virginia.  Such items were -- all

10   such items were submitted to the laboratory's DNA casework

11   unit for DNA examination.

12         Qualified FBI laboratory biologists at the direction

13   of FBI Forensic Scientist Tiffany L. Smith processed the

14   submitted items and undertook preliminary steps to allow

15   Tiffany L. Smith to conduct a DNA comparison of the submitted

16   items.  For the entire time they processed the submitted

17   items, the FBI biologists followed best practices and FBI

18   protocol for the processing and handling of the submitted

19   items for DNA comparison by Tiffany L. Smith.  At all times,

20   the FBI biologists maintained a proper chain of custody of the

21   submitted items, and a proper foundation exists for their

22   admission into evidence.

23         Government's Exhibit 1 is a true and accurate

24   photograph of Government's Exhibit 1-A.  Government's

25   Exhibit 2 is a true and accurate photograph of Government's

Smith - direct

1  Exhibit 2-A.  Government's Exhibit 3 is a true and accurate

2  photograph of Government's Exhibit 3-A.  And Government's

3  Exhibit 4 is a true and accurate photograph of Government's

4  Exhibit 4-A.

5        So stipulated?

6        MS. DeLEON:  So stipulated.

7        MR. APPLEBY-BHATTACHARJEE:  And, your Honor, I

8  believe that Exhibits 1-A and 2-A have been entered into

9  evidence, but at this time the government moves to admit

10  Exhibits 1, 2, 3, and 3-A and 4 and 4-A.

11        THE COURT:  All right.  Those are all admitted based

12  on the stipulation.

13    (Above-mentioned exhibits were received in evidence.)

14        MR. APPLEBY-BHATTACHARJEE:  And, your Honor, may I

15  place Exhibits 1-A and 2-A before the witness?

16        THE COURT:  That's fine.

17        MR. APPLEBY-BHATTACHARJEE:  Thank you.

18  BY MR. APPLEBY-BHATTACHARJEE:

19  Q.  And, Ms. Smith, I'm going to ask you to take Exhibit 1-A

20  out of its box, if you could just do so.  And I will place the

21  box on the ground next to you.

22        Exhibit 1-A is a Smith & Wesson rifle bearing serial

23  number TE38718.  Do you see that?

24  A.  Yes, I do.

25  Q.  Did you or individuals at the FBI laboratory working at

Smith - direct

1  your direction attempt to recover DNA from a Smith & Wesson

2  rifle bearing serial number TE38718?

3  A.  Yes.

4  Q.  Can you explain for the jury how you would go about

5  attempting to recover DNA from a firearm that looks like that?

6  A.  With a firearm that has textured areas, we will always

7  swab only those textured areas.  And the reason for that is we

8  don't want to swab any smooth areas that might contain

9  fingerprints.  DNA goes first to preserve the integrity of the

10 DNA evidence.  So we would swab anything on this item that was

11 textured.  We always will swab the grip, because that's

12 traditionally textured.  We will swab any buttons or levers.

13 We will swab the ridges along the rifle if it has textured

14 ridges.  We will swab along the trigger as well and also along

15 the stock, if needed.

16 Q.  And I'll ask you to put that back in the box, and I'll

17 take it from you.

18          Now, Ms. Smith, were DNA swabs taken from the rifle

19 we just looked at together subjected to the four-step process,

20 extraction, quantification, amplification, and separation,

21 that we discussed before?

22 A.  Yes.

23 Q.  Was DNA successfully recovered from the firearm in

24 Exhibit 1-A?

25 A.  Yes, it was.

Smith - direct

248

1   Q.  From how many contributors?

2   A.  I observed male DNA from two contributors.

3   Q.  What relative proportion from each contributor?

4   A.  I would again have to refer to my notes.

5         From the rifle, it was estimated that approximately

6   78 percent came from one contributor and 22 percent came from

7   the other.  And, again, this is just an estimate.  But that

8   would indicate that one person did donate more DNA than the

9   other individual.

10  Q.  And is that sufficient to conclude that one person was a

11  major contributor?

12  A.  Potentially.  We don't use that terminology in our

13  reporting anymore, but a major contributor is when one person

14  donates the majority of the DNA.  And other individuals would

15  be considered a minor contributor.

16  Q.  Now, if you could look at Exhibit 2-A in the other box up

17  on the bench right now and take the item out of that box.

18        Exhibit 2-A is a Smith & Wesson pistol bearing serial

19  number FYJ7552.  Do you see that?

20  A.  Yes, I do.

21  Q.  Did you or individuals at the FBI lab working at your

22  direction attempt to recover DNA from a Smith & Wesson pistol

23  bearing serial number FYJ7552?

24  A.  Yes, we did.

25  Q.  And referring to your lab notes, if necessary, are you

Smith - direct

1    aware of the condition in which either of these firearms that

2    we have been looking at were found?

3    A.  No, I was not.

4    Q.  So could you explain for the jury, looking at Exhibit 2-A,

5    the pistol, how you would attempt to recover DNA from a

6    firearm like that?

7    A.  We treat all firearms the same, so we would, again, swab

8    just the textured portions.  So we would swab the textured

9    grip.  We would swab the ridges along the side of this

10   firearm.  We would swab the textured areas of the trigger as

11   well as there's texture on the side of the firearm.  We would

12   swab that as well.  And then we would also swab along the back

13   textured areas.

14   Q.  And were the DNA swabs taken from the pistol in

15   Exhibit 2-A subjected to the four-step process, extraction,

16   quantification, amplification, and separation, that we

17   discussed before?

18   A.  Yes, it was.

19   Q.  Was DNA successfully recovered from the pistol?

20   A.  Yes, it was.

21   Q.  From how many contributors?

22   A.  Again, two individuals, and male DNA was detected.

23   Q.  And in what relative proportion from each contributor?

24   A.  For the pistol, it was estimated that approximately

25   94 percent from one contributor and 6 percent for the second

1    contributor.

2          MR. APPLEBY-BHATTACHARJEE:  And, your Honor, may I

3    place Exhibits 3 and 4, which have already been admitted,

4    before the witness --

5          THE COURT:  That's fine.

6          MR. APPLEBY-BHATTACHARJEE:  -- or, rather, 3-A and

7    4-A.

8          THE COURT:  Okay.

9    BY MR. APPLEBY-BHATTACHARJEE:

10   Q.  Exhibit 3-A is a buccal swab taken from the defendant

11   Cameron Battiste.  Do you see that?

12   A.  I do.

13   Q.  Using the defendant's buccal swab, did you or individuals

14   at the FBI lab working at your direction create a DNA profile

15   for Cameron Battiste that could be compared against other DNA

16   profiles?

17   A.  Yes.

18   Q.  Did you do so following the process you previously

19   described for creating DNA profiles from a known person?

20   A.  Yes.

21   Q.  And Exhibit 4-A is a buccal swab taken from Iesha

22   Stanciel.  Do you see that?

23   A.  Yes, I do.

24   Q.  Using her buccal swab, did you or individuals at the FBI

25   lab working at your direction create a DNA profile for Iesha

Smith - direct

251

1  Stanciel that could be compared against other DNA profiles?

2  A.  Yes, I did.

3  Q.  And did you do so following the process you previously

4  described for creating DNA profiles of a known person?

5  A.  Yes.

6  Q.  Before you is a binder of exhibits.  If you could turn to

7  Exhibit 13.

8  A.  Yes.

9  Q.  Are you familiar with Exhibit 13?

10  A.  I am, yes.

11  Q.  What is it?

12  A.  It is a figure that shows the summary of my results.

13  Q.  And, specifically, does Exhibit 13 reflect your findings

14  from comparing the DNA profiles for Defendant Battiste and

15  Iesha Stanciel against the DNA profiles you obtained from the

16  Smith & Wesson rifle and pistol we previously discussed?

17  A.  Yes.

18  Q.  Does the data underlying the summary chart include

19  multiple reports and other lab documents?

20  A.  Yes, it does.

21  Q.  Does the data underlying the summary chart reflect the

22  actions of numerous lab technicians working at your direction?

23  A.  Yes, it does.

24  Q.  Does the underlying data encompass multiple pages of

25  documents?

Smith - direct

252

1    A.  Yes, it does.

2    Q.  Does Exhibit 13 fairly and accurately summarize your

3    findings with respect to the DNA profiles for the firearms as

4    compared against the DNA profiles for Defendant Battiste and

5    Iesha Stanciel?

6    A.  Yes, it does.

7            MR. APPLEBY-BHATTACHARJEE:  Your Honor, the

8    government moves to admit summary Exhibit 13 under Rule 1006.

9            THE COURT:  Any objection to 13?

10           MS. DeLEON:  Not at this time, your Honor.

11           THE COURT:  All right.  It's admitted.

12       (Above-mentioned exhibit was received in evidence.)

13           MR. APPLEBY-BHATTACHARJEE:  May I publish for the

14   jury?

15           THE COURT:  Sure.

16           MR. APPLEBY-BHATTACHARJEE:  Thank you.

17   BY MR. APPLEBY-BHATTACHARJEE:

18   Q.  So referring to Exhibit 13 as a guide --

19           THE COURT:  Are we back on the computer now?

20           MR. APPLEBY-BHATTACHARJEE:  Oh, yes.  I'm sorry, your

21   Honor.

22           THE COURT:  That's okay.  I can switch it.  You got

23   it?  Okay.

24           MR. APPLEBY-BHATTACHARJEE:  If your Honor could flip

25   over to the computer from the --

1      THE COURT:  Now I just got to turn the jury's thing

2  on.  There we go.

3  BY MR. APPLEBY-BHATTACHARJEE:

4  Q.  And do you see it on the screen before you as well,

5  Ms. Smith?

6  A.  I do, yes.

7  Q.  So what conclusions, if any, did you make in comparing the

8  DNA profile for Iesha Stanciel against the DNA profile

9  obtained from the Smith & Wesson rifle?

10  A.  When I compared Ms. Stanciel to the rifle, she was

11  inconclusive.  So, again, an inconclusive result means that I

12  cannot tell one way or another if an individual may have been

13  a contributor to that sample.

14  Q.  What conclusions, if any, did you make in comparing the

15  DNA profile for Defendant Cameron Battiste against the DNA

16  profile obtained from the Smith & Wesson rifle?

17  A.  When I compared Mr. Battiste's DNA to the mixture of DNA

18  from that rifle, I determined that he matched to a potential

19  contributor on that rifle.  I calculated my likelihood ratio,

20  because whenever I have a match, I have to calculate a

21  likelihood ratio to show the strength of that match.  And in

22  this case, my likelihood ratio was 240 billion.  And so what

23  that means is the DNA typing results are 240 billion times

24  more likely if Mr. Battiste is a contributor to that DNA than

25  if Mr. Battiste is not a contributor to that DNA.

Smith - direct

254

1  Q.  Do you recall mentioning that there were approximately two

2  DNA contributors on the rifle?

3  A.  Yes.

4  Q.  And which of those contributors is Mr. Battiste a match

5  for, according to your analysis?

6  A.  He was more consistent with the major contributor, the

7  78 percent contributor.

8  Q.  I'd like to turn your attention now to the Smith & Wesson

9  pistol.  What conclusions, if any, did you make in comparing

10  the DNA profile for Iesha Stanciel against the DNA profile

11  obtained from the Smith & Wesson pistol?

12  A.  From the pistol, Ms. Stanciel was excluded as a potential

13  contributor, meaning her DNA was not the same as the DNA found

14  on the pistol.

15  Q.  So are you able to conclude that Ms. Stanciel was not the

16  major contributor on the pistol?

17  A.  That is correct.  She was excluded as from both

18  contributors.

19  Q.  What conclusions, if any, did you make in comparing the --

20  in comparing the DNA profile for Defendant Cameron Battiste

21  against the DNA profile obtained from the Smith & Wesson

22  pistol?

23  A.  When I compared Mr. Battiste to the pistol, I, again,

24  matched him to a potential contributor in that sample.  When I

25  calculated my likelihood ratio here, it was 62 quintillion.

Smith - cross

255

1  So 62 quintillion means that the DNA type results are

2  62 quintillion times more likely if Mr. Battiste is a

3  contributor than if Mr. Battiste is not a contributor, and

4  this offers support for identification, that he is a

5  contributor to that DNA.

6  Q.  And just for the jury's benefit, what's a quintillion?  1

7  followed by how many zeros?

8  A.  A quintillion is 1 followed by 18 zeros.

9  Q.  Do you recall mentioning that there were two DNA

10  contributors on the pistol as well?

11  A.  Yes, I do.

12  Q.  Which of those two contributors is Mr. Battiste a match

13  for?

14  A.  Using STRmix, he was a match to the 94 percent

15  contributor.

16       MR. APPLEBY-BHATTACHARJEE:  No further questions at

17  this time, your Honor.

18       THE COURT:  Ms. DeLeon.

19               - - -

20       TIFFANY L. SMITH, CROSS-EXAMINATION

21  BY MS. DeLEON:

22  Q.  Good afternoon, Ms. Smith.

23  A.  Good afternoon.

24  Q.  If you will just give me a moment so I can get organized a

25  little here.

1         So, Ms. Smith, first off, in discussing DNA evidence,

2    in discussing DNA in general, we are talking about very small

3    particles; is that right?

4    A.  That is correct.

5    Q.  And maybe even smaller than small, would be like tiny,

6    microscopic, in fact?

7    A.  Yes, that is correct.

8    Q.  And so we're discussing something that cannot be seen to

9    the naked eye, right?

10   A.  Traditionally, no.  Some cells are larger than others, but

11   traditionally that is correct, yes.

12   Q.  And when you're swabbing surfaces, as you have described

13   on direct, are you looking for only visual cues as to where

14   DNA could potentially be, or you're just swabbing areas where,

15   in your experience, microscopic biological material could be

16   present?

17   A.  We will swab according to our standard operating

18   procedure.  So for firearms, for instance, we always will swab

19   all the textured areas.  So that is a visual cue on the

20   firearm.  Where there is texture, we know that skin cells may

21   or may not be trapped on that area.  So we are visually

22   looking at the item, but we are following our protocol to

23   determine where to collect from.

24   Q.  And that could be -- you described that maybe the skin

25   cells are on those textured ridges, but it could be, as you

Smith - cross

1  described on direct, bodily fluids like blood, saliva, semen;

2  is that correct?

3  A.  It is possible, yes.

4  Q.  So not just skin cells, is my point?

5  A.  Yes, that is correct.  We will swab all the textured areas

6  based on how firearms are traditionally used.  However, we do

7  not know where the DNA comes from.  It could come from a body

8  fluid as well.  That is correct.

9  Q.  Okay.  And just by the very nature of DNA as we have been

10 talking about, it's a very sensitive kind of evidence; is that

11 right?  Would you agree with that statement?

12 A.  That is correct.  DNA testing is relatively sensitive,

13 yes.

14 Q.  And is it true that, in fact, just a few cells could get

15 you a full DNA profile of a contributor?

16 A.  It's possible.  Traditionally we target 1 nanogram of DNA,

17 which is close to 200 cells, but you can get full profiles

18 from less than that.  That is possible, yes.

19 Q.  And are you familiar with the number of cells that were

20 recovered from, for instance, in this case, the rifle?

21 A.  We don't know specifically how many cells are collected.

22 There's no way for us to determine exactly how many cells are

23 found.

24 Q.  So is there any way to determine whether it was less than

25 1 nanogram as you said was typically 200 cells?

Smith - cross

1   A.  It was less than 1 nanogram.  That is correct.

2   Q.  Was it less than half a nanogram?

3   A.  I would have to refer to my notes specifically.

4   Q.  Please do.

5           THE WITNESS:  Your Honor, may I grab my notes?

6           THE COURT:  Yes.  That's fine.  Oh, they're over

7   there.  Go ahead.

8   BY MS. DeLEON:

9   Q.  And take your time.  Let us know when you are ready.

10  A.  Yes.  That is correct.  From the rifle, there was less

11  than a half a nanogram as well as with the pistol.  That is

12  correct.

13  Q.  So as to the rifle that we were discussing earlier that

14  you looked -- took a look at and the pistol that you were

15  describing earlier, from each one of those objects, less than

16  1 nanogram of cells was recovered from each; is that right?

17  A.  This, again, is an estimate, but that is correct.  It is

18  an estimate, but it would be about that, yes.

19  Q.  Okay.  And just to remind us, that, you said, is about 200

20  cells?

21  A.  It's actually a little less than that, but, yes.

22  Q.  Okay.  So then it would be fair to say that if half of a

23  nanogram, which is less than 200 cells, was recovered, then it

24  would be less than a hundred was found on each object that you

25  tested?

Smith - cross

1   A.  Again, that's potential.  These are all estimates, so it

2   is an estimation.  I can't say the specific number of cells,

3   yes.

4   Q.  Sure.

5           So back to what I kind of briefly asked you about

6   before, which was a full DNA profile can be recovered from

7   just a few cells; is that right?

8   A.  It is possible.  Yes, that is possible.

9   Q.  Or a portion profile; is that right?

10  A.  That is correct.  And a partial profile just means we did

11  not obtain DNA at all of the tested locations.

12  Q.  And so can you -- can you briefly just explain to -- well,

13  me and the jury what the difference between a full profile and

14  a partial profile is?

15  A.  So when we look at the different locations in the DNA, a

16  full profile is if we have DNA at all of those locations.  We

17  are not missing information at any of them.  For a partial

18  profile, it means we don't have DNA at all of the locations.

19  Some of the locations are missing DNA, and that is typical for

20  forensic testing.

21          THE COURT:  When you say "locations," you don't mean

22  locations on the object you're looking at; you mean locations

23  within the cell structure?

24          THE WITNESS:  That is correct.  The specific

25  locations I'm referring to are the DNA testing locations or

 1   short tandem repeats throughout the DNA.
 2   BY MS. DeLEON:
 3   Q.  And so with respect to full versus partial profiles, as
 4   you just explained, whereas in a partial profile, there would
 5   be missing information at those locations, as you cleared up
 6   for the judge, what kind of a profile was created in this
 7   case?
 8   A.  Again, referring to my notes specifically, full profiles
 9   were obtained from the known reference samples, and partial
10   profiles were obtained from the evidence samples.
11   Q.  And so when you say "the known samples," those were the
12   samples that you eventually tested for comparison that were
13   directly swabbed from inside the cheek of Mr. Battiste at some
14   point; is that right?
15   A.  Yes, that is correct.
16   Q.  So that would be a full profile because you know where
17   that's coming from, right?
18   A.  Typically it is a full profile, but, again, if it's
19   treated through extreme temperatures, heat or humidity, it can
20   degrade just like evidence can.  But, yes, routinely known
21   profiles are full profiles.
22   Q.  Okay.  And then -- so with respect to what was recovered
23   from the two firearms at issue in this case, we are talking
24   about recovery of a partial profile as to each; is that right?
25   A.  Yes.  They are both partial profiles but still suitable

1   for comparison.

2   Q.  Okay.  And we talked a little about DNA transfer or

3   transferring DNA from an object, physically touching it like

4   the pen.  I believe you used your microphone stand -- or the

5   microphone as an example.  There are other types of transfers;

6   is that right?

7   A.  Yes, there are different types of transfer.  That's

8   correct.

9   Q.  And -- what are those different types of transfer?

10  A.  Primary transfer is when an individual comes into direct

11  contact with an item leaving their DNA on that item.

12  Q.  And so that would be somebody directly touching an item or

13  perhaps sneezing or spitting towards an item, and it lands on

14  top of that -- on top of a surface, correct?

15  A.  Yes.  That would be considered primary transfer, yes.

16  Q.  And what's the other kind -- is it two kinds of transfer

17  or three?

18  A.  There are multiple types of transfer.  The second type is

19  secondary transfer, and that is when an individual's DNA is

20  obtained from an item through indirect transfer.  So, again,

21  if I touch this microphone stand, I'm leaving my DNA on this

22  microphone stand through primary transfer.  However, the next

23  individual that comes up and sits in this seat might touch the

24  same spot, and my DNA may get on their hands because they

25  touched an object that my DNA is already on.  That is

Smith - cross

262

1  secondary transfer, meaning myself and that individual have

2  never come in contact with one another, but my DNA is

3  transferred through that secondary contact.

4  Q.  And are there more -- is there another type of transfer?

5  I know you were saying that there was more than that.

6  A.  There is a third type of transfer called tertiary

7  transfer, and that would be now that my DNA is on this

8  individual's hand, they go touch a new object, and a few of my

9  cells might be left behind on that object.  That would be

10  called tertiary transfer.

11  Q.  It's tertiary; is that right?

12  A.  Yes.

13  Q.  Okay.  I just want to make sure I was pronouncing it

14  right.

15       So tertiary transfer is where, you know, let's use

16  the microphone or this pen, for example.  I leave this pen

17  behind.  My DNA perhaps is on this pen, either through saliva

18  or through skin particles.  And then somebody else comes into

19  the courtroom, picks up this pen and takes it off somewhere

20  else.  Now, my DNA on this object would be in another room

21  somewhere else hypothetically; is that right?

22  A.  Yes.  The DNA would still be on the object itself.  That's

23  still primary transfer.  Secondary transfer would be if the

24  DNA transferred from that pen to another object.

25  Q.  I see.  Okay.  So I'm explaining it wrong.

1          So can you give us another example of tertiary DNA

2     transfer, just so I'm making sure I understand?

3     A.   So tertiary transfer could be anything such as I bled on

4     an item.  So I have a cut, and I have liquid blood left on the

5     counter.  That would be primary transfer.  My DNA in the form

6     of blood was left behind on that counter.  Now, say, my friend

7     comes through and touches that blood.  That blood gets on her

8     shirt.  That would be secondary transfer.  She never

9     interacted with me directly.  I didn't bleed on her.  However,

10    she picked up my blood from the countertop.  That would be

11    considered secondary transfer.

12         Now, if she took her shirt off and left it on the

13    floor and some of my blood then transferred to the carpet of

14    that floor, that would be considered tertiary transfer.  So

15    it's very difficult to pass DNA through this process.  It's

16    just -- it is a possibility, and so we have names for it just

17    because it could happen, yes.

18    Q.   And so is that -- that's a principle, though, that is

19    accepted in forensic science; is that right?

20    A.   That is correct.  And, again, liquid samples, such as

21    liquid blood, saliva, or semen, are more easily transferred

22    because they are wet.  They are able to absorb onto items.

23    Whereas, dried samples or skin cells are more difficult to

24    transfer, but, yes, it is.

25    Q.   Sorry.

1          But transfer can still occur?

2   A.  That is correct.  Yes, it can.

3          MS. DeLEON:  Sorry.  If you will just give me a

4   moment.

5     (Brief pause.)

6   BY MS. DeLEON:

7   Q.  Based on this idea of transferring DNA, either primary,

8   secondary, or tertiary -- tertiary; is that right?

9   A.  That's how I pronounce it, yes.

10  Q.  Okay.  There is no way of telling which method of transfer

11  landed that -- those specific cells on a certain item; is that

12  right?

13  A.  That is correct.  Through DNA testing, you cannot tell how

14  or when DNA got on an item.

15  Q.  How or when; is that right?

16  A.  That's correct.

17  Q.  Okay.  And you certainly, therefore, then don't know the

18  order in which cells arrived on an item?

19  A.  That is correct, no.

20  Q.  Or how they were deposited then?

21  A.  That is correct, no.

22  Q.  And the source of the DNA, whether it be skin cells,

23  blood, semen, saliva, or really any cells that you said that

24  could carry DNA, there's no way to tell what the source of the

25  DNA is from the test, right?

Smith - cross

265

A.   That is correct.  Traditionally if we believe there is a
body fluid on an item such as blood or semen, we will do types
of testing called serology where we'll test an item for the
presence of blood or semen.  That was not done in this case.
In this case, there was no reason to believe there was any
blood present on the item because we didn't see any red-brown
staining.  However, I do not know where the DNA from this item
came from.  That is correct.

Q.   And you're familiar, as you told us on direct examination,
with the concept of DNA degradation; is that right?

A.   That is correct, yes.

Q.   I have a problem with that word, too, "degradation."

        And that has to do with the quality of the DNA that
you were describing to us on direct, right?

A.   Yes.  Again, degradation is when DNA is subjected to
either heat, sunlight, humidity, time.  It could break down
the DNA leaving less DNA on that item.

Q.   And can that also be -- or can degradation also occur
through microbial activity?

A.   It can, yes.  So if there's bacteria that could break up
the DNA as well, that is another possibility, yes.

Q.   And that, again, is at a microscopic level, right?  This
microscopic bacteria could potentially degrade microscopic
human cells?

A.   It could be, but it would have to be pretty extreme

Smith - cross

1  because we can obtain DNA from bloodstains that are 30 years

2  old.  So it would have to be a pretty extreme condition, but,

3  yes, it is possible.

4  Q.  Just based on what you were saying about being able to

5  get -- or test an old bloodstain, for instance, that's just

6  because of the high sensitivity of these examinations, right,

7  or the tests that you perform?

8  A.  It is highly sensitive.  But, again, with blood, if it's

9  absorbed and dried on an item and subjected to pristine

10  conditions, it can last forever even without sensitive

11  examinations because there's a lot of DNA there.

12  Q.  Pardon.

13          So does the quality or level of degradation of the

14  DNA matter to testing?

15  A.  For testing purposes, it doesn't matter.  We are going to

16  swab the item regardless on whether the DNA has been

17  potentially degraded or not.  Whether we see a DNA profile or

18  not may show in the results.  If the sample is extremely

19  degraded, we may not obtain a DNA profile, or we will get very

20  limited DNA.  But the testing is not any different.

21  Q.  On direct examination, you had talked about how almost

22  anything can have DNA on it; is that right?

23  A.  That is possible.  Anything that's come in contact with an

24  individual or an individual speaks over or sneezes onto can

25  have DNA.  That is possible.

1   Q.  And that goes for household objects; is that right?

2   A.  Yes, that is correct.

3   Q.  So you, as a forensic examiner, know that clothing or

4   bedsheets or items in a household would probably have DNA or

5   most certainly have DNA material on them; is that right?

6   A.  Yes.  That would be possible, yes.

7   Q.  And are you familiar with the -- I guess the way that

8   these objects were found -- or I'm sorry -- the way that the

9   objects were before you received them in the lab?

10  A.  I was not prior to my testing.  I am now familiar with it

11  because I was informed recently.  But during my testing, I was

12  not familiar with it.

13  Q.  Okay.  And you were informed recently then that these

14  items that you had tested were originally wrapped in a

15  bedsheet; is that right?

16  A.  Yes.  I am familiar with at least one of them being in a

17  bedsheet, yes.

18  Q.  Okay.  And did you ever have occasion to examine that

19  bedsheet?

20  A.  No, I did not.

21  Q.  So that bedsheet was not sent to you at any point; is that

22  right?

23  A.  That's correct.

24  Q.  And certainly then you received no swabs from that -- from

25  a bedsheet in this case; is that right?

1  A.  That is correct.  And traditionally we wouldn't have

2  tested the bedsheet for DNA.

3          THE COURT:  Just answer the question that's asked,

4  please.

5          THE WITNESS:  No, that's correct.  We did not.

6  BY MS. DeLEON:

7  Q.  Okay.  We had talked earlier -- or I'm sorry.  Not we.

8  But you had spoken earlier about a program that this software

9  that creates or generates a percentage that we had seen on a

10 chart that counsel had put up earlier; is that right?

11 A.  Yes, that's correct.

12 Q.  Okay.  And you had described the percentage that was

13 attributed on that chart in the boxes as an estimation; is

14 that right?

15 A.  Yes, that is correct.

16 Q.  And that's an estimation because to really determine the

17 percentages, what would be too difficult to do, or can you

18 kind of explain why that is difficult to prove?

19 A.  Again, because we don't know how or when DNA was left

20 behind, we can't say exactly what the ratio is between that.

21 What we're using is what we see in the profile.  We look at

22 the heights of the DNA, so how much DNA are we actually seeing

23 from each contributors.  And the software uses a series of

24 algorithms to determine this.  But, again, it is an estimate.

25 Q.  And when we were talking earlier -- I keep saying that.

Smith - cross

269

1    When you were talking earlier about the firearms
2    having been swabbed, you had described the different areas --
3    the different textured regions were swabbed, right?
4    A.  Yes, that is correct.
5    Q.  And you have described specifically as to the pistol, for
6    example, that the grip, the ridges, the trigger, the side
7    textured areas, and the back textured areas were all swabbed?
8    A.  Yes.  All of the textured areas were swabbed.
9    Q.  Now, when you say "swabbed," do you mean each
10   individual -- each section that I just described is
11   individually swabbed with one stick or like one collection
12   stick?
13   A.  We take --
14        THE COURT:  I think what she is asking you is does
15   each section get its own swab?
16        Is that what you are asking?
17   BY MS. DeLEON:
18   Q.  Yeah, I guess what I'm trying to clear up, what I'm not
19   sure of is the swab itself, is that an object, a swab?
20   A.  Yes.  It is a swab that has moisture on it, and we are
21   vigorously swabbing all of the textured areas to transfer the
22   DNA onto that item, yes.
23   Q.  So what does that swab look like?
24   A.  It looks like -- in essence, it looks like a Q-Tip.  It is
25   longer, but it only has swab on one end.

1  Q.  It's like a big one-sided Q-Tip?

2  A.  Yes.

3  Q.  And so this big one-sided Q-Tip, you take one, and you're

4  vigorously swabbing the trigger.  And then you move on to

5  another swab, and then you vigorously swab the ridges?

6  A.  We use one swab, and we will swab all the textured areas

7  on that firearm with one swab.

8  Q.  Okay.  So one big one-sided Q-Tip is used to swab the

9  entire item that you're testing?

10  A.  Unless we need to go to a second swab.  Routinely, we

11  don't need to.  If the swab starts to...

12  Q.  Come apart?

13  A.  Yeah, if it becomes difficult to transfer any more

14  material onto it, we will go to a second swab.  But,

15  routinely, with firearms that's not necessary.

16  Q.  Okay.  So this one swab is being used on all of those

17  areas that I just described.  You're vigorously swabbing this

18  grip, the ridges, the trigger, the side textured areas, the

19  back textured areas, anywhere else you're deeming should be

20  swabbed.  It's that one swab for the whole thing, vigorously

21  rubbing on those areas, right?

22  A.  Yes, that is correct.

23  Q.  All right.  Because you are trying to pick up every little

24  bit?

25  A.  Yes.  We're trying to pick up as much as we can.  We know

1    that because, again, these areas are textured, there could be

2    skin cells within that texture.  So we know we are not getting

3    everything.  We're just getting as much as we can.

4    Q.  And by the very nature of DNA, you need to try to get

5    everything that you can because everything is so small, right?

6    A.  Well, we want to get enough DNA in order to be able to

7    generate a DNA profile, so we are trying to get as much as we

8    can from that area.

9    Q.  And what you did in this case with respect to both the

10   swabbing of both firearms created only a partial profile, as

11   we had discussed earlier?

12   A.  It was a partial profile, but we still got an almost

13   complete profile.  It was not just a few locations.

14   Q.  But you had said earlier that it was a partial profile,

15   not a full profile; is that right?

16   A.  That is correct.  When we look at 24 locations, a partial

17   profile would also mean if we only got DNA at 23 of the 24.

18   So it's a little misleading.  A partial profile just means

19   that I don't have DNA at all of the locations present.

20   Q.  Okay.

21          MS. DeLEON:  Your Honor, if I could just have a

22   moment.

23          THE COURT:  Sure.

24     (Brief pause.)

25          MS. DeLEON:  Just a few more questions, if you'll

Smith - redirect

1  bear with me.

2  BY MS. DeLEON:

3  Q.  So when we were talking about transfer earlier, certainly

4  in a hypothetical where an item is wrapped in a cloth or

5  wrapped in -- an object is wrapped tightly or wrapped in a

6  piece of material, for instance, it is possible that

7  material -- biological particles and material, whether wet or

8  dry, on the cloth could potentially transfer to the surface of

9  the material -- of the object that was inside that cloth; is

10  that right?

11  A.  It is possible, yes.

12  Q.  Okay.

13        MS. DeLEON:  Okay.  I have no further questions of

14  this witness.

15        THE COURT:  Redirect?

16        MR. APPLEBY-BHATTACHARJEE:  Yes, your Honor.  Can I

17  have a moment to set up the computer?

18                         - - -

19        TIFFANY L. SMITH, REDIRECT EXAMINATION

20  BY MR. APPLEBY-BHATTACHARJEE:

21  Q.  Hello again, Ms. Smith.  I want to start with swabbing

22  textured areas.  Do you recall being asked about that on

23  cross-examination?

24  A.  Yes, I do.

25  Q.  When you're swabbing firearms, do you use one swab per

1  gun?

2  A.  Yes.  Traditionally, yes.

3  Q.  Are you going to use the swab -- do you typically use the

4  swab that was used for the rifle on the pistol as well?

5  A.  No.  We would collect from each item individually.  We'd

6  also clean our bench tops with bleach before going on to the

7  next item as well.  We only have one item out at a time.  We

8  use one swab per item.  That item is then completed.  And then

9  we will go on to the next item.

10  Q.  You talked about textured areas.  Are those the places

11  where a person would ordinarily hold a firearm, such as the

12  grips?

13  A.  Oftentimes, a grip is textured.  It's not always textured.

14  So, in most instances, yes, that is potentially where an

15  individual would come in contact with a firearm.

16  Q.  Now, you testified on both direct and cross-examination

17  that you don't know how cells get onto an item; is that right?

18  A.  That is correct.  I cannot say how or when DNA is

19  obtained -- found on an item or left behind on an item.

20  Excuse me.

21  Q.  Again, that's not part of your job description; is that

22  fair?

23  A.  That is correct, yes.

24  Q.  Hypothetically, if aliens from outer space deposited DNA

25  on an object, you wouldn't know?

1   A.  That is correct, no.

2   Q.  And, hypothetically, if a defendant ran from the police

3   before you ever found his DNA --

4           MS. DeLEON:  Objection, your Honor.

5           THE COURT:  The objection is sustained.

6   BY MR. APPLEBY-BHATTACHARJEE:

7   Q.  On direct exam and cross-examination, you were asked a few

8   questions about degradation.  Do you recall that?

9   A.  Yes, I do.

10  Q.  And you described factors that can lead DNA to degrade.

11  Do you remember that?

12  A.  Yes.

13  Q.  Does that include the passage of time?

14  A.  Yes, that is correct.

15  Q.  And other environmental factors as well?

16  A.  Yes.  Again, heat, humidity, bacteria, moisture, cleaning.

17  Those can all remove DNA or degrade DNA.

18  Q.  Based on your experience, is there sometimes a gap in time

19  between when an object is recovered from a crime scene and

20  when your lab --

21          MS. DeLEON:  Objection, your Honor.

22          THE COURT:  Leading.  Sustained.  You are not allowed

23  to lead even though it's redirect.

24  BY MR. APPLEBY-BHATTACHARJEE:

25  Q.  Is it your typical experience to swab items for DNA on the

Smith - redirect

275

1    day they are recovered from a crime scene?

2    A.  No, that's not typical.  Traditionally, once the evidence

3    is received at the laboratory, it will get assigned to the

4    different units.  It will move through the laboratory

5    depending on what examinations are required, and then it will

6    get tested in the order in which we routinely receive the

7    case.  So we receive about 200 or so cases a month.

8    Q.  Based on your training and experience, can DNA that may be

9    deposited on an object degrade out in the field before it

10   comes to your lab?

11   A.  That is possible, yes.

12   Q.  You were asked questions about secondary and tertiary

13   transfer.  Is that fair?  Or do you recall that?

14   A.  Yes.

15   Q.  And would it be okay if I referred to secondary and

16   tertiary transfer by the term "indirect transfer"?

17   A.  That's fine, yes.

18   Q.  So on direct exam you testified that there were some

19   generally understood limitations on indirect transfer.  Do you

20   recall that?

21   A.  I do.

22   Q.  Based on your training and experience, if DNA is deposited

23   through indirect transfer, is that usually a major or a minor

24   contributor?

25   A.  The direct transfer is typically the major contributor.

1    The indirect transfer is usually the minor contributor, based
2    off the studies I have seen.  Again, that's not always the
3    case.  It could be different.  However, the majority of the
4    case studies I have read, the individual who comes into direct
5    contact with an item routinely will leave the majority of the
6    DNA.
7    Q.  And if DNA is deposited through indirect transfer, would
8    you generally expect to find the transfer's DNA as well?
9    A.  You could, yes.
10   Q.  On direct examination, you described the possibility of
11   indirect transfer from absorbant surfaces like a shirt.  Do
12   you recall that?
13   A.  Yes, I do.
14   Q.  And your testimony, if I recall correctly, is that
15   indirect transfer from such absorbant surfaces like shirts
16   would be less likely; is that right?
17   A.  I'm sorry.  Can you repeat the question?
18   Q.  That indirect transfer of DNA from absorbant surfaces
19   would be less likely?
20   A.  Based off the studies I have read, it is easier to
21   transfer from a non-porous item, like a smooth item, to a
22   absorbant material like a shirt than it is from vice versa.
23   So, for instance, if a firearm is wrapped in a blanket, it
24   would be actually easier for the firearm to transfer DNA to
25   the blanket than vice versa, but it could happen.

1  Q.  At the time you conducted your DNA analysis in this case,

2  were you aware that the Smith & Wesson rifle was found wrapped

3  in a bedsheet?

4  A.  No, I was not.

5  Q.  At the time you conducted your DNA analysis in this case,

6  were you aware that the Smith & Wesson pistol was found

7  wrapped in a plastic shopping bag?

8  A.  No, I was not.

9  Q.  In spite of how they were stored, was your lab able to

10  recover DNA from both firearms?

11  A.  Yes, it was.

12  Q.  Was it able to recover enough DNA suitable for comparison

13  in this case?

14  A.  Yes, it was.

15        MR. APPLEBY-BHATTACHARJEE:  Your Honor, may I publish

16  Exhibit 13, which is already in evidence?

17        THE COURT:  Sure.

18  BY MR. APPLEBY-BHATTACHARJEE:

19  Q.  Of defendant and Iesha Stanciel, who, if anyone, was

20  excluded as a contributor on the DNA on any of the firearms?

21  A.  Ms. Stanciel was excluded from the pistol, and then she

22  was inconclusive on the rifle.

23  Q.  And of defendant and Ms. Stanciel, who, if anyone, was a

24  match for the major contributor on both firearms?

25  A.  Mr. Battiste matched to both firearms.

Smith - redirect

278

1        MR. APPLEBY-BHATTACHARJEE:  No further questions,

2   your Honor.

3        THE COURT:  Anything new based on the redirect?

4        MS. DeLEON:  No, your Honor.

5        THE COURT:  The witness is excused.  We are going to

6   take a 10-minute break.

7     (The jury leaves the courtroom.)

8        THE COURT:  I've got a draft of the jury

9   instructions, one for each side.  It's a little bit

10  overinclusive probably, but we can always eliminate stuff.  So

11  we'll figure out at the end of the day when we're going to

12  talk about all that.

13       MR. APPLEBY-BHATTACHARJEE:  Thank you, your Honor.

14       THE COURT:  Okay.  Take ten minutes.

15       MR. APPLEBY-BHATTACHARJEE:  And just to notify the

16  Court and the parties, one more witness left from us.  Thank

17  you.

18    (Short break.)

19       THE COURT:  Okay.  We are back on the record.  All

20  the lawyers and Mr. Battiste are present.  So is there

21  something you wanted to bring up?

22       MR. ADAMS:  Yes, your Honor.  Mr. Battiste would like

23  to call his expert out of order from the government's case, if

24  that's all right with the Court.  I have spoken to the

25  government about it.

1    THE COURT:  So you changed your mind?

2    MR. ADAMS:  I did, your Honor.

3    THE COURT:  Okay.  All right.  That's fine.

4    MR. APPLEBY-BHATTACHARJEE:  We have no objection.

5    THE COURT:  You don't have a problem with it.  Okay.

6  So that would -- okay.  How long do you think the direct is?

7    MR. ADAMS:  It might take half an hour at the most.

8    THE COURT:  The goal is to get the person done

9  today --

10    MR. ADAMS:  Yes.

11    THE COURT:  -- because there is a problem with

12  tomorrow or something like that.

13    MR. ADAMS:  Yes, your Honor.

14    THE COURT:  Okay.  We should make a record of what it

15  is.  So it's a problem with tomorrow.  The person would have

16  trouble getting back here.

17    MR. ADAMS:  Yes, your Honor.  He would.  And, your

18  Honor, can I have an extra five minutes just to get ready

19  with Mr. Friedman.

20    THE COURT:  Make sure you understand you are eating

21  into your own time.

22    MR. ADAMS:  Yes, your Honor.

23    THE COURT:  Okay.  So take five minutes, and we'll

24  get them back out here then.

25    (Short break.)

Smith - redirect

280

1          THE COURT:  Can I get them out here?

2      (The jury enters the courtroom.)

3          THE COURT:  All right.  Everybody can are have a

4   seat.  You have some more stipulations to read,

5   Mr. Bhattacharjee?

6          MR. APPLEBY-BHATTACHARJEE:  Yes, your Honor.

7          THE COURT:  Hang on one second until everybody's

8   situated here.

9          Okay.  Go ahead.

10          A couple more stipulations, folks.

11          MR. APPLEBY-BHATTACHARJEE:  Yes.  Stipulation 8:

12   Government's Exhibit 17 consists of emails exchanged between

13   Iesha Stanciel and Cameron Battiste.  If called to testify, a

14   witness from the BOP, or the Bureau of Prisons, would testify

15   that Government's Exhibit 17 contains emails that are kept in

16   the course of the Bureau of Prisons' regularly conducted

17   activity and that an adequate foundation exists for Exhibit 17

18   to be received in evidence.

19          So stipulated?

20          MR. ADAMS:  So stipulated.

21          MR. APPLEBY-BHATTACHARJEE:  Your Honor, the

22   government moves to admit Exhibit 17.

23          THE COURT:  It's admitted based on the stipulation.

24      (Above-mentioned exhibit was received in evidence.)

25          MR. APPLEBY-BHATTACHARJEE:  Stipulation number 9:

1    Government's Exhibit 19 is a certified docket sheet kept by

2    the DuPage county clerk of the 18th Judicial Circuit Court,

3    which sets out that office's activities and is a public record

4    for which an adequate foundation exists.

5            So stipulated?

6            MR. ADAMS:  So stipulated, your Honor.

7            MR. APPLEBY-BHATTACHARJEE:  And the government moves

8    to admit Exhibit 19, your Honor.

9            THE COURT:  And that's admitted based on the

10   stipulation.

11     (Above-mentioned exhibit was received in evidence.)

12           THE COURT:  So what's going to happen next is,

13   although the government isn't quite finished with its case

14   yet, we're going to call a defense witness out of sequence,

15   which I told them they could do.  It's just an availability

16   issue.  So that person is going to be called next.

17           One thing you should know, I think I told you

18   earlier, that witnesses, generally speaking, wait outside the

19   courtroom if they're not testifying.  There is an exception

20   that I made for the next witness who has been here I think for

21   a little bit and Ms. Smith, who you will see is still there.

22   The reason being they may be commenting on each other's

23   testimony.  So they are entitled to hear the other's

24   testimony.

25           So you can call the witness.  Ms. DeLeon, you can

1   call the witness.

2          MS. DeLEON:  Yes.  We will be calling Dr. Alan

3   Friedman.

4      (Witness sworn.)

5                              - - -

6          ALAN FRIEDMAN, Ph.D., DIRECT EXAMINATION

7   BY MS. DeLEON:

8   Q.  Good afternoon.  In a loud, clear voice, can you please

9   introduce yourself to the jury.

10  A.  My name is Alan Friedman.

11  Q.  And could you --

12         THE COURT:  Since there's multiple spellings of both

13  of those, why don't you spell them both.  And I'm going to

14  move the mic so it's more in front of you.

15         THE WITNESS:  Sure.

16         Alan Friedman is A-l-a-n, F-r-i-e-d-m-a-n.

17         THE COURT:  Thanks.

18  BY MS. DeLEON:

19  Q.  And where did you go to school?

20  A.  I was an undergraduate, and I did a master's degree at

21  Humboldt State University in California, and I have a Ph.D.

22  from the University of Chicago in molecular genetics and cell

23  biology.

24  Q.  So as you have a Ph.D. then, it's appropriate to call you

25  Doctor; is that correct?

Friedman - direct

283

1  A.  Yes.

2  Q.  May I call you Doctor?

3  A.  Yes.

4  Q.  Dr. Friedman, what was your bachelor's in?

5  A.  My bachelor's degree was in botany, and my master's degree

6  was in biology.

7  Q.  And your Ph.D., can you tell us what your Ph.D. is in from

8  the University of Chicago?

9  A.  It's molecular genetics and cell biology, which is one

10 degree.

11 Q.  I'm sorry.  Can you repeat that?

12 A.  It's one degree.

13 Q.  Can you repeat the degree?  I'm so sorry.

14 A.  Molecular genetics and cell biology.

15 Q.  And where did you begin working after -- well, after your

16 many accreditations?

17 A.  After graduate school, I did a post doctoral research

18 fellowship at the University of Wisconsin, Madison.  And after

19 that, I was an assistant professor of biology at Marquette

20 University in Milwaukee.  After that, I opened a laboratory in

21 1996, Helix Biotech, Inc., and in that capacity, I was

22 president and the laboratory director.  And I did both

23 forensic DNA profiling, body fluid identification, as well as

24 paternity testing.

25 Q.  And what professional affiliations do you have, if any, in

1   your field?

2   A.  I'd like to consult my C.V.  I'm a member of the American

3   Association of Forensic Scientists, and the Midwest

4   Association of Forensic Scientists.

5   Q.  And, Dr. Friedman, do you do continuing education courses

6   or seminars?

7   A.  I do.

8   Q.  And have you testified ever before?

9   A.  I have.

10  Q.  And how many times have you testified in court, I should

11  say?

12  A.  Over 60 times over the course of more than 20 years in ten

13  different states and in federal courts.

14  Q.  And how long have you been working in the field of

15  molecular biology?

16  A.  Molecular biology started in graduate school, but forensic

17  biology, since 1996.

18  Q.  Forensic biology since 1996?

19  A.  Yes.

20          MS. DeLEON:  Judge, may I proceed at this time?

21          THE COURT:  Do you want to question him now regarding

22  his qualifications?

23          MR. APPLEBY-BHATTACHARJEE:  Subject to

24  cross-examination.

25          THE COURT:  Okay.  That's fine.

Friedman - direct

285

1          You can proceed.

2          MS. DeLEON:  Thank you.

3   BY MS. DeLEON:

4   Q.  So, Doctor, as we know, you were here for the previous

5   testimony when Ms. Smith testified?

6   A.  Yes.

7   Q.  And you were listening in the courtroom; is that right?

8   A.  That's correct.

9   Q.  Okay.  And so I just wanted to speak with you and have you

10  explain some things to the jury that I spoke to Ms. Smith

11  about.

12          Specifically, as to the degradation of DNA, what can

13  cause DNA degradation?  Pardon me.

14  A.  DNA degradation occurs over time, and it can be a function

15  of moisture; microbial activity, such as bacteria, fungi;

16  direct exposure to sunlight.  Those are examples of things

17  that break down DNA into smaller pieces.

18  Q.  So they can be environmental -- environmental issues,

19  right, like you were saying, the sunlight or moisture,

20  humidity; is that right?

21  A.  Yes.

22  Q.  Okay.  And what is the effect of D -- of degradation on

23  DNA that is to be tested?

24  A.  Sure.  The DNA profile consists of a number of regions of

25  the human genome.  And some of these are going to be larger

1    than others.  So what we know is that individuals vary in

2    their DNA profile in terms of how long the DNA is at the

3    region that's being tested.  Now, when one looks at a profile

4    from a pristine high quality DNA, the peaks from the smallest

5    fragments to the largest fragments will be of similar quality

6    or peak height.  And with degraded DNA, what you see is

7    preferential amplification of the smaller fragments compared

8    to the larger fragments.

9    Q.  And you reviewed materials in this case, correct?

10   A.  Yes.

11   Q.  And you reviewed those materials for your -- in

12   preparation for your testimony today; is that right?

13   A.  Yes.

14   Q.  And based on your review of the materials in this case,

15   did you find that preferential testing occurred here?

16   A.  Degradation?

17   Q.  Yes.  Or rather --

18           THE COURT:  Why don't you ask your question over

19   again.

20   BY MS. DeLEON:

21   Q.  Did you, in preparing for this case today, review material

22   that you found showed DNA degradation?

23   A.  Yes, I did.

24   Q.  And, therefore, did you also find the test materials that

25   you reviewed showed or indicated preferential testing as you

Friedman - direct

287

1  had just described?

2  A.  I'm not sure I understand that question.

3  Q.  You had said you were describing about the lengths and the

4  peak heights --

5  A.  Yes.

6  Q.  -- where DNA is potentially degraded.

7  A.  Yes.

8  Q.  Those peak heights are lower or higher?

9  A.  The smaller fragments show larger peak heights.  The

10  larger fragments show smaller peak heights.

11  Q.  And what peak heights did you observe in this case?

12  A.  That the smaller fragments were larger and the larger

13  fragments had lower peak heights.

14  Q.  You also heard me discussing transfer DNA and the

15  different types of transfer DNA with Ms. Smith, correct?

16  A.  Yes.

17  Q.  And to your understanding, is transfer DNA a widely

18  accepted event in DNA analysis?

19  A.  Well, all DNA in a criminal situation is going to be

20  transferred.  There is primary transfer where it goes from one

21  individual to the crime scene evidence.  And then secondary

22  transfer is where it goes from an individual to some

23  intermediary to the crime scene evidence.

24  Q.  Are there any factors that would affect the likelihood of

25  DNA being transferred from one object to another?

Friedman - direct

288

A.   Yes.  We talked about DNA mobility, and so DNA transfer is
more likely to occur when a sample is moist or wet, and it
also is a function of the amount of DNA that's being
transferred.  So if you have a large amount of DNA, it is --
even if it transfers a small amount, a small percentage of the
total DNA, it still can be quite significant in the DNA
profile.

Q.   And if DNA is, let's say, in a fluid, in a bodily fluid,
and it is on either clothes or on a bedsheet and that item --
or rather -- and an item is later wrapped or comes into
contact from either a prolonged period of time or a short
period of time, is there a possibility that DNA can transfer
from either the clothes or bedsheet material to another
object?

          MR. APPLEBY-BHATTACHARJEE:  Objection on compound
grounds.

          THE COURT:  Can I see you at sidebar?

          MS. DeLEON:  Sure.

   (The following proceedings were had at sidebar outside the
hearing of the jury:)

          THE COURT:  Come over here.  No, mainly you.  Okay.
So, look, you got to ask shorter and simpler questions.

          MS. DeLEON:  Okay.

          THE COURT:  These are long and convoluted.  They are
hard to understand.

1      MS. DeLEON:  Okay.

2      THE COURT:  He doesn't get half of them.  The jury's

3  not getting any of them.

4      MS. DeLEON:  Sure.

5      THE COURT:  You got to have it in bite sizes.  They

6  have to be nice and simple and easy to understand.  So

7  Mr. Bhattacharjee's objection was right.  There was --

8      MS. DeLEON:  Yeah, I got you.

9      THE COURT:  -- at least two and possibly more than

10  two questions in there.

11      I'm just going to say one other thing, okay, because

12  I've got to worry about future proceedings.  You had him do

13  all this stuff.  You had him say something about peak heights.

14  I even know this stuff, and I didn't understand what he was

15  saying.  So you might want to have him explain that.  Just a

16  suggestion.

17      MS. DeLEON:  Okay.  Sure.

18    (The following proceedings were had in open court in the

19  presence and hearing of the jury:)

20  BY MS. DeLEON:

21  Q.  I want to go back just a moment, Doctor.  We were talking

22  about peak heights earlier.  Can you explain that to us?

23  A.  Sure.  The amount of DNA that is collected, extracted,

24  amplified, and profiled, the amount of DNA is proportional to

25  the peak height.  Now, with regard to --

1        THE COURT:  Peak of what?

2        THE WITNESS:  The peak height?

3        THE COURT:  Yeah.

4        THE WITNESS:  Within the DNA profile, there will be

5   DNA types that will be represented in the graph as peaks.

6        THE COURT:  Thank you.

7   BY MS. DeLEON:

8   Q.  I want to highlight the DNA that was tested in this case.

9   You were able to review the reports of Ms. Smith and her

10  findings; is that correct?

11  A.  Yes.

12  Q.  And do you agree with the findings as they were reported

13  during her testimony?

14  A.  Yes.

15  Q.  And that is to both the rifle and the pistol; is that

16  correct?

17  A.  That's correct.

18  Q.  You saw a chart earlier that was shown to Ms. Smith,

19  correct, on the screens?

20  A.  I did.

21  Q.  And there were percentages attributed to a major

22  contributor versus what we can call a minor contributor; is

23  that right?

24  A.  Yes.

25  Q.  Can you explain to us what the basis of those percentages

Friedman - direct

291

1  is in your expertise and understanding?

2  A.  Well, in my experience, it's unusual to express the

3  relative amount of DNA from different contributors in terms of

4  percentages.  Most laboratories represent the relative

5  contribution as being major and minor contributors.  But with

6  the advent of this new software, STRmix, that one of the

7  functions of that software is to calculate the relative peak

8  heights and estimate the percentage coming from the major and

9  minor contributors.

10  Q.  And you were saying that this is an estimation, correct?

11  A.  Yes.

12  Q.  And the software that is used, do you have experience with

13  the software that is being used to create these estimations?

14  A.  Yeah.  I took a short course through the Midwestern

15  Association of Forensic Scientists this past spring that was

16  on probabilistic genotyping.  And the major presenter from

17  that was an individual, Michael Kobel, who is well respected

18  in the field.  And so that is my training in probabilistic

19  genotyping and this software.

20  Q.  And so now switching gears just a little bit to sources of

21  DNA.  Can you describe to us what are some of the sources of

22  DNA that a person can secrete?

23  A.  Sure.  DNA can come from blood, semen, and saliva.  And

24  those -- there are specific serological tests that can detect

25  and in some cases identify.  And then DNA can be on our hands.

1    And we know that some people transfer far more DNA when they

2    handle an object than other people.  That can be a function of

3    contact of the hands with the mouth, nose, and eyes.  It can

4    also be a function of hygiene.  And if you have a cold, you

5    may be sneezing on your hands.  So other tissues and body

6    fluids, mucous from the nose, tears can have DNA.

7    Q.   And in testing, in DNA testing, forensic testing, there is

8    no way to determine a source of DNA; is that correct?

9    A.   The source of DNA?

10   Q.   Right.

11   A.   Well, we can identify the individual to a high degree of

12   probability, but we cannot necessarily say with something like

13   touch DNA that we can't say what body fluid it comes from.

14   Q.   And so with respect to the different kinds of secretions

15   or bodily fluids, we can talk about dry versus wet DNA, right?

16   A.   Yes.

17   Q.   And can you explain to us the difference between wet DNA

18   transference and dry DNA transference?

19   A.   Sure.  First of all, when we talk about wet and dry, those

20   are the extremes.  DNA can be -- or I should say that the

21   evidence that's being tested can be anywhere in between wet

22   and dry.  Once it's entirely dry, it's relatively stable.

23   It's not going to degrade.  It can exist on an item for many

24   months or many years.  And so -- and it is the case that DNA

25   that is more moist or more wet will transfer a greater

1  percentage of the DNA to another item that it comes in contact
2  with, but even with dried samples, there is transfer that can
3  occur.  And if there's a great deal of DNA on the source, then
4  the receiving subject still can receive a significant amount
5  of DNA.
6  Q.  And so would it be -- would it be safe to say that a
7  soiled bedsheet, for instance, would possibly create a greater
8  possibility for transfer to another object?
9       MR. APPLEBY-BHATTACHARJEE:  Objection, compound.
10      THE COURT:  No, that's not a compound question, but
11 why don't you simplify it a little bit.
12      MS. DeLEON:  Sure.
13 BY MS. DeLEON:
14 Q.  If a bedsheet, for instance, is dirty or soiled, can it
15 transfer fluids to another object?
16 A.  Well, it is possible, depending on how much DNA is on
17 there.  I have seen bedsheets with over a hundred semen stains
18 on the bedsheet.  And semen, for instance, not only can be
19 transferred in its wet state, but on something that is pliable
20 such as a bedsheet, it actually can flake.  So it can be
21 transferred in that way also.
22 Q.  Because it can flake, was that right?
23 A.  Yes.
24 Q.  Okay.  So if an item is wrapped in a bedsheet, as you
25 described, then transfer could occur?

Friedman - direct

294

1   A.  It could.

2   Q.  Or if an item is laid on top of a bedsheet, depending on

3   the amount of contact, transfer could occur?

4   A.  Yes.

5   Q.  And you also were present when I was talking with

6   Ms. Smith about the specific amount of DNA that was found in

7   this case?

8   A.  Yes.

9   Q.  And can you describe to us what the I guess it would be

10   the picograms that we were talking about are with Ms. Smith?

11   A.  Sure.  Picograms is one-trillionth of a gram.  And a

12   typical human cell -- actually, every human cell with the

13   exception of sperm and egg cells contain six picograms per

14   cell.  And so if there was .6 nanograms, that would be

15   equivalent to 100 human cells.

16   Q.  Do you know, Doctor, how many pictograms were recovered in

17   this case?

18   A.  I understood the testimony to be less than 500 -- let me

19   restate that.

20         I understood her testimony to be less than half a

21   nanogram.

22   Q.  So when we talked about major and minor contributors as to

23   that amount, what does that mean?  What do major and minor

24   contributors mean in the --

25   A.  Well, that's the total amount of DNA that was analyzed,

1   and then within the profile, there was more DNA that came from

2   a major contributor and less DNA that came from a minor

3   contributor.

4           MS. DeLEON:  One second.

5   BY MS. DeLEON:

6   Q.  Finally, Doctor, what is the effect of the presence of

7   male DNA in a DNA mixture?

8   A.  There are two ways that the gender of the contributors can

9   be determined.  One is during the quantitation or

10  quantification step.  That tests for total human DNA and male

11  DNA.  And by subtracting one from the other, you get female

12  DNA.  And then within the profile itself, there is a region of

13  the DNA which is not used for human identification.  It's

14  called an amelogenin.  And it tells you something about the

15  gender of the entire mixture when you have a mixture.  And so

16  just like females are XX.  They only have an X peak within

17  amelogenin.  And males have an X and a Y.  So if you see that

18  Y peek in a profile, you know there's at least one male

19  contributor.

20  Q.  And when there's a male contributor, does that affect the

21  ability to detect a female contributor?

22  A.  Oh, that's a good question.  The female can be masked.

23  You cannot necessarily -- these are not all that precise.

24  They are very sensitive methods, but they are not necessarily

25  all that precise or reproducible.  So if there is a great deal

1    of male DNA there, a female could be masked within that

2    mixture profile.

3            MS. DeLEON:  Thank you, Doctor.

4            Just one moment.

5            I have no further questions at this time, your Honor.

6            THE COURT:  Cross.

7            MR. APPLEBY-BHATTACHARJEE:  May I approach, your

8    Honor?

9            THE COURT:  Sure.

10                            - - -

11            ALAN FRIEDMAN, Ph.D., CROSS-EXAMINATION

12   BY MR. APPLEBY-BHATTACHARJEE:

13   Q.  Dr. Friedman, good afternoon.

14   A.  Good afternoon.

15   Q.  You've testified over 60 times in court; is that right?

16   A.  Yes, I have.

17   Q.  Does that include in criminal cases?

18   A.  Yes, it has.

19   Q.  Approximately how many times have you testified on behalf

20   of a defendant?

21   A.  In every -- in every criminal case, it has been on behalf

22   of the defendant.

23   Q.  Now, based on your training, your experience, you're

24   generally familiar with how DNA samples are processed for

25   comparison?

1   A.  Yes.

2   Q.  Sometimes that process starts by swabbing textured objects

3   to see if DNA is left behind?

4   A.  That's correct.

5   Q.  And you're familiar with a process called extraction?

6   A.  I am.

7   Q.  You're familiar with a process called quantitation or

8   quantification?

9   A.  I am.

10  Q.  You are familiar with a process called amplification?

11  A.  I am.

12  Q.  And you are familiar with a process called separation?

13  A.  Yes.  I think I know what you mean by that.  I would call

14  it profiling.  Yes.

15  Q.  Or profiling.  Sure.

16          Now, you didn't swab any evidence in this case; is

17  that right?

18  A.  That's correct.

19  Q.  And you didn't personally perform any DNA extraction?

20  A.  That's correct.

21  Q.  Or quantitation?

22  A.  Correct.

23  Q.  Or amplification?

24  A.  That's correct.

25  Q.  Or generate your own DNA profiles, correct?

Friedman - cross

298

1   A.  That's correct.

2   Q.  Your conclusions here are based solely on your review of

3   reports and documents received from the FBI's laboratory; is

4   that right?

5   A.  That's correct.

6   Q.  Are you being paid for your testimony here today?

7   A.  I am.

8   Q.  And so is it fair to say you were paid by the defense not

9   to conduct your own DNA analysis but to review the

10  conclusions?

11         THE COURT:  I need to see you at sidebar.  The jury

12  is directed to disregard that completely improper question.

13    (The following proceedings were had at sidebar outside the

14  hearing of the jury:)

15         THE COURT:  Your cross-examination is within one more

16  bad question of being done.  You know that is complete BS.

17  You know that is complete BS.  He is not being paid by the

18  defense.  He is being paid by the court, okay, which I am now

19  going to tell the jury.

20         MR. APPLEBY-BHATTACHARJEE:  Yes.

21         THE COURT:  And as far as him not being able to do an

22  analysis, were you willing to turn over the guns to him to do

23  it?

24         MR. APPLEBY-BHATTACHARJEE:  If they were asked for,

25  I'm sure we could lay foundation.  We could.

1          THE COURT:  Okay.  Right.  When was the last time

2    that was ever done, the FBI lab turned over a gun to a defense

3    expert to test it?  You tell me.  When?  When?

4          MR. APPLEBY-BHATTACHARJEE:  I'm not aware.

5          THE COURT:  Yeah.  Right.  Okay.  You're going to get

6    an instruction right now.  One more bad question, and I'm

7    going to cut it off.

8          MR. APPLEBY-BHATTACHARJEE:  I understand.

9      (The following proceedings were had in open court in the

10   presence and hearing of the jury:)

11         THE COURT:  Okay.  I need to tell the jury something

12   here.  So first of all, the witness is not being paid by the

13   defense; he is a court-appointed expert.  He is being paid by

14   the court.  So that question was misleading.  It was wrong.

15   And it shouldn't have been asked.

16         Secondly, there's no basis to believe that the FBI

17   would have turned over the guns to the defense to test them.

18         So proceed.

19   BY MR. APPLEBY-BHATTACHARJEE:

20   Q.  Dr. Friedman, you are aware that the FBI laboratory

21   recovered DNA from a Smith & Wesson rifle bearing serial

22   number TE38718; is that correct?

23   A.  I am.

24   Q.  You don't dispute that DNA was actually recovered from

25   that rifle?

Friedman - cross

1  A.  I do not.

2  Q.  You don't dispute that Cameron Battiste was included as a

3  contributor to the DNA on that rifle?

4  A.  I do not.

5  Q.  You don't dispute that Cameron Battiste was included as a

6  major contributor on that rifle?

7  A.  I do not.

8  Q.  You are aware, sir, that the FBI laboratory recovered DNA

9  from a Smith & Wesson pistol bearing serial number TE38718; is

10  that correct?

11  A.  I am, yes.

12  Q.  You don't dispute that DNA was actually recovered from

13  that pistol?

14          MS. DeLEON:  Objection, your Honor, asked and

15  answered.

16          THE COURT:  Overruled.

17          You can answer.

18          THE WITNESS:  I do not dispute that.

19  BY MR. APPLEBY-BHATTACHARJEE:

20  Q.  And you do not dispute that an individual named Iesha

21  Stanciel was excluded as a contributor of the DNA recovered

22  from that pistol?

23  A.  That's correct.

24  Q.  And you do not dispute that Cameron Battiste was included

25  as a contributor to the DNA recovered from that pistol?

1  A.  That is correct.

2  Q.  In fact, that Mr. Battiste was included as a major

3  contributor to the DNA on that pistol?

4  A.  That is correct.

5  Q.  Now, on direct examination, you testified about secondary

6  transfer.  Do you recall that?

7  A.  I do.

8  Q.  There are a number of variables involved that can impact

9  whether secondary transfer of DNA would occur.  Is that fair?

10 A.  That's correct.

11 Q.  Now, on direct exam, you testified that a soiled bedsheet

12 that contained DNA could possibly transfer DNA onto a surface

13 like a weapon.  Do you recall that?

14 A.  I do.

15 Q.  You have no evidence that the firearms here were wrapped

16 in a soiled bedsheet, do you?

17 A.  I do not.

18 Q.  You submitted a written report in this case.  Do you

19 recall that?

20 A.  I do.

21       MR. APPLEBY-BHATTACHARJEE:  Your Honor, may I

22 approach the witness with his report?

23       THE COURT:  Sure.

24 BY MR. APPLEBY-BHATTACHARJEE:

25 Q.  Dr. Friedman, I have handed you a two-page document.  Is

Friedman - cross

1   that your written report in this case?

2   A.  It is.

3   Q.  In your written report on page 2, do you discuss the

4   concept of secondary transfer?

5   A.  I do.

6   Q.  There is a footnote there, footnote 3.  Do you see that?

7   A.  Yes.

8   Q.  And there is a citation to an article titled secondary --

9   transfer -- DNA transfer of biological substances under

10  varying test conditions.  Do you see that?

11  A.  I do.

12  Q.  And you cited that article in support of your written

13  opinion in this case?

14  A.  I did.

15  Q.  And experts in your field would reasonably rely on the

16  data in this article to form an opinion about secondary

17  transfer of DNA.  Is that fair?

18  A.  Yes.

19  Q.  And you relied on the data in this article itself in order

20  to reach your conclusions in this case?

21  A.  In part.

22  Q.  Correct.  In part, you relied on the data in this article

23  that's cited in your written report.  Is that fair?

24  A.  Yeah, the Goray article is the one that tests secondary

25  transfer under various conditions, smooth material to rough

Friedman - cross

1    conditions -- rough material, cotton, wool, and also mobility

2    under wet and dry conditions.

3    Q.  So the authors of that article did subject in lab

4    conditions items made of cotton to certain tests?

5    A.  Yes.

6    Q.  And items made of wool to certain tests?

7    A.  Wool, wood, plastic.

8    Q.  And you would agree that bedsheets can be made of cotton?

9    A.  They can be.

10   Q.  Now, the findings in that article were that there's only

11   minimal secondary transfer from DNA on surfaces such as cotton

12   or wool; is that correct?

13   A.  That's correct.

14   Q.  DNA recovered from a gun can be the result of direct

15   contact with that gun.  Is that fair?

16   A.  Say that again?

17   Q.  DNA that is ultimately recovered from a gun can be the

18   result of direct contact with that gun.  Is that fair?

19   A.  Yes.

20   Q.  And it's absolutely possible that the DNA recovered from

21   the firearms in this case got there because of direct contact

22   with the defendant?

23   A.  That's possible.

24   Q.  You don't dispute that it is 240 billion times more likely

25   that Cameron Battiste as opposed to someone else is the major

1  contributor of the DNA recovered from the rifle?

2  A.  I do not.

3  Q.  You do not dispute that it is 62 quintillion times more

4  likely that Cameron Battiste, as opposed to someone else, is

5  the major contributor of the DNA recovered from the pistol?

6  A.  That's correct.

7         MR. APPLEBY-BHATTACHARJEE:  I have no further

8  questions, your Honor.

9         THE COURT:  Redirect.

10                           - - -

11         ALAN FRIEDMAN, Ph.D., REDIRECT EXAMINATION

12  BY MS. DeLEON:

13  Q.  Have you ever worked with a prosecution in a criminal

14  case --

15  A.  I have.

16  Q.  -- Doctor?

17         And why is it typically that you don't testify for

18  the prosecution in a criminal case?

19  A.  Well, in most cases, it's the government's crime lab

20  analysts that will testify for the prosecution.  They are

21  essentially on full-time retainers for the prosecution.

22  Q.  So you don't testify because they already have their

23  people; is that correct?

24  A.  Right.

25         MS. DeLEON:  No questions.

 1          THE COURT:  Anything based on that?

 2          MR. APPLEBY-BHATTACHARJEE:  No, your Honor.

 3          THE COURT:  The witness is excused.

 4          So we are back to calling government witnesses at

 5   this point?

 6          MR. APPLEBY-BHATTACHARJEE:  Yes, your Honor.  The

 7   government's next witness will be Special Agent Michael

 8   Ericks.

 9          THE COURT:  And you know you were already under oath,

10   right?

11          THE WITNESS:  Yes, sir.

12          THE COURT:  I'm not going to swear him in again

13   because he was sworn in.

14          All right.  You can proceed.

15          MR. APPLEBY-BHATTACHARJEE:  If I can have a moment to

16   get the laptop, your Honor.

17          THE COURT:  Sure.

18                                - - -

19          MICHAEL ERICKS, DIRECT EXAMINATION (RESUMED)

20   BY MR. APPLEBY-BHATTACHARJEE:

21   Q.  Good afternoon, Special Agent Ericks.

22   A.  Good afternoon.

23   Q.  We're going to have you briefly read a few documents into

24   the record.

25          MR. APPLEBY-BHATTACHARJEE:  Your Honor, may I place

1    before the witness Exhibit 17?

2         THE COURT:  Sure.

3         MR. APPLEBY-BHATTACHARJEE:  May I publish?

4         THE COURT:  Yeah, that's fine.  It's already in

5    evidence.  I just admitted this right before.  Right.

6         MR. APPLEBY-BHATTACHARJEE:  Yes, your Honor.

7    BY MR. APPLEBY-BHATTACHARJEE:

8    Q.  Now, Special Agent Ericks, in the course of this

9    investigation, were you or agents at your direction routinely

10   obtaining email communications exchanged by Iesha Stanciel

11   while she was in custody?

12   A.  Correct.

13   Q.  And did those include emails that Iesha Stanciel exchanged

14   with Defendant Cameron Battiste?

15   A.  They did.

16   Q.  Looking to the first page of Exhibit 17, would you please

17   first draw your attention to the highlighted portion at the

18   bottom of this email and note who is the sender on the email?

19   A.  The sender is Battiste, Cameron.

20   Q.  And what is the date that this email is sent?

21   A.  April 26, 2017.

22   Q.  And would that be after agents executed the arrest warrant

23   for Ms. Stanciel?

24   A.  Yes.  Just about three weeks shy of the arrest -- after

25   the arrest.

1  Q.  And would you please read the content of that email.

2  A.  "The car gone and seven-day note on door.  I'm fucked.

3  Smfh."

4  Q.  And above that email, can you see another email being

5  sent?

6  A.  Yes.

7  Q.  Who is that being sent from?

8  A.  Iesha Stanciel.

9  Q.  Who is it being sent to?

10  A.  Cameron Battiste.

11  Q.  And does this email appear to be in response to the email

12  you just read from Mr. Battiste?

13  A.  Yes, it does.

14  Q.  If you could read for the members of the jury, I'll

15  highlight approximately three sentences.  If you could just

16  read that into the record.

17  A.  "Find a way to DuPage tomorrow.  Go to clerk office, take

18  the five-day notice with you.  Tell them you have been served

19  with a five-day notice and you would like to file a motion to

20  stay.  File the motion as an indigent.  Tell them you lost

21  your job recently and you need time for you and your

22  girlfriend to move, who is on a CPAP machine, breathing stops

23  at night.  You must do that ASAP."

24  Q.  And, Special Agent Ericks, the Willowbrook apartment where

25  the arrest was executed, are you aware of which county in

Ericks - direct

1  Illinois that apartment is located in?

2  A.  Yes.  That's located in DuPage County.

3  Q.  If I could turn your attention to the second page of this

4  document.

5          MR. APPLEBY-BHATTACHARJEE:  Your Honor, may I be

6  heard at sidebar for a moment?

7          THE COURT:  Sure.  While we are talking about it, I'm

8  going to take it down from the jury's screen.

9    (The following proceedings were had at sidebar outside the

10  hearing of the jury:)

11          THE COURT:  Do I need to see the thing?

12          MR. APPLEBY-BHATTACHARJEE:  It's the same redaction.

13  I just want -- if your Honor would instruct the jury just

14  because things are redacted, they shouldn't speculate.

15          THE COURT:  Thank you for telling me that.

16    (The following proceedings were had in open court in the

17  presence and hearing of the jury:)

18          THE COURT:  You may see some things that are kind of

19  blacked out or omitted from the email.  That's because they

20  are not relevant.  You shouldn't try to speculate on what's

21  there.

22          Okay.  Go ahead.  I'll put it back up.  There you go.

23          MR. APPLEBY-BHATTACHARJEE:  Thank you, your Honor.

24  BY MR. APPLEBY-BHATTACHARJEE:

25  Q.  If I could turn your attention first, Special Agent

1    Ericks, to the bottom of page 2 of the exhibit.  You can see

2    an email that's being sent at the bottom there.  Who is the

3    sender?

4    A.  Cameron Battiste.

5    Q.  And what's the approximate date that's noted on the email?

6    A.  April 30th.

7    Q.  And so just drawing your attention to the highlighted

8    part, would you please read into the record what Mr. Battiste

9    writes.

10   A.  "What exactly I'm I trying to do at the courthouse?"

11   Q.  And is this being written to Ms. Stanciel?

12   A.  Yes, it is.

13   Q.  If I could draw your attention now to the middle portion

14   of the page, can you tell who the sender of that email is?

15   A.  Iesha Stanciel.

16   Q.  Is that being sent to Mr. Battiste?

17   A.  It is.

18   Q.  What's the date?

19   A.  May 1st, 2017.

20   Q.  If you could read the full content of that excerpt into

21   the record, please.

22   A.  "Go to the clerk's office, tell them you have been served

23   with a seven-day notice, bring seven-day with you, and you

24   would like to file a motion for a stay.  File the motion as

25   indigent.  Tell them how you lost your job recently and need

1 time for you and your girlfriend, who is on a CPAP machine,

2 breathing stops at night. And you have been occupying the

3 apartment since the lease began, and you need time to move."

4 Q. And, now, if you could look at the top portion of page 2

5 of the exhibit, can you see who the sender of the email is?

6 A. Yes. The sender is Cameron Battiste.

7 Q. And who is it being sent to?

8 A. Iesha Stanciel.

9 Q. And what's the date?

10 A. May 1st, 2017.

11 Q. Would you please read the email into the record.

12 A. "It's a lot of weird shit been going on. Why I'm up at

13 6:30 getting ready. I had been downloaded the app the other

14 day. I got to put card number in. It won't accept it. I put

15 money on the card and everything. I tried Lyft and Uber. It

16 won't accept it. I called the card. They don't know why it

17 didn't work because it show money I got on it. I'm going to

18 have to go to court first thing in morning. I was up at 6:00

19 because I wanted to be there early so won't be no BS. The

20 shit piss me off. We had to pay $1600 before May 21 to get

21 car back. I got like there now. I'm going to have to use

22 like $100 to get to court. It's $30 there and $30 back."

23 Q. Thank you, Special Agent Ericks.

24        Turning your attention now --

25        MR. APPLEBY-BHATTACHARJEE: Your Honor, would you

Ericks - direct

1   give me the screen just so I can make sure the redactions are

2   there?

3           THE COURT:  Yep.  There you go.

4           MR. APPLEBY-BHATTACHARJEE:  Do you want to come and

5   take a look?

6           THE COURT:  I think it's correct.

7           MR. APPLEBY-BHATTACHARJEE:  May I proceed?

8           THE COURT:  All right.

9   BY MR. APPLEBY-BHATTACHARJEE:

10  Q.  Now, turning your attention to the bottom of page 3 of the

11  exhibit, do you see who is sending the email at the bottom?

12  A.  Iesha Stanciel.

13  Q.  Is that being sent to Cameron Battiste?

14  A.  It is.

15  Q.  What's the date?

16  A.  May 1st, 2017.

17  Q.  And what's the content of that email?

18  A.  "Why didn't get no mail or pictures today?  It's just the

19  beginning.  Don't fall apart.  God got you."

20  Q.  Now, if you could turn to the middle portion of the page.

21  I'm sorry.  Let me try that again.

22          Are you able to make out the email in the middle

23  portion of the page?

24  A.  Yes.

25  Q.  And who is that email from?

1    A.  Cameron Battiste.

2    Q.  Who is it to?

3    A.  Iesha Stanciel.

4    Q.  What's the date?

5    A.  May 1st, 2017.

6    Q.  Could you read the content of the email, please.

7    A.  "Iesha, don't do that shit, bro, smmfh.  You know how

8    fucked up it is for me out here right now.  You talking about

9    MF picture and shit.  What about our car?  What about where

10   the fuck ima sleep?  Yo ass tripping, smmfh."

11   Q.  I'm drawing your attention now to the email at the top of

12   the page.  Are you able to make out who the email is from?

13   A.  Iesha Stanciel.

14   Q.  Who is it to?

15   A.  Cameron Battiste.

16   Q.  What's the date?

17   A.  May 1st, 2017.

18   Q.  What's the time stamp?

19   A.  9:00 p.m.

20   Q.  Could you read the highlighted statement, please.

21   A.  "Let me know how things work at the courthouse."

22           MR. APPLEBY-BHATTACHARJEE:  And now, your Honor, if I

23   may publish Exhibit 19, which is also entered into evidence.

24           THE COURT:  That's fine.  Go ahead.

25   BY MR. APPLEBY-BHATTACHARJEE:

1  Q.  Special Agent Ericks, are you familiar with this document?

2  A.  I am.

3  Q.  Is this a certified docket of certain court proceedings

4  taking place in DuPage County?

5  A.  Yes, it is.

6  Q.  Are these docket proceedings relating to an eviction?

7  A.  It is.

8  Q.  If you could note at the top of the page, I'm going to

9  draw your attention first to the party names.  Would you read

10  what's highlighted on the screen?

11  A.  "Name:  Jasmine Mattox.  Role:  First named defendant."

12  Q.  If you could draw your attention to the next highlighted

13  excerpt and read that into the record.

14  A.  "Name:  Cameron Battiste.  Role:  Party of interest."

15  Q.  And if you could read the line below that that I have now

16  highlighted as well.

17  A.  "Name:  Cameron Battiste.  Role:  Pro se attorney.

18  Address:  10 South 481 Ivy Lane, Willowbrook, Illinois, ZIP

19  code 60527."

20  Q.  And that address that you just read, is that the address

21  where the arrest warrant for Iesha Stanciel was executed?

22  A.  It was.

23  Q.  Bear with me one moment, Special Agent.

24          Turning your attention back momentarily to Exhibit 17

25  and page 2.

1         MR. APPLEBY-BHATTACHARJEE:  May I walk a copy up to

2   the witness?

3         THE COURT:  Sure.  That's fine.

4         MR. APPLEBY-BHATTACHARJEE:  Thank you, your Honor.

5   BY MR. APPLEBY-BHATTACHARJEE:

6   Q.  Special Agent Ericks, on page 2 of Exhibit 17, do you

7   recall reading an excerpt of an email in which Iesha Stanciel

8   directs Mr. Battiste to go to the clerk's office?

9   A.  Yes.

10  Q.  And directs Mr. Battiste to say he would, quote, like to

11  file a motion for a stay?

12  A.  Yes.

13  Q.  And is that email dated May 1st, 2017?

14  A.  It is.

15  Q.  Turning your attention back to Exhibit No. 19, can you see

16  that the docket for the action reflects on May 2nd, 2017, a

17  notice of motion being filed?

18  A.  No.

19  Q.  Is it on your screen?

20  A.  I don't have it.

21  Q.  It's on your screen.  Is it not on your screen?

22        THE COURT:  That's my fault then.

23        Okay.  There you go.

24  BY MR. APPLEBY-BHATTACHARJEE:

25  Q.  Let me rephrase my question now that it's on your screen.

Ericks - cross

1    Do you see from the docket of the action on page 3 of

2  Exhibit 19 an entry on the docket dated May 2nd, 2017,

3  entitled Notice of Motion?

4  A.  I do.

5  Q.  And two lines above that, do you see a docket entry that

6  says "address"?

7  A.  I do.

8  Q.  And below that, could you read the information that's on

9  the record?

10 A.  "Cameron Battiste.  Address type:  Home.  Address line:

11 10 South 481 Ivy Lane.  City:  Willowbrook.  State:

12 Illinois."

13    MR. APPLEBY-BHATTACHARJEE:  Nothing further, your

14 Honor.

15    THE COURT:  Mr. Adams.

16    - - -

17    MICHAEL ERICKS, CROSS-EXAMINATION

18 BY MR. ADAMS:

19 Q.  Hello again, Agent.

20 A.  Good afternoon.

21 Q.  So you went over some emails between Ms. Stanciel and

22 Mr. Battiste, right?

23 A.  Yes.

24 Q.  And these are emails Ms. Stanciel sent from jail?

25 A.  That's correct.

316

1  Q.  She was unable to go to the DuPage courthouse, correct?

2  A.  Correct.

3  Q.  So she had Cameron do it for her?

4  A.  Evidently.

5  Q.  So he's taking direction from Ms. Stanciel, correct?

6  A.  Correct.

7  Q.  To file these documents in her foreclosure case, correct?

8  A.  Correct.

9  Q.  He puts the address of the Willowbrook apartment on

10 because that's the address of the foreclosure, correct?

11        MR. APPLEBY-BHATTACHARJEE:  Objection, your Honor.

12        THE COURT:  Sustained.  He can't speculate on why

13 something was done by somebody else.

14 BY MR. ADAMS:

15 Q.  You also looked at the docket sheet for the court case in

16 DuPage, correct?

17 A.  Yes.

18 Q.  And the address that Mr. Battiste put is the Willowbrook

19 address, right?

20 A.  Correct.

21 Q.  And that's about almost a month after Ms. Stanciel's

22 arrest, correct?

23 A.  The arrest was on April 7.  I believe that document,

24 pro se motion, was on May 2.

25        MR. ADAMS:  Nothing further, Judge.

1          THE COURT:  Redirect?

2          MR. APPLEBY-BHATTACHARJEE:  Nothing further, your

3   Honor.

4          THE COURT:  The witness is excused.

5          Any further witnesses or evidence?

6          MR. APPLEBY-BHATTACHARJEE:  May we have a moment,

7   your Honor?

8          THE COURT:  Sure.

9     (Brief pause.)

10          MR. APPLEBY-BHATTACHARJEE:  Your Honor, may we be

11   heard at sidebar?

12          THE COURT:  Sure.  Absolutely.

13          MR. APPLEBY-BHATTACHARJEE:  Thank you.

14     (The following proceedings were had at sidebar outside the

15   hearing of the jury:)

16          MR. APPLEBY-BHATTACHARJEE:  The only thing, your

17   Honor --

18          THE COURT:  Get closer.  I don't think she caught

19   that.

20          MR. APPLEBY-BHATTACHARJEE:  The only thing, your

21   Honor, is since Ms. Smith did sit in during the examination.

22          THE COURT:  You want to call her for rebuttal?

23          MR. APPLEBY-BHATTACHARJEE:  If we can just confer

24   with her for five minutes.  And if there is nothing, we

25   anticipate resting shortly.

318

1    THE COURT:  Okay.  I mean, if there's nothing, then
2    you are going to rest?
3    MR. APPLEBY-BHATTACHARJEE:  That's what we
4    anticipate, yes.
5    THE COURT:  Okay.  So five minutes is a real five
6    minutes, so that's fine.  And I assume that the odds are she
7    is going to say no, or maybe it's a couple of minutes of
8    stuff.  And then you should be prepared to tell me whether you
9    got any other evidence and if the defense is going to testify.
10   Before you say I want to think about it overnight, the answer
11   is going to be no.
12   MR. ADAMS:  We have a witness, Mr. Battiste's Aunt
13   Tandy.  She was scheduled to come here tomorrow morning at
14   8:30.
15   THE COURT:  So you are going to call somebody else.
16   That's fine.
17   MR. APPLEBY-BHATTACHARJEE:  Thank you, your Honor.
18     (The following proceedings were had in open court in the
19   presence and hearing of the jury:)
20   THE COURT:  I know we're close to 4:30.  We are going
21   to take a five-minute break, five, just so some quick
22   conferring can be done, so we can kind of get a little more
23   information before we leave.  So just five minutes, and then
24   we'll get back at it.
25     (The jury leaves the courtroom.)

1    (Short break.)

2         MR. SRIVASTAVA:  We don't anticipate recalling

3    Ms. Smith to the stand.  Essentially, we don't expect to call

4    any more witnesses.  What we propose, given the hour, is that

5    we formally rest tomorrow morning.

6         THE COURT:  No.  No.

7         MR. SRIVASTAVA:  Okay.  In that case, your Honor, we

8    will be prepared to rest.

9         THE COURT:  Okay.  And then you're telling me -- not

10   like the thing before lunch where I asked you if you had much

11   more cross and it was 10 to 15 minutes and you ended up with

12   no questions.  You are telling me you are going to call this

13   person tomorrow.

14        MR. ADAMS:  One person, five minutes, your Honor.

15        THE COURT:  Okay.  All right.  So I'm going to wait

16   until tomorrow morning to discuss with Mr. Battiste his

17   decision not to testify.  I'm going to assume you're going to

18   go through that with him.  And so -- fine.  That's what we are

19   going to do.

20        MR. APPLEBY-BHATTACHARJEE:  Your Honor, before we

21   bring the jury in, can we just confirm which exhibits have

22   been moved in with the Court's record?

23        THE COURT:  Absolutely.  No, we should do that.  We

24   should do that.

25        MR. APPLEBY-BHATTACHARJEE:  Thank you, your Honor.

1    So we have --

2            THE COURT:  Just pay attention here so that if

3    there's any issues, we can deal with them right now.

4            MR. APPLEBY-BHATTACHARJEE:  We have Exhibits 1 and

5    1-A, 2 and -- essentially Exhibits 1 all the way through

6    Exhibit 17 admitted.

7            THE COURT:  There's a 19 as well.

8            MR. APPLEBY-BHATTACHARJEE:  Exhibit 18 was marked

9    only for identification.  Exhibit 19 was admitted, and

10   Exhibits 21 and 22 we have as admitted as well.

11           THE COURT:  Yeah, that sounds right to me.  Does that

12   sound right to you?  When you say 1 through 17, there were

13   some A's in there.

14           MR. APPLEBY-BHATTACHARJEE:  Right.

15           THE COURT:  And those were all admitted, too.

16           MR. APPLEBY-BHATTACHARJEE:  1-A, 2-A, 3-A, and 4-A.

17           MR. ADAMS:  6-A through 6-E as well.

18           MR. APPLEBY-BHATTACHARJEE:  I just want to confirm

19   defense counsel's recollection that all stipulations have been

20   read to the jury.

21           MR. ADAMS:  Yes, they have.

22           THE COURT:  Okay.  Good.  All right.

23           MR. APPLEBY-BHATTACHARJEE:  Thank you.

24           THE COURT:  You can bring the jury in.

25     (The jury enters the courtroom.)

1         THE COURT:  All right.  Everybody can have a seat.

2         Any more witnesses or evidence for the government?

3         MR. SRIVASTAVA:  Your Honor, we have no additional

4  evidence to present.  At this time the United States rests its

5  case in chief.

6         THE COURT:  All right.  So we are going to stop for

7  the day.  We are going to resume at -- let me just look at my

8  schedule of other things.  It should be right about 10 o'clock

9  tomorrow.  The government's rested its case, but you haven't

10  heard everything yet.  There's conceivably other evidence.

11  There's instructions.  There's lawyer arguments.  So don't

12  start making up your mind yet.  Don't start discussing the

13  case.  Keep an open mind.  Be careful going home.  It's been

14  doing some funny stuff out there this afternoon.  And we'll

15  see you at 10:00 o'clock in the morning.

16    (The jury leaves the courtroom.)

17         THE COURT:  Okay.  So let's just talk about logistics

18  a little bit.  So on the instructions, I think what we ought

19  to figure maybe -- what I'd appreciate -- we'll talk about

20  them on the record, but what I'd appreciate if you could do

21  would be to get -- you still got my email address -- to get

22  each other and me by email this evening just kind of a

23  heads-up on any issues that you're likely to raise just so

24  everybody knows what they are.  I think it will streamline

25  things in the morning.  It may make sense to talk about that

1    before the witness testifies.  We can figure that out

2    tomorrow.  That's one thing.

3            The second thing is, do you want to argue the Rule 29

4    motion now, or do you want to argue it after your witness

5    testifies?  I mean, it doesn't matter legally.

6            MR. ADAMS:  After the witness testifies.

7            THE COURT:  Fine.  Okay.  So figure on doing that

8    tomorrow, too.

9            Just a reminder, I instruct the jury before closings,

10   so, you know, it will take however long it takes.

11           Ballpark, how long are you talking about on closings?

12           MR. APPLEBY-BHATTACHARJEE:  For the government's open

13   and close, I think we clocked in at about 23, 25 minutes.

14           THE COURT:  Between -- so that means 24.

15           MR. APPLEBY-BHATTACHARJEE:  Right.

16           THE COURT:  Okay.  So you get 24 then, not 24 and a

17   half.  I'm joking.

18           MR. ADAMS:  Around 20 minutes, your Honor.

19           THE COURT:  Okay.  That all seems fine.  So if his

20   ends up being 20, so figure no more than about 10 for rebuttal

21   then.

22           MR. SRIVASTAVA:  That's fine, your Honor.

23           THE COURT:  Okay.  All right.  So on the exhibits,

24   just make sure that Pam has got the thumb drive of everything

25   on it.  And if you've got anything that you might be

1   introducing, just make sure she's got a thumb drive.  Even if

2   you don't end up using it, we just upload the stuff that gets

3   admitted so that that's all ready to go tomorrow, too.

4          On the indictment, we need -- we will need to have

5   12 -- I'd like to have 12 copies.  And you'll need to just

6   redact out the true bill, you know, signature by the

7   foreperson type stuff is normal.

8          Oh, we got to get the other counts out.  There's

9   counts that just involve Ms. Stanciel.

10         MR. APPLEBY-BHATTACHARJEE:  Stanciel.

11         THE COURT:  So we will need to --

12         MR. APPLEBY-BHATTACHARJEE:  We do have a proposed

13  redacted indictment that we'll share with the defense tonight

14  and make sure --

15         THE COURT:  Is it going to call the count Count 1, or

16  was it already Count 1?

17         MR. SRIVASTAVA:  Judge, it was Count 2 in the

18  indictment.  The way we proposed -- again, I can tender a copy

19  up to the Court as well.

20         THE COURT:  Just tell me.  It's okay.

21         MR. SRIVASTAVA:  It just says Count 1, on or about

22  April 7th.  It has the names of both defendants, and then it

23  has the charging language.

24         THE COURT:  The count that is at issue we're calling

25  Count 1.  So we're not going to just give them a Count 2 and

1    they're going to wonder what Count 1 is.

2         MR. SRIVASTAVA:  Exactly, your Honor.  It's been

3    amended to say Count 1.

4         THE COURT:  That's perfect.  That's perfect.

5         MR. SRIVASTAVA:  We have redacted the signature and

6    the foreperson and the true bill.

7         THE COURT:  Yep.  Okay.  Just make sure you have 12

8    copies tomorrow.  Okay.  Thanks.

9         MR. APPLEBY-BHATTACHARJEE:  Thank you, your Honor.

10     (The trial was adjourned at 4:30 p.m. on February 12, 2019,

11   until 10:00 a.m. on February 13, 2019.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25